LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  PAUL POGUE and PAUL POGUE, in his
6  capacity as owner of SURVEYORS' PARK,
7  Plaintiff,
8
9  vs.    CIVIL ACTION NO. 2:06CV148-MHT
10
11  TONY CHANDLER, in his individual and
12  official capacity, et al.,
13  Defendants.
14  DEPOSITION OF PAUL POGUE, taken
15  pursuant to notice and stipulation on
16  behalf of the Defendants, at the
17  Alabama Forestry Commission, 513
18  Madison Avenue, Montgomery, Alabama,
19  before Bridgette Mitchell, Shorthand
20  Reporter and Notary Public in and for
21  the State of Alabama at Large, on
22  August 2, 2006, commencing at
23  9:05 a.m.

**Page 2**

1  APPEARANCES
2  APPEARING PRO SE:
3  Paul Pogue
4  301 Kahn Street
5  Montgomery, Alabama
6
7  APPEARING FOR THE DEFENDANTS:
8  James W. Davis, Esquire
9  Assistant Attorney General
10  OFFICE OF THE ATTORNEY GENERAL
11  303 State House
12  11 S. Union Street
13  Montgomery, Alabama  36130
14
15  Linda C. Breland, Esquire
16  ALABAMA FORESTRY COMMISSION
17  513 Madison Avenue
18  Montgomery, Alabama  36130
19
20  Charles T. Conway, Esquire
21  ALABAMA FORESTRY COMMISSION
22  513 Madison Avenue
23  Montgomery, Alabama  36130

**Page 3**

1  STIPULATIONS
2  It is hereby stipulated and
3  agreed by and between counsel
4  representing the parties that the
5  deposition of PAUL POGUE is taken
6  pursuant to notice and stipulation on
7  behalf of the Defendants; that all
8  formalities with respect to procedural
9  requirements are waived; that said
10  deposition may be taken before
11  Bridgette Mitchell, Shorthand Reporter
12  and Notary Public in and for the State
13  of Alabama at Large, without the
14  formality of a commission; that
15  objections to questions, other than
16  objections as to the form of the
17  questions, need not be made at this
18  time, but may be reserved for a ruling
19  at such time as the deposition may be
20  offered in evidence or used for any
21  other purpose as provided for by the
22  Civil Rules of Procedure for the State
23  of Alabama.

**Page 4**

1  It is further stipulated and
2  agreed by and between counsel
3  representing the parties in this case
4  that the filing of the deposition of
5  PAUL POGUE is hereby waived and that
6  said deposition may be introduced at
7  the trial of this case or used in any
8  other manner by either party hereto
9  provided for by the Statute,
10  regardless of the waiving of the
11  filing of same.
12  It is further stipulated and
13  agreed by and between the parties
14  hereto and the witness that the
15  signature of the witness to this
16  deposition is hereby waived.
17
18
19  INDEX
20
21  EXAMINATION                Page
22  By Mr. Davis..................... 6
23

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www
1-800-888-DEPO


EXHIBIT

A

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 5

1   EXHIBITS:                    Page
2   Defendants' Exhibit #1............  5
3   Defendants' Exhibit #2............  5
4   Defendants' Exhibit #3............  5
5   Defendants' Exhibit #4............  5
6   Defendants' Exhibit #5............  5
7   Defendants' Exhibit #6............  5
8   Defendants' Exhibit #7............  5
9   Defendants' Exhibit #8............  5
10  Defendants' Exhibit #9............  97
11  Defendants' Exhibit #10..........  99
12  Defendants' Exhibit #11..........  106
13  Defendants' Exhibit #12..........  109
14  Defendants' Exhibit #13..........  113
15  Defendants' Exhibit #14..........  122
16  Defendants' Exhibit #15..........  123
17
18      (Defendants' Exhibits 1 through 8
19      were previously marked for
20      identification.)
21
22
23

Page 7

1       state actors and private actors.
2   Q.  Would you state you name for the
3       record, please?
4   A.  Paul.
5   Q.  Would you state your last name,
6       please?
7   A.  Pogue.
8   Q.  Would you spell your last name for me?
9   A.  It would be spelled P-O-G-U-E.
10  Q.  Mr. Pogue, we met prior to the
11      deposition.  My name is Jim Davis.
12      I'm an assistant attorney general.
13      I'm here to represent Mr. Tony
14      Chandler and Mr. Danny Clark with the
15      Forestry Commission in a lawsuit that
16      you have filed.  Do you have an
17      attorney in this action, Mr. Pogue?
18  A.  I'm appearing in this action pro se,
19      sir.
20  Q.  Have you ever given a deposition
21      before?
22  A.  Yes, I have.
23  Q.  Then you know what this is.  I'm going

Page 6

1           PAUL POGUE, of lawful age,
2       having first been duly sworn,
3       testified as follows:
4               EXAMINATION
5       BY MR. DAVIS:
6   Q.  Would you state your name for the
7       record, please?
8   A.  Hold on just a moment, sir.  I want to
9       go on record and object to this
10      proceeding inasmuch as I brought that
11      to the attention of Susan Russ Walker.
12      And I feel that this is really not an
13      appropriate discovery process simply
14      because matters are pending before the
15      federal district court judge.  So I
16      would respectfully object to this
17      proceeding and I feel that it is
18      inappropriate.  And I also feel that
19      the matter should be dealt with at a
20      later time, after the district court
21      judge issues rulings as relates to
22      parties in so much as this matter is
23      dealing with conspiracy and acts of

Page 8

1       to ask you some questions about the
2       lawsuit.  If there's any reason that
3       you do not understand my question or
4       if my question is not clear to you,
5       let me know and I'll ask it again in a
6       different way.
7   A.  Yes, sir.
8   Q.  If you answer my question, I'm going
9       to assume that you have understood it.
10      Is that fair?
11  A.  Yes, sir.
12  Q.  I will at various times in this
13      deposition ask you to review
14      documents, and I'll have questions
15      about those.  The first one I have
16      marked as Defendants' Exhibit 1.
17  A.  In terms of who?  Are you identifying
18      who you are referring to as a
19      defendant?  We have several defendants
20      in this case.
21  Q.  I'm referring to Mr. Clark and
22      Mr. Chandler collectively.
23  A.  Yes, sir.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 9

```
1    Q. You take whatever time you need to
2       review the document. When you're
3       ready to answer, I'd like to know
4       whether that is the Complaint that you
5       have filed in this action.
6       (Witness reviews document.)
7    A. It is in part, but not in total.
8       There were exhibits attached to this
9       Complaint. That's a fraud of what I
10      have. This is a fraud document.
11   Q. I have marked two documents as
12      Defendants' Exhibits 3 and 4. Are
13      these the exhibits you're referring
14      to?
15   A. Based on what has just happened, I do
16      not know and I cannot trust these as
17      the authentic documents. But for the
18      purpose of going on with the
19      discovery, since you handed them to me
20      and you're an employee of the state, I
21      guess I'll go and do the best I can
22      with this.
23   Q. Do you believe those to be copies of
```

Page 10

```
1       the exhibits that you attached to your
2       Complaint?
3    A. As I said earlier, I had to call your
4       attention to the alteration or the
5       missing of these particular pages that
6       you have just marked as Exhibit No. 3
7       and No. 4, so, therefore, I do not
8       know. I do not trust it. But at this
9       point, the clerk is not here and
10      nothing is certified, so we have to go
11      forward with what we have.
12   Q. Mr. Pogue, would you please tell me in
13      your own words, what is the nature of
14      the lawsuit that you have filed
15      against Mr. Clark and Mr. Chandler?
16   A. Well, the lawsuit speaks for itself.
17      It's a civil rights lawsuit filed in
18      the Middle District of Alabama against
19      Tony Chandler in his individual
20      capacity, Tony Chandler in his
21      official capacity as a state employee.
22      With respect to Danny Clark, he would
23      also be sued in his individual
```

Page 11

```
1       capacity and in his capacity as a
2       state employee.
3    Q. And what is the nature of your claims
4       against Mr. Clark and Mr. Chandler?
5    A. Well, I would think that the Complaint
6       speaks for itself. I would accept
7       exactly what the Complaint has stated,
8       and it does speak for itself.
9    Q. Is one of the basis for your lawsuit,
10      does it concern the cutting of timber
11      in Perry County, Alabama?
12   A. This particular lawsuit does not
13      concern, as it relates to Tony
14      Chandler, the cutting of any timber,
15      and it does not concern the cutting of
16      the timber as it relates to Danny
17      Clark.
18   Q. What, then, does it concern?
19   A. As I said earlier, the Complaint
20      speaks for itself. But it deals with
21      matters as it relates to the role and
22      responsibility of state employees to
23      do that which is right under the law
```

Page 12

```
1       as they are duty-bound to do pursuant
2       to their job titles and
3       responsibilities.
4    Q. Mr. Pogue, I have reviewed your
5       Complaint, and it's my job today to
6       ask some questions about the Complaint
7       to make sure that I fully understand
8       what it is that you're claiming and
9       also to understand what evidence you
10      may have that supports the matters
11      that you've alleged. So I've got some
12      questions that we'll ask about some of
13      the details about the things that you
14      have alleged. Do you own property in
15      Perry County, Alabama?
16   A. When you say "property," what are you
17      speaking of, sir?
18   Q. Any real property, any land?
19   A. I own some property in Perry County,
20      Alabama.
21   Q. Where is that located in Perry County,
22      Alabama?
23   A. Could you rephrase your question?
```

3 (Pages 9 to 12)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 13 |
|---|
| 1    Perry County, Alabama, is where it's |
| 2    located. |
| 3    Q.  Where within Perry County is your |
| 4    property located? |
| 5    A.  I would need a surveyor to answer that |
| 6    question. |
| 7    Q.  Is there timber on that property? |
| 8    A.  I do not know.  I have not looked at |
| 9    the property in some time. |
| 10   Q.  When was the last time you were on |
| 11   that property? |
| 12   A.  I do not remember, but it was within |
| 13   the -- maybe about three or four |
| 14   months past. |
| 15   Q.  Have you ever entered into a contract |
| 16   to ask someone to cut timber on |
| 17   property that you own in Perry County, |
| 18   Alabama? |
| 19   A.  No, I have not, sir. |
| 20   Q.  Did anyone ever enter into a contract? |
| 21   A.  That would be a question for anyone to |
| 22   answer.  But for me, Paul Pogue, in my |
| 23   capacity, and Paul Pogue in my |

| Page 14 |
|---|
| 1    capacity of Surveyors' Park, has not |
| 2    entered into a contract with anyone. |
| 3    Q.  Did any of the owners of property of |
| 4    which you were a part owner in Perry |
| 5    County enter into a contract for the |
| 6    cutting of timber? |
| 7    A.  I know nothing about that, sir.  I |
| 8    can't answer that question. |
| 9    Q.  Well, then, let's go back to your |
| 10   allegations against Mr. Chandler and |
| 11   Mr. Clark.  What is it that you claim, |
| 12   if anything, that they have done |
| 13   wrong? |
| 14   A.  As I said earlier, my claims against |
| 15   Chandler and Clark would have to stem |
| 16   from the role and the responsibility |
| 17   that they have as forestry employees |
| 18   and in their individual capacity as it |
| 19   relates to their demeanor and their |
| 20   behavior as related to how they |
| 21   treated me throughout the ordeal as it |
| 22   relates to me as a consumer and a |
| 23   tax-paying citizen making a request to |

| Page 15 |
|---|
| 1    them. |
| 2    Q.  What did you request of them? |
| 3    A.  I asked the Alabama State Forestry |
| 4    Commission to look into the |
| 5    allegations that I had regarding |
| 6    people taking advantage of forestry |
| 7    products on my particular property. |
| 8    Q.  Is that the property in Perry County |
| 9    that we were discussing? |
| 10   A.  No, sir.  In this particular case, |
| 11   we're talking about matters a little |
| 12   different from matters as it relates |
| 13   to timber.  Let's not get that |
| 14   confused.  See, there are different |
| 15   matters, different issues.  And if |
| 16   you're not a skilled person, then you |
| 17   will intertwine, commingle, as well as |
| 18   create collateral issues that are not |
| 19   before this particular discovery |
| 20   process in this particular case. |
| 21       So going back and making it |
| 22   clear, I'm dealing with Chandler and |
| 23   I'm dealing with Clark in the capacity |

| Page 16 |
|---|
| 1    that I could deal with them.  And they |
| 2    made themselves known to be state |
| 3    employees.  So we're dealing with |
| 4    matters as it relates to state |
| 5    employees and what they do and what |
| 6    they don't do. |
| 7    Q.  Any intermingling and intertwining is |
| 8    strictly unintentional.  I'm just |
| 9    trying to understand the claims that |
| 10   you've raised. |
| 11       So you made a request of |
| 12   Mr. Clark and Mr. Chandler; is that |
| 13   correct? |
| 14   A.  No, sir. |
| 15   Q.  Who did? |
| 16   A.  I know nothing about that. |
| 17   Q.  Okay.  Did I understand you to say |
| 18   that your claims against Mr. Clark and |
| 19   Mr. Chandler relate to a request that |
| 20   you made of them for services as a |
| 21   consumer? |
| 22   A.  I think you're not understanding |
| 23   correctly.  I said I directed my |

4 (Pages 13 to 16)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 17 | Page 19 |
|---|---|
| 1    complaint to the Alabama State | 1    You may want to rephrase that |
| 2    Forestry Commission. | 2    question. |
| 3  Q. Okay. And what was your request to | 3  Q. Okay. Who did the missing forestry |
| 4    the forestry commission? | 4    products belong to before they became |
| 5  A. There were numerous requests to the | 5    missing? |
| 6    Alabama State Forestry Commission, but | 6  A. I would not know that. That would be |
| 7    based on what I asked the Alabama | 7    a question to ask to investigators. |
| 8    Forestry Commission was to do is to | 8    I'm not an investigator, sir. |
| 9    look into matters that I had regarding | 9  Q. Why are you concerned about the |
| 10    forestry products, missing forestry | 10    missing forestry products? |
| 11    products. | 11  A. As I told you earlier, in this |
| 12  Q. And what forestry products are you | 12    particular matter and this particular |
| 13    speaking of? | 13    case, I'm concerned, and as you |
| 14  A. Well, there are numerous forestry | 14    identified yourself, and narrow the |
| 15    products, but I think according to the | 15    issues down, I'm only concerned about |
| 16    law, forestry products would be | 16    what Clark and Chandler has done and |
| 17    anything that is on land that is. | 17    what Clark and Chandler in their |
| 18    considered natural resources or | 18    individual as well as official |
| 19    matters of conservation. So | 19    capacity has done to me. I'm not |
| 20    everything. | 20    concerned about any timber at this |
| 21  Q. Are you saying somebody cut trees that | 21    time. |
| 22    they shouldn't have cut? | 22  Q. Were you at any time? |
| 23  A. I did not say that. We're talking | 23  A. I can't answer -- you have to rephrase |

| Page 18 | Page 20 |
|---|---|
| 1    about -- if I'm understanding you | 1    that question. |
| 2    correctly, sir, you're talking about | 2  Q. Tell me why you went to Mr. Clark and |
| 3    Clark and Chandler. I don't think | 3    Mr. Chandler. |
| 4    Clark and Chandler has anything to do | 4  A. I did not go to Mr. Clark nor did I go |
| 5    with my property or anything to do | 5    to Mr. Chandler. |
| 6    with anything other than being | 6  Q. Tell me why you went to the forestry |
| 7    employees of the state with the | 7    commission? |
| 8    Alabama Forestry Commission. So we | 8  A. I went to the Alabama Forestry |
| 9    need to make that clear. | 9    Commission because it's my |
| 10  Q. I understand. All right. Did | 10    understanding, according to Alabama |
| 11    somebody other than Mr. Chandler and | 11    state law, that if you have matters of |
| 12    Mr. Clark cut trees that should not | 12    concern that deals with forestry |
| 13    have been cut on any property that you | 13    issues, then you may want to contact |
| 14    had an ownership interest in? | 14    the Alabama Forestry Commission, and |
| 15  A. I know nothing about that, sir. | 15    that's exactly what I did. |
| 16  Q. You refer to missing forestry | 16  Q. Okay. You went to the forestry |
| 17    products; correct? | 17    commission because of a concern; |
| 18  A. Yes, sir. | 18    correct? |
| 19  Q. Where were those missing forestry | 19  A. Forestry concern. |
| 20    products located before they became | 20  Q. And that forestry concern was missing |
| 21    missing? | 21    forestry products; correct? |
| 22  A. I would not know that specifically, | 22  A. No, sir. That forestry concern was a |
| 23    sir. I can't answer that question. | 23    very broad concern, very broad. |

5 (Pages 17 to 20)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 21

1  Q. Was one of your concerns missing
2     forestry products when you went to the
3     forestry commission?
4  A. I think I went to the forestry
5     commission, as I said, for the
6     forestry commission to look into
7     matters at that time that I was
8     concerned about --
9  Q. Okay. Would --
10 A. -- within the scope of the Alabama
11    Forestry Commission's authority
12    pursuant to the Alabama law. So that
13    would be inclusive of everything that
14    the Alabama Forestry Commission would
15    have anything to do with.
16 Q. Would you please tell me, then, all of
17    the concerns that you took to the
18    Alabama Forestry Commission at that
19    time?
20 A. Well, I would adopt the Alabama laws
21    as it relates to forestry issues as my
22    concern. So it would be too volumous
23    (sic) to really sit here and state

Page 22

1     that. But I would accept and adopt
2     what the Alabama code says and what
3     the Alabama law says and what the
4     administrative procedure acts and the
5     publications of the forestry, that's
6     what I would be concerned with.
7  Q. When you went to the forestry
8     commission, did you have a meeting in
9     person with someone?
10 A. I spoke with the Alabama Forestry
11    Commission employees.
12 Q. Was it on the telephone?
13 A. By phone as well as in present -- in
14    person here on Madison Avenue.
15 Q. Let's deal with the first contact you
16    had about these matters. Was that
17    first contact by telephone?
18 A. The first contact was in person.
19 Q. Okay. And who did you meet with?
20 A. Several Alabama Forestry Commission --
21    people that said that they were
22    employees of the Alabama Forestry
23    Commission.

Page 23

1  Q. Where did that meeting take place?
2  A. Here -- what's the address here? Hold
3     just one moment. 513 Madison Avenue,
4     Montgomery, Alabama.
5  Q. In the building where we're meeting
6     today?
7  A. It would be in the 513 Madison Avenue
8     building.
9  Q. Do you remember the names of any of
10    the people who were with the forestry
11    commission?
12 A. No, sir.
13 Q. What did you discuss with them?
14 A. Discussed with them various issues as
15    it relates to the scope of Alabama
16    Forestry Commission's authority as it
17    relates to being concerned for
18    concerned consumers.
19 Q. Did you bring up any property that you
20    own in Perry County or anything that
21    may have happened on that property?
22 A. I do not recall doing that, sir.
23 Q. Maybe it would help if we went through

Page 24

1     the Complaint, the document that we've
2     marked as Defendants' Exhibit 1.
3  A. Yes, sir.
4  Q. And let's begin with the factual
5     allegations, which appear on page 3.
6     Do you see paragraph 7 on page 3,
7     Mr. Pogue?
8  A. Yes, sir. On your document, yes, sir.
9  Q. Okay. Paragraph 7 says, Plaintiff is
10    a member of the black race and the
11    owner, developer, and promotor of
12    Surveyors' Park. What is Surveyors'
13    Park?
14 A. Surveyors' Park is a division of Paul
15    Pogue. Surveyors' Park is considered,
16    as I said, and it speaks for itself
17    here at paragraph 7, that I'm doing
18    business as Surveyors' Park. So it is
19    also a proprietary concern that I
20    have.
21 Q. What is the business of Surveyors'
22    Park?
23 A. It is undefined at this time.

6 (Pages 21 to 24)

## Page 25

1  Q. Is one part of your plan for
2  Surveyors' Park a real estate
3  development?
4  A. It is undefined at this time, sir.
5  Q. What does Surveyors' Park have to do
6  with this lawsuit?
7  A. Surveyors' Park is a part of me and I
8  am the plaintiff in this lawsuit and,
9  therefore, to that extent it is a part
10  of the lawsuit.
11  Q. Paragraph 8 says, Within a year of
12  filing of this Complaint, Plaintiff's
13  Surveyors' Park was announced to the
14  public at large. How was that
15  announcement made?
16  A. As an announcement would be made. It
17  was announced.
18  Q. Was it made orally or through a press
19  release or in some other way?
20  A. Orally.
21  Q. Who did you announce it to?
22  A. The public.
23  Q. What did you say to the public about

## Page 26

1  Surveyors' Park?
2  A. I cannot recall exactly what I said,
3  but I did announce that Surveyors'
4  Park was alive and well and a part of
5  me.
6  Q. Paragraph 9 says that, Within two
7  years of the filing of this Complaint,
8  Plaintiff's Surveyors' Park sustained
9  and experienced insurgery -- excuse
10  me -- insurgency and terrorist-style
11  ground/soil damage and obliteration of
12  unmanufactured forest products within
13  the State of Alabama.
14  Tell me what you know about the
15  insurgency and terrorist-style
16  ground/soil damage and obliteration of
17  unmanufactured forest products that
18  this paragraph relates to.
19  A. This particular paragraph speaks for
20  itself. It has a time line involved
21  in it. But I'd like to make clear
22  that it does speak for itself. But as
23  you know, insurgency is the process by

## Page 27

1  which people, uninvited, comes into an
2  established environment and have their
3  way against the will of the person in
4  control of the environment. And
5  terrorists are those that seek to tear
6  down or take that which has been
7  established. So I feel quite
8  confident that that's a proper
9  paragraph and it speaks for itself.
10  Q. Where were the unmanufactured forest
11  products located?
12  A. That will be left up to an
13  investigator to determine.
14  Q. Were they located on property owned by
15  Paul Pogue?
16  A. "They" when you speak of, what are you
17  talking about? I'm talking about
18  ground/soil damage and obliteration of
19  unmanufactured forest products.
20  Q. Correct. And I'm asking about the
21  forest products that this paragraph
22  refers to. And what I'm asking is,
23  where were they located?

## Page 28

1  A. Like I don't understand your question.
2  If you could rephrase your question, I
3  could try to answer it, sir.
4  Q. Okay. I'll try it another way. What
5  are the unmanufactured forest products
6  that this paragraph is talking about?
7  A. It's talking about that which is
8  incorporated as, as I've said earlier,
9  the enforcement authority at Alabama
10  Forestry Commission. So it's
11  containing all earth science and all
12  natural resources that can be
13  contained within reason and what you
14  would be referring to as earth
15  science, earth natural resources.
16  That's dirt -- that's dirt, bark,
17  branches, leaves, whatever.
18  Q. Okay. And were the particular forest
19  products that you're speaking of in
20  this paragraph, were they located on
21  property that you owned?
22  A. I specifically state here that I
23  experienced the insurgency and a

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 29

1    terrorist-style ground/soil damage and
2    obliteration of unmanufactured forest
3    products within the State of Alabama.
4    So that's within Alabama, yes.
5    Q. And was it on property that you owned?
6    A. It's on property that I have authority
7       over. You need to understand, and I
8       want to make this clear, when you
9       start talking about ownership, it
10      doesn't necessarily mean real
11      property. Ownership could mean
12      personal property. So Forestry
13      products in this particular case and
14      this particular matter would be
15      talking about, as I've said,
16      ground/soil damage and obliteration of
17      unmanufactured forest products. So,
18      therefore, we're talking about
19      personal property that I have.
20   Q. Who owned the real property where
21      these unmanufactured forest products
22      were located?
23   A. I would not know that. I can't answer

Page 30

1    that question. But I can specifically
2    answer that I owned the personal
3    property for which I'm referring to
4    here as unmanufactured forest
5    products.
6    Q. How did you come to own that personal
7       property?
8    A. Through assumption. I assumed it.
9    Q. How did you assume it?
10   A. Assumed it, acknowledged it as mine,
11      claimed it as mine.
12   Q. What did you do in order to claim it
13      as yours?
14   A. I accepted it as mine, that which I've
15      identified in paragraph 9.
16   Q. Did you purchase it from somebody?
17   A. I assumed it, sir.
18   Q. I'm sorry, Mr. Pogue, but I don't
19      understand what you mean by "assumed."
20   A. Well, you have to rephrase your
21      question.
22   Q. Okay. Did somebody give it to you as
23      a gift?

Page 31

1    A. No one gave me a gift.
2    Q. Did anybody give you a piece of paper
3       that says you now own this personal
4       property?
5    A. No one gave me that, no paper.
6    Q. What did you do in order to assume
7       this personal property?
8    A. I assumed it and claimed it as mine.
9    Q. Did you tell anybody that this is now
10      mine?
11   A. Yes.
12   Q. Who did you say that to?
13   A. I told the public.
14   Q. How did you tell the public?
15   A. I announced it to the public.
16   Q. When did you announce it to the
17      public?
18   A. Within the two years of the filing of
19      this Complaint.
20   Q. Was it on a particular day?
21   A. Yes, it was on a day.
22   Q. Do you know what that day was?
23   A. No, I do not. Can't recall.

Page 32

1    Q. Where were you located when you made
2       that announcement?
3    A. Before the public, sir.
4    Q. Who was present?
5    A. I do not recall, but there were
6       several people present.
7    Q. Can you tell me any of the people who
8       were present?
9    A. No, I cannot.
10   Q. And do you personally, Paul Pogue,
11      have any ownership interest in the
12      real property where this personal
13      property was located?
14   A. You have to rephrase your question.
15      As I explained to you earlier, if
16      you're referring to that particular
17      paragraph, that's referring to
18      personal property.
19   Q. And that personal property has a
20      location; correct?
21   A. That personal property would be
22      somewhere.
23   Q. Where?

8 (Pages 29 to 32)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 33

1  A. That's left up to the investigators to
2     determine the whereabouts of it.
3  Q. Do you have an opinion as to where it
4     is?
5  A. No, sir.
6  Q. Do you have an opinion as to where it
7     was before it became missing?
8  A. If you could rephrase the question, I
9     could answer that question.
10 Q. Okay. Is part of the personal
11    property that you're referring to
12    timber?
13 A. I'm referring to all forestry
14    products, as you can see. All
15    products.
16 Q. Okay. You're talking about a large
17    group of forestry products, and I want
18    to narrow it down to one thing, which
19    is timber, just for purposes of this
20    question.
21 A. I can't do that. I would have to
22    object to that question.
23 Q. Do you own any timber in the State of

Page 34

1     Alabama?
2  A. Could you rephrase that question, sir?
3  Q. Do you own any timber or any interest
4     in timber?
5  A. If it is -- if it is inclusive as
6     forestry products, I would say.
7  Q. You would say yes?
8  A. As I said, if it's inclusive. If that
9     is -- if the forestry products can be
10    defined as timber.
11 Q. And these forestry products, were they
12    located in Perry County, Alabama?
13 A. Is that a continuation of the question
14    you just asked or is it a new
15    question?
16 Q. It's a new question. The forestry
17    products referred to in paragraph 9,
18    were they located in Perry County,
19    Alabama?
20 A. Yes.
21 Q. And do you have any knowledge about
22    who owns the real property where those
23    forest products were located?

Page 35

1  A. Excuse me. Could you repeat your
2     question, sir?
3  Q. Sure. Do you have any information
4     about who owned the real property in
5     Perry County, Alabama, where the
6     personal property was located, and the
7     personal property with being that
8     which you've referred to in
9     paragraph 9?
10 A. I wouldn't have that information, sir.
11 Q. Have you ever personally been present
12    on the real property in Perry County,
13    Alabama, where the unmanufactured
14    forest products were located? And I'm
15    speaking of the unmanufactured forest
16    products that you're talking about in
17    paragraph 9.
18 A. Could you repeat the question?
19 Q. Did you ever go look at the
20    unmanufactured forest products that
21    you're talking about in paragraph 9?
22 A. Yes, sir.
23 Q. Did you have to get anybody's

Page 36

1     permission to go on that property?
2  A. I did not get anyone's permission.
3  Q. Whose property were you on when you
4     went to go look at those
5     unmanufactured forest products?
6  A. I was standing on the public road.
7  Q. I want to show you a document that
8     I've marked as Defendants' Exhibit 2,
9     Mr. Pogue.
10 A. Yes, sir.
11 Q. Can you identify that document for me?
12 A. No, I cannot.
13 Q. Have you ever seen this document
14    before?
15 A. Could you rephrase your question, sir?
16 Q. Have you ever seen the document
17    before, the one that is marked as
18    Defendants' Exhibit 2?
19 A. This appears to be a document, but I
20    don't know whether or not I've seen
21    this particular document before.
22 Q. Do you know Mamie Darden?
23 A. No, I do not.

9 (Pages 33 to 36)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 37

1  Q. Do you know Valissa Darden?
2  A. No, I do not.
3  Q. Have you ever heard those names
4     before?
5  A. May or may not have.
6  Q. Have you ever heard of Alabama Civic
7     Specialty Group, Inc.?
8  A. Yes, I have.
9  Q. What is Alabama Civic Specialty Group,
10    Inc.?
11 A. It's a corporation.
12 Q. Did you form that corporation?
13 A. Could you rephrase that question?
14 Q. Are you a shareholder in that
15    corporation?
16 A. No, I'm not.
17 Q. Are you an officer or a director in
18    that corporation?
19 A. No, I'm not.
20 Q. Do you have any ownership interest in
21    that corporation?
22 A. No, I do not.
23 Q. Do you know what business Alabama

Page 38

1     Civic Specialty Group, Incorporated,
2     is?
3  A. It should be a corporation.  It speaks
4     for itself.
5  Q. Do you know if it's engaged in any
6     business activity?
7  A. I would not know that.
8  Q. The first line of Exhibit 2,
9     Mr. Pogue, refers to Mamie Darden,
10    Valissa Darden, and Paul Pogue,
11    parenthesis, Alabama Civic Specialty
12    Group, Inc.  Are you the Paul Pogue
13    this paragraph refers to?
14 A. I'm not familiar with this document.
15    And as earlier trends suggested, I
16    need to be very aware of what I agree
17    to and not agree to.  So, therefore,
18    my name is Paul Pogue.
19 Q. Are you familiar with a contract
20    between Alabama -- Alabama Civic
21    Specialty Group, Inc., and Cherokee
22    Timber Company, Incorporated?
23 A. That would be a matter that would -- I

Page 39

1     would have to object to that question
2     and go on and answer by stating that
3     Alabama Civic Specialty Group is a
4     corporation and I can't represent a
5     corporation and I'm not here to
6     represent Alabama Civic Specialty
7     Group, Incorporated.
8  Q. I understand.  But does Paul Pogue,
9     you sitting here today, do you have
10    any information about a contract
11    between that corporation and Cherokee
12    Timber Company?
13 A. No, I do not.
14 Q. Was there, at any time, a contract
15    that dealt with the unmanufactured
16    forest products that is the subject
17    of your Complaint?
18 A. Speaking of the subject of my
19    Complaint, then you would be excluding
20    document what you identified as
21    Defendants' Exhibit 2.
22 Q. Well, I'm going back to the Complaint,
23    Exhibit 1.  Did you or anybody else

Page 40

1     enter into a contract with somebody
2     for the cutting of timber?
3  A. When you say "Exhibit 1," what are you
4     referring to, sir?
5  Q. The Complaint.
6  A. Oh, okay.  Go ahead with your
7     question, sir.
8  Q. Was there a contract that concerned
9     the cutting of timber or other
10    unmanufactured forest products?
11 A. Not that I would have anything to do
12    with, sir.
13 Q. Did Mr. Chandler or Mr. Clark conduct
14    any investigation on your behalf?
15 A. You would have to ask Mr. Chandler and
16    Mr. Clark that question.  I can't
17    answer that question.  I don't
18    represent them.
19 Q. I understand that you don't represent
20    them.  But I'm having difficulty
21    communicating with you and
22    understanding what it is that you went
23    to the forestry commission about.

10 (Pages 37 to 40)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 41

1 These aren't trick questions. I'm
2 trying to understand -- let me tell
3 you what I understand so far. I --
4 what I believe happened, according to
5 you, is that somebody cut timber where
6 they weren't supposed to. You asked
7 the forestry commission to investigate
8 and you have complaints about the way
9 they investigated and what happened as
10 a result of that investigation; is
11 that correct?
12 A. I would have to object to that
13 characterization as well as that
14 statement. My Complaint speaks for
15 itself. And I -- I'm not altering nor
16 amending it at this point.
17    MS. BRELAND: Can I ask a
18 question?
19    MR. DAVID: Yeah.
20    MS. BRELAND: Can I ask a
21 question, Mr. Pogue?
22    THE WITNESS: If it's proper
23 to do so.

Page 42

1    MS. BRELAND: Well, what we
2 want to know is, you have filed a
3 lawsuit against employees of the
4 forestry commission and we're just
5 trying to find out what exactly it is
6 you're suing us about.
7    THE WITNESS: Well, the
8 Complaint speaks for itself, ma'am.
9    MS. BRELAND: But we don't
10 know what you -- it may speak to you,
11 but it doesn't speak to us. We don't
12 understand exactly what it is you're
13 complaining about. That's why we're
14 here today, to try to find out what it
15 is that you're complaining about that
16 we've done.
17    THE WITNESS: Well, it has
18 been my experience that if you're not
19 cognizant of what is going on in terms
20 of a Complaint, file a 12(b) Motion.
21 And if Susan Russ (sic) chooses to
22 engage in de facto counsel, let her
23 continue. But the proper thing for

Page 43

1 you to do, if you are of that concern,
2 is to file a 12(b) Motion.
3    MS. BRELAND: Well, a proper
4 thing also is to have a deposition
5 where you -- and this is done in every
6 case that I'm aware of -- where you
7 ask the plaintiff specific questions
8 about what it is that they are
9 complaining about. Since you're suing
10 us, we are entitled to know what
11 you're suing us about.
12    THE WITNESS: Well, I'm not
13 suing you, the term "us." But as I
14 said earlier, my Complaint speaks for
15 itself. If we need to stop here and
16 get the judge involved, let's do it.
17 If we need to stop and get the
18 magistrate involved and ask her not to
19 engage in de facto counsel, then we
20 should do it.
21    MS. BRELAND: Well, apparently
22 it doesn't speak for itself because
23 you're telling us that you didn't ask

Page 44

1 for things that the Complaint says you
2 did ask for. So, you know, we don't
3 know what this complaint means.
4 Q. (By Mr. Davis) Mr. Pogue, are you
5 going to decline to answer any
6 questions about the details of the
7 allegations of this lawsuit?
8 A. I'm going to continue to participate
9 pursuant to the law. I'm going to
10 continue to participate pursuant to
11 the scheduling order after having
12 objected to it. So we're not going to
13 prejudice the issues by electing
14 premature -- premature statements of
15 that nature. I wouldn't participate
16 in that.
17 Q. What I'd like to do now is maybe just
18 take a five-minute break and then come
19 back and continue the deposition. Is
20 that okay with you?
21 A. If I have anything to do with it, I
22 would like for it to continue on. But
23 if you have the authority to stop the

11 (Pages 41 to 44)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 45

1    deposition over my objection, go right
2    ahead.
3    Q. I don't want that to be controversial.
4    Typically in depositions, Mr. Pogue,
5    either party sometimes needs to go to
6    the restroom or get a drink of water
7    or just take a break for a few minutes
8    and then come back to continue. And
9    that's what I would like to do at this
10   time. Is that okay with you?
11   A. You have the authority to do that,
12   sir.
13   Q. Thank you. We'll be back in about
14   five minutes, then we'll continue the
15   deposition at that time.
16   A. Yeah.
17        (Short recess.)
18   Q. Are you ready to continue, Mr. Pogue?
19   A. Yes, I am.
20   Q. Mr. Pogue, would you refer back to the
21   Complaint that's been marked as
22   Defendants' Exhibit 1?
23        (Witness complies.)

Page 46

1    Q. I'd like to ask now about paragraph 10
2    of that document. Paragraph 10 says
3    that, Within a year of filing the
4    Complaint, Plaintiff voiced his
5    complaint of concern to the Alabama
6    Forestry Commission. Who did you
7    speak to at the Alabama Forestry
8    Commission?
9    A. Well, at the Alabama Forestry
10   Commission, which is located at 513,
11   there are several people that come to
12   your aid if you're coming off the
13   street or calling in that I guess the
14   dispatcher places you with people that
15   are recognized as employees of the
16   forestry commission. So that's what
17   that document is referring to. I
18   never ID'd anybody.
19   Q. I see. Paragraph 11 says that the
20   dispatcher spoke by phone with you and
21   assured Plaintiff that other Alabama
22   Forestry Commission employees would
23   visit Plaintiff at the designated

Page 47

1    place of concern. Do you see where
2    I'm reading?
3    A. Yes, sir.
4    Q. What is the designated place of
5    concern?
6    A. Well, the designated place of concern
7    was, I think at that particular time,
8    and what this paragraph is referring
9    to, is the getting away of issues that
10   I had voiced to the forestry
11   commission about forestry products.
12   And so the dispatcher -- as I told you
13   earlier, I was in the forestry
14   commission's office and the forestry
15   commissioner -- commissions employee
16   contacted a forestry commission
17   employee and we spoke by phone in
18   several locations. And I think the
19   question at that time was, How do we
20   get together to go out on property to
21   determine what is going on? So that's
22   what that is referring to. That's
23   referring to the fact that I made

Page 48

1    contact with the Alabama Forestry
2    Commission, voiced my concern, then
3    the dispatcher contacted several
4    employees, other Alabama Forestry
5    Commissions, and those employees then
6    contacted other employees and then we
7    got together and came up with a
8    solution, which was for me to meet
9    with several forestry commission
10   employees and talk with several --
11   several forestry commission employees
12   by phone.
13   Q. Okay. Do you know who you spoke with
14   by phone?
15   A. No, sir.
16   Q. Okay. But you made arrangements to
17   meet with people by telephone; is that
18   correct?
19   A. The people within the Madison --
20   513 Madison Avenue did that.
21   Q. Did you agree to meet with people by
22   telephone?
23   A. Well, I had no option.

12 (Pages 45 to 48)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 49

1  Q. Did you meet with people by telephone
2     dealing with this matter?
3  A. Yeah, I spoke with several people
4     within the Alabama Forestry
5     Commission. Well, they said that they
6     were employees of the Alabama Forestry
7     Commission.
8  Q. Do you know the names of any of the
9     people you spoke to at the forestry
10    commission?
11 A. During this particular time and in
12    reference to this paragraph 11 --
13 Q. Correct.
14 A. -- no one would -- no one gave names.
15    That was all done through the
16    dispatcher.
17 Q. Okay. Did anyone visit you from the
18    forestry commission at the designated
19    place of concern?
20 A. I think what the concern at that
21    time -- yes, someone did come here to
22    the forestry commission.
23 Q. Okay. Did you meet with anybody with

Page 50

1     the forestry commission in Perry
2     County, Alabama?
3  A. Yes, I did.
4  Q. Where did you meet with them in Perry
5     County, Alabama?
6  A. Met with them on the state highway.
7  Q. What state highway?
8  A. Alabama State Highway.
9  Q. Do you know the number of that
10    highway?
11 A. No, sir.
12 Q. Does it have a name, that highway?
13 A. Alabama Highway.
14 Q. Does it have a popular name? How
15    would somebody know that that highway
16    is different from some other highway?
17 A. It guess it's a state highway.
18 Q. Is it Highway 219?
19 A. I've heard them use that to describe
20    it as that.
21 Q. Okay. Do you, Paul Pogue, own any
22    real property adjacent to Highway 219
23    in Perry County, Alabama?

Page 51

1  A. I would object to that question and
2     ask you to rephrase it as it relates
3     to this particular case. As I said
4     earlier, I'm trying to make it clear
5     what this lawsuit is about as it has
6     been written. And if we were to
7     continue to go down the path of not
8     getting clarification, then we would
9     be going in the wrong direction as it
10    relates to what the commission and
11    purpose of this lawsuit is.
12 Q. Do you -- are you a party to a lawsuit
13    pending Mobile County, Alabama?
14 A. Yes, I am.
15 Q. What is the nature of that lawsuit?
16 A. That particular lawsuit is a federal
17    lawsuit filed against International
18    Paper Company.
19 Q. Are you the plaintiff in that action?
20 A. Yes, I am.
21 Q. What are you alleging against
22    International Paper?
23 A. Well, basically, I'm alleging that

Page 52

1     International Paper has committed acts
2     of conversion, and that's basically
3     what it's about. I think the matter
4     will eventually have to go to the
5     Eleventh Circuit and then probably on
6     to the U.S. Supreme Court if I'm lucky
7     and they accept it.
8  Q. In that lawsuit, what are you claiming
9     that International Paper converted?
10 A. I'm claiming that International Paper
11    engaged in the act of conversion as it
12    would be defined in the State of
13    Alabama, and that is dealing with
14    timber.
15 Q. Was that timber located in or around
16    the Alabama State Highway in Perry
17    County, Alabama, that has been
18    referred to as Highway 219?
19 A. That's what we're trying to get to
20    now. That's the -- that's the
21    question that we're trying to get
22    resolved now.
23 Q. You mean that's the question that

13 (Pages 49 to 52)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

---

Page 53

1  you're trying to resolve in the
2  lawsuit against International Paper?
3  A. No. What I'm saying is, what happened
4  and the whereabouts has everything to
5  do with the investigation. And I
6  really want to make this point clear
7  so that we can clarify these issues so
8  that we don't commingle, intertwine,
9  and create collateral issues for
10  parties involved which precipitates
11  new lawsuits being filed. So I want
12  to make it clear that the forestry
13  industry attorney is a closed
14  industry, so therefore matters that a
15  general consumer or citizen would have
16  as it relates to the whereabouts and
17  what happened to rests with the
18  forestry commission. So if you were
19  to see a load of wood traveling down
20  the road, even if you think it's
21  yours, you can very well be falsely
22  accusing. So the forestry commission
23  would have to bring in their

Page 54

1  investigator to determine the
2  whereabouts. So I'm saying to you,
3  that's the big question. And I'm
4  almost for certain that the matters
5  will be litigated along those lines,
6  in Mobile as well.
7  Q. What I would like to ask, then, is
8  where the timber was located before it
9  was cut. Was it located in or around
10  Highway 219 in Perry County, Alabama?
11  A. I think that some was.
12  Q. Okay.
13  A. But that was dealing with the issues
14  in Mobile and that was dealing with
15  matters, as I said, dealing with
16  conversion in the federal lawsuit in
17  Mobile.
18  Q. Paragraph 12 of the Complaint,
19  Mr. Pogue --
20  A. Yes.
21  Q. -- it says, Plaintiff discovered
22  hidden timber theft equipment and
23  machinery on the ground of Surveyors'

Page 55

1  Park.
2  A. Yes.
3  Q. Where is the ground of Surveyors' Park
4  located?
5  A. The ground of Surveyors' Park is a
6  narrow -- narrow strip that I would
7  have to go out and show you what is
8  meant by that.
9  Q. Is the ground of Surveyors' Park real
10  property?
11  A. The grounds of Surveyors' Park is
12  describing personal properties, the
13  location of personal -- personal
14  properties.
15  Q. Does Surveyors' Park own the real
16  property?
17  A. Surveyors' Park does not own the real
18  property, as I told you earlier. I
19  would not know who owns the real
20  property. But I do know that where
21  that timber theft equipment was
22  located, I can show you, whomever
23  wants to go see it, the whereabouts

Page 56

1  and the location of it.
2  Q. Mr. Pogue, I'd like to show you a
3  document that I've marked as
4  Defendants' Exhibit 5.
5  A. Yes, sir.
6  Q. And Exhibit 5, Mr. Pogue, I represent
7  to you is a map of property within
8  Perry County, Alabama, township 18
9  north, range 10 east. Do you see on
10  Exhibit 5 where it refers to the
11  Emanuel Darden estate?
12  A. Yes, sir.
13  Q. Do you believe that the personal
14  property that you're referring to was
15  located somewhere on the property of
16  the Emanuel Darden estate?
17  A. First of all, I'll object to the
18  admittance of this Exhibit 5 inasmuch
19  as it does not say what you're talking
20  about here. But I would need an area
21  photograph to intelligently answer
22  that particular question. These
23  drawings, I can't help you with this.

14 (Pages 53 to 56)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 57

1  Q. Are you able to tell me one way or the
2     other whether the personal property
3     that is part of what this lawsuit is
4     about was located anywhere on the map
5     that's marked as Exhibit 5?
6  A. No, sir.
7  Q. You just don't know if it is or if it
8     isn't; is that correct?
9  A. I can't read this particular map. I
10    would need an area photograph to show
11    you.
12 Q. Do you have an area photograph of the
13    property?
14 A. No, sir.
15 Q. Do you know anyone who does?
16 A. No, sir.
17 Q. Do you know Emanuel Darden?
18 A. No, I do not.
19 Q. Do you have any information about an
20    Emanuel Darden?
21 A. No, I do not.
22 Q. Do you have any information about a
23    person named Emanuel Darden who is now

Page 58

1     deceased?
2  A. No, sir.
3  Q. Have you ever heard of the name
4     Emanuel Darden before today?
5  A. Yes, I have.
6  Q. In what context?
7  A. I've heard of the name. I've heard
8     people use the name Emanuel Darden.
9  Q. Who have you heard use the name
10    Emanuel Darden?
11 A. Just people out in the public.
12 Q. Are you related to anyone named
13    Darden?
14 A. Please clarify that question, sir.
15 Q. Are you blood kin to anybody in the
16    Darden family?
17 A. I still can't understand your
18    question. If you could clarify that
19    question, the question, then I could
20    answer.
21 Q. Do you have any grandparents or
22    parents or brothers or sisters whose
23    last name is Darden?

Page 59

1  A. No, I do not.
2  Q. Do you have a spouse or former spouse
3     or in-laws whose last name was Darden?
4  A. Yes, I do.
5  Q. Who is that?
6  A. If you go back to Document Exhibit
7     No. 2, when you asked that question,
8     asked me did I know any of these
9     particular people, and I told you that
10    I knew Paul Pogue. But to put these
11    names in its proper perspective, this
12    Mamie Darden is not proper. That's
13    not proper. And that Valissa Darden
14    is not proper. So I wouldn't know
15    those people in that particular
16    written way.
17 Q. I don't understand what you mean by
18    "it's not proper."
19 A. I am familiar with a Mamie Mims Darden
20    and I am familiar with the name
21    Valissa Darden Pogue, but no Valissa
22    Darden and no Mamie Darden.
23 Q. Who is Mamie Mims Darden?

Page 60

1  A. Mamie Mims Darden is a mother-in-law
2     of Paul Pogue.
3  Q. And who is Valissa Darden Pogue?
4  A. Valissa Darden Pogue is the wife of
5     Paul Pogue.
6  Q. All right, Mr. Pogue. Let's go back
7     to Exhibit 13 -- excuse me --
8     Exhibit 1, in paragraph 13 of that
9     exhibit. Paragraph 13 says, A
10    spectator identified the found
11    equipment and machinery as that
12    equipment which most likely severed
13    unmanufactured forestry product from
14    Plaintiff Surveyors' Park's soil. Do
15    you see where I'm reading?
16 A. Yes, sir.
17 Q. Who is the spectator that you're
18    referring to?
19 A. The spectator is an unnamed person.
20    The person did not identify himself.
21    But it was a white male.
22 Q. So a white male told you that he had
23    seen equipment and machinery?

15 (Pages 57 to 60)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 61

1  A. Yes, sir.
2  Q. When did he tell you this?
3  A. Well, that was referring to a visit to
4     the particular Surveyors' Park that we
5     are speaking of in this particular
6     lawsuit. A visit to the location led
7     the young man to identify this
8     particular equipment.
9  Q. So you had a conversation with this
10    person?
11 A. Yes.
12 Q. Where did that conversation take
13    place?
14 A. We were on the dirt road, the unnamed
15    dirt road.
16 Q. And that dirt road is different from
17    State Highway 219?
18 A. Yes, it is.
19 Q. Where is the dirt road located?
20 A. I'm not a surveyor, but the dirt road
21    is somewhat west of that state
22    highway.
23 Q. Who owns the property around that dirt

Page 62

1     road where that conversation took
2     place?
3  A. I think the county does, but I'm not
4     for certain.
5  Q. Not the road itself, but the real
6     property surrounding the dirt road?
7     That's what I'm asking about. Are you
8     saying the county owns the property in
9     the area?
10 A. I think it does. I think they have a
11    right-of-way where this particular
12    matter took place. And what,
13    apparently, 13 is referring to, I
14    think the state highway department
15    owns.
16 Q. When you get past the right-of-way,
17    who owns the real property?
18 A. I think there's a gentleman -- I don't
19    know -- I don't really know who that
20    particular person is.
21 Q. What was the spectator doing there?
22 A. He did not identify himself, but he
23    was explaining to me about the

Page 63

1     equipment.
2  Q. How did he come to see the equipment?
3  A. That particular person, as I told you,
4     as it says, the spectator identified
5     the found equipment and machinery and
6     equipment which mostly likely
7     severed -- that particular person was
8     on that equipment. Yeah.
9  Q. He was on the equipment?
10 A. Yes.
11 Q. Was he operating the equipment?
12 A. Well, it was being operated, yes.
13 Q. What was the equipment doing?
14 A. Leaving the particular property.
15 Q. Who is Jimmy Ingram, who is referred
16    to in paragraph 14?
17 A. He's believed -- at this point, I have
18    not taken his deposition. I wouldn't
19    actually know Jimmy Ingram other than
20    what is generally understood in the
21    public domain, which is that he's a
22    member of International Paper Company
23    and the owner of the equipment. And

Page 64

1     he's also believed to be, and
2     generally recognized, as a Caucasian
3     white male.
4  Q. Do you understand that Jimmy Ingram is
5     an employee of International Paper?
6  A. He's believed to be. I don't -- I
7     don't have the International Paper
8     roster. As I've said, I have never
9     taken his deposition.
10 Q. Is that what you believe to be the
11    case?
12 A. Yes.
13 Q. Why do you believe that to be the
14    case?
15 A. That's what's in the public domain.
16 Q. Did somebody tell you that --
17 A. Yes, sir.
18 Q. -- they think --
19 A. That's right. The public. The people
20    in the public.
21 Q. If I may, please, Mr. Pogue, it will
22    help if you allow me to finish my
23    question before you answer. It will

16 (Pages 61 to 64)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 65

1  help when we get the transcript back
2  to make sure that the question I'm
3  asking and the question you're
4  answering are one and the same.
5  A. Yes, sir.
6  Q. Did somebody tell you that Jimmy
7  Ingram is an employee of International
8  Paper?
9  A. Yes.
10 Q. Who told you that?
11 A. It was being talked about at the water
12   well. So there were several people
13   standing around the water well and
14   they identified Jimmy Ingram.
15 Q. What is this water well you're
16   speaking of?
17 A. Well, this is a place where people
18   congregate, come together to just talk
19   in that particular community.
20 Q. Is the water well located on --
21 A. State property -- excuse me.
22 Q. It's located on state property?
23 A. Yes.

Page 66

1  Q. Is it a park of some sort?
2  A. Yes, sir.
3  Q. Who was present at the water well when
4    this conversation took place?
5  A. Unknown people that were coming to get
6    their water jugs filled up. I didn't
7    ask -- I didn't ask -- I didn't intend
8    to identify them and didn't want to
9    identify their names.
10 Q. What led you to believe that
11   Mr. Ingram owned the equipment?
12 A. At that particular time, as I said,
13   the spectator identified Jimmy Ingram.
14 Q. Look at paragraph 16, please,
15   Mr. Pogue --
16 A. Yes, sir.
17 Q. -- which is on page 5 of the
18   Complaint. And it speaks of a blue
19   van occupied by seven white citizens.
20   Do you see where I'm reading?
21 A. Yes, sir.
22 Q. Tell me about that incident.
23 A. Well, that particular matter, as it is

Page 67

1  written here, it speaks for itself.
2  But the people that were in the blue
3  van were white citizens and they were
4  stopped and questioned extensively
5  about their whereabouts and what were
6  they doing out there on my property.
7  Q. Who asked them that question?
8  A. I did.
9  Q. And on what property was it?
10 A. That was on the strip of land where
11   the personal property which we're
12   referring to as Surveyors' Park which
13   is different from other land, sir.
14 Q. Is it your belief that anybody who is
15   employed by the forestry commission
16   was one of the people in the blue van?
17 A. No, the forestry commission officials
18   were not in that van.
19 Q. Did that blue van cause any damage to
20   any personal property owned by you or
21   Surveyors' Park?
22 A. I would say yes.
23 Q. What damage are you speaking of?

Page 68

1  A. Well, that blue van was a van that had
2    a lot of oil, chemicals, and other
3    types of substances in the back, which
4    I happened to look at; I actually
5    opened the van. And those are the
6    same -- that is the same debris and
7    trash that looked to be somewhat that
8    was left on Surveyors' Park.
9  Q. Did you complain to anybody about the
10   damage that you allege was caused by
11   the people in the blue van?
12 A. Yes, I did.
13 Q. Who did you complain to?
14 A. I brought that matter to the attention
15   of the Alabama Forestry Commission.
16 Q. Can you tell me the names of anybody
17   in the forestry commission that you
18   spoke to about the blue van?
19 A. Mr. -- gentleman's name -- Danny
20   Clark.
21 Q. Danny Clark. When did you speak to
22   Danny Clark about this?
23 A. I can't remember specifically, but I

17 (Pages 65 to 68)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 69

1    spoke to Danny Clark about it.
2  Q. Was it on the telephone or in person?
3  A. In person.
4  Q. Where did that conversation take
5    place?
6  A. On a dirt road on a trail.
7  Q. Is it --
8  A. We were standing on the trail.
9  Q. Is it near the strip of property where
10   the personal property is located?
11  A. That's right.
12  Q. Now, paragraph 17, Mr. Pogue, says,
13   Plaintiff learned that an
14   International Paper Company employee
15   was the first to greet and meet with
16   the Alabama Forestry Commission
17   employees on the grounds of Surveyors'
18   Park. Who was the International Paper
19   Company employee you're speaking of?
20  A. That particular person did not
21   identify his name, but he was the
22   person that was with Danny Clark when
23   I entered the property at the location

Page 70

1    of concern.
2  Q. All right. So you entered the
3    property and you saw Danny Clark there
4    and Danny Clark was with someone else;
5    correct?
6  A. Right.
7  Q. And that someone else you believe to
8    be an International Paper employee;
9    correct?
10  A. Yes.
11  Q. What makes you believe that other
12   person was an International Paper
13   Company employee?
14  A. Several people in the community
15   identified that individual as an
16   International Paper Company employee.
17  Q. Who?
18  A. The people around the water well.
19  Q. Okay.
20      MS. BRELAND: Well, what did
21   he look like?
22      MR. POGUE: That would be a
23   question to ask Tony Chandler and

Page 71

1    Danny Clark.
2      MS. BRELAND: Was Tony
3    Chandler there?
4      MR. POGUE: I don't know. But
5    they're investigators.
6      MS. BRELAND: Oh, I know.
7    Were you there?
8      MR. POGUE: No, I was not
9    there.
10  Q. Did you see this other person who was
11   with Danny Clark?
12  A. I saw that person as I drove upon the
13   dirt road. I did.
14  Q. Okay. Did you get a good look at him?
15  A. Not really.
16  Q. Okay. Was that other person, was he
17   African-American or was he Caucasian?
18  A. This particular person looked to be a
19   crossbreed.
20  Q. Was he shorter or taller than
21   Mr. Clark?
22  A. I didn't pay that much attention to
23   him.

Page 72

1  Q. Do you have an understanding as to why
2    the people around the water well
3    thought that was an Internation Paper
4    employee?
5  A. No, sir.
6  Q. What did you say to the people around
7    the water well about this person who
8    was with Danny Clark?
9  A. Well, what happened, Danny Clark --
10   Danny Clark is the -- is the person
11   that claimed to be a state forester
12   that was with several people prior to
13   me coming to Surveyors' Park. So
14   Danny Clark met with me, Paul Pogue,
15   and I gave him a public announcement
16   document about Surveyors' Park and
17   pointed out to him the damage and
18   destruction that was done, and he
19   specifically stated to me that he
20   would have taken care of. I said
21   at that time, People, you all can go,
22   those that I could not identify as
23   having any rights and authority to be

18 (Pages 69 to 72)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

### Page 73

1  in and around or near this matter of
2  concern.
3      And as those people left with
4  equipment and other things, they made
5  a right, which would be going back in
6  an eastward direction, and there I
7  discovered that those very people,
8  they were all Caucasian, were around
9  the water well. And Danny Clark
10  mysteriously appeared there. And as I
11  was leaving traveling along the state
12  highway headed eastward, I happened to
13  see Danny Clark's state forestry truck
14  there, and so I came back to that
15  location. Danny Clark moved on, and
16  that's when people started talking to
17  me.
18  Q. And that sequence of events, is that
19      what led the people to believe that
20      the person meeting with Danny Clark
21      was an International Paper employee?
22  A. All of that -- that whole conversation
23      about the International Paper Company

### Page 74

1  employee or who owns the equipment,
2  the whereabouts of the various people
3  that were involved or what were they
4  doing out there. So it was just a
5  gossip conversation that took place.
6  Q. Do you have any evidence, other than
7      this gossip conversation, that Danny
8      Clark was meeting with an
9      International Paper employee?
10  A. I'm the person that happened to see
11      it. I'm the evidence. I saw that
12      with my eyes.
13  Q. I understand you saw Danny meeting
14      with somebody. Do you have any
15      evidence that that somebody worked for
16      International Paper?
17  A. Other than what was said to me. At
18      this point, I have not done discovery.
19  Q. As of this date in time, as we sit
20      here today, you don't have any
21      evidence, other than what was said
22      around the water well, that Danny
23      Clark was meeting with an

### Page 75

1  International Paper employee on the
2  property; is that correct?
3  A. I saw Danny Clark meet with the
4      International Paper Company employee.
5      And the fact that it was confirmed to
6      me that it was an International Paper
7      Company employee, I'm satisfied. So I
8      would be the evidence.
9  Q. Okay. And the reason you're satisfied
10      is solely because you heard it around
11      the water well; correct?
12  A. And it was confirmed by, I think,
13      Danny Clark at that time.
14  Q. Did Danny Clark tell you he was
15      meeting with an International Paper
16      employee?
17  A. I believe he did.
18  Q. What did Danny Clark say to you during
19      this conversation?
20  A. Danny Clark was more apologetic about
21      what had occurred. And Danny Clark
22      had a conversation -- he explained
23      that he had had a conversation with

### Page 76

1  that particular gentleman prior to me
2  getting there, an extensive
3  conversation, maybe thirty minutes to
4  an hour. So it would be Danny Clark
5  that would place this particular
6  individual, which is, I believe to be,
7  an International Paper Company
8  employee.
9  Q. And you don't know that other person's
10      name; correct?
11  A. Not at this time.
12  Q. Had you asked Danny Clark to meet you
13      on the property?
14  A. No, I did not.
15  Q. Did Danny Clark ask you to meet him on
16      the property?
17  A. No, he did not.
18  Q. Did somebody ask you to meet Danny
19      Clark on the property?
20  A. The Alabama Forestry Commission, as I
21      told you earlier, handles those
22      particular matters.
23  Q. Okay. So a dispatcher said Danny

19 (Pages 73 to 76)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 77

1    Clark or somebody is going to meet you
2    on the property?
3    A. No. The dispatcher did make
4    statements. The dispatcher referred
5    my concern -- we're talking about in
6    this particular case -- my concern to
7    some gentleman, which was in
8    Montgomery County. The particular
9    gentleman in Montgomery County stated
10    that that was outside of his area, so
11    we spoke with a gentleman or some
12    woman or somebody by phone in a place
13    called Brewton. Then that person out
14    of Brewton then called somebody back
15    in Montgomery County and we were
16    standing together down in this
17    particular building and then someone
18    else got on the phone and somehow
19    whomever it was directed me to go back
20    to the point and location of concern.
21    And that's how that come about.
22    Q. Okay. And when you got there, that's
23    when you saw Danny Clark?

Page 78

1    A. That's when I saw several people. But
2    Danny Clark was an individual that
3    came up and identified himself as a
4    forestry commission employee.
5    Q. How many people were there?
6    A. Maybe about six or seven people, I
7    would assume. I didn't really count
8    for accuracy.
9    Q. That's fine.
10    A. But it was more than Danny Clark.
11    Q. So it was you --
12    A. No. No, sir, not counting myself.
13    Q. Okay. Not counting yourself. It was
14    Danny Clark and six or seven other
15    people?
16    A. Right.
17    Q. Do you know who any of those six or
18    seven other people are?
19    A. No, sir.
20    Q. Did any of those six or seven other
21    people identify themselves to you by
22    name?
23    A. No, sir.

Page 79

1    Q. Did Danny Clark introduce you to any
2    of them?
3    A. I would say no. But I would make it
4    more clear. I think Danny Clark
5    allowed Mr. Hudson -- that was another
6    gentleman there. This gentleman's
7    name is Hudson. I do not know his
8    first name. Afro-American person that
9    was very polite and very good person.
10    And I did notice that Danny Clark was
11    using Mr. Hudson's cell phone making
12    several calls.
13    Q. Okay. Did you -- did anyone tell you
14    who Mr. Hudson worked for?
15    A. Mr. Hudson identified himself as a
16    person that works for the state.
17    Q. Did he tell you that it was a forestry
18    commission?
19    A. No, he didn't tell me that.
20    Q. Did somebody tell you that Mr. Hudson
21    worked for the forestry commissions?
22    A. Danny Clark did.
23    Q. Did Danny Clark tell you who any of

Page 80

1    the other people were?
2    A. No, he did not.
3    Q. Do you have a copy of the news release
4    that you gave to Danny Clark?
5    A. No, I do not.
6    Q. Do you have a copy with you today?
7    A. No, sir.
8    Q. Do you have a copy with you at home or
9    anywhere else?
10    A. No, sir.
11    Q. Do you know who might have a copy of
12    that?      .
13    A. Danny Clark.
14    Q. Is there anybody else who would have a
15    copy of that, that you know of?
16    A. No, sir.
17    Q. Did that news release ever appear in
18    any newspapers?
19    A. I think it did.
20    Q. Which newspaper?
21    A. I'm not familiar.
22    Q. What did you say to Mr. Clark during
23    the course of this meeting?

20 (Pages 77 to 80)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 81

1    A. I spoke with Mr. Clark about the need
2    to allow three or four Caucasians, or
3    white kids, that were on the property
4    to go without question. And I also
5    told Mr. Clark to let the disabled man
6    go, which was a white man. And I
7    think there was a white lady there and
8    I told them to let those people go,
9    and not to question another little
10   white boy, which was about seven or
11   eight or nine years old, and not to
12   question the little bitty white girl
13   and that she can go on my property and
14   get -- go get her a nice little
15   flower, which she did, and pinned to
16   her little pretty dress, and she went
17   on.
18   Q. Okay. So the disabled white person
19   and the young girl and the young boy
20   were all there at the same time?
21   A. Yes, they were.
22   Q. Do you know who they were?
23   A. No. And I did not want Mr. Clark nor

Page 82

1    Mr. Hudson to bother them.
2    Q. Were Mr. Clark or Mr. Hudson bothering
3    those people?
4    A. Well, the fact that I had met with
5    Mr. Danny Clark and explained to him
6    the frustration that I was
7    experiencing at that time and to
8    happen to see those young people
9    traveling down the Surveyors' Park
10   trail and to not know those particular
11   people, I did not want anything to
12   happen to those people.
13   Q. Were they just taking a walk on the
14   property?
15   A. As I said, those people were on the
16   property without my permission nor
17   consent.
18   Q. Okay.
19   A. And they happened to come to that
20   resting location where Clark and I
21   were standing.
22   Q. I see. So those people were there,
23   but although they didn't have your

Page 83

1    permission, you didn't want them to be
2    investigated or prosecuted; is that
3    correct?
4    A. Right.
5    Q. What else did you say to Danny Clark
6    during this meeting?
7    A. I explained to Danny Clark that as a
8    state forester that investigates, he
9    needed to get involved and look at
10   what was going on. I also gave him
11   full range and permission to walk in
12   and about Surveyors' Park trail, and
13   that he did.
14   Q. But --
15   A. And before -- before he left the
16   property, I explained to him what a
17   Christian person would do. He said
18   that he was a Christian. I said,
19   Here's a copy of this park document.
20   I'd like for you to read it and if in
21   some kind of way if you can support
22   this nonprofit effort, do it. And he
23   took it and said that all these

Page 84

1    matters would be resolved.
2    Q. What is it that you wanted Mr. Clark
3    to look into?
4    A. Wanted Mr. Clark to apply his
5    authority as an investigator and
6    determine exactly what had happened to
7    the property in terms of destruction
8    to the land, destruction to the real
9    property, just what had happened to
10   change the character in relationship
11   of Surveyors' Park as I knew it to be,
12   which it wasn't after those matters
13   were brought to the attention to the
14   forestry commission. So it was a
15   continuation of my complaint.
16   Q. What destruction of property are you
17   speaking of?
18   A. Well, you've got, as I said earlier,
19   we had oil everywhere. We had
20   chemicals everywhere. We had all
21   types of things out there that the
22   forestry commissions deal with.
23   Q. Did Mr. Clark look into these things?

21 (Pages 81 to 84)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 85

1  A. He said that he would.
2  Q. Do you know if he did or not?
3  A. Well, from all indication, nothing was
4     done as agreed to by myself and
5     Mr. Clark.
6  Q. Do you know whether or not Mr. Clark
7     investigated?
8  A. According to Mr. Clark, he said he
9     investigated the matter.
10  Q. Do you have any reason to believe that
11     he did not investigate the matter?
12  A. I have to reason to believe that he
13     didn't do an adequate investigation or
14     his investigation was slanted for
15     racial reasons.
16  Q. That's a very serious allegation,
17     Mr. Pogue. What is it that you
18     think -- what makes you believe that
19     Mr. Clark's investigation was slanted
20     for racial reasons?
21  A. First of all, as it was understood and
22     determined out there on the property,
23     all of these people that were involved

Page 86

1     in what we're talking about, which
2     makes the basis of this Complaint,
3     were white people. And for the
4     destruction to take place and for the
5     theft to take place and all other
6     matters to take place that were
7     wronged to myself and Surveyors' Park,
8     they were all white people. And if
9     you're looking at the forestry and
10     related laws, it specifically tells
11     you what you must do and what you must
12     not do irrespective of race, color,
13     creed, national origin.
14  Q. Do you have any evidence that
15     Mr. Clark discriminated against you on
16     the basis of your race?
17  A. All indications that I think a jury,
18     if they were to hear the facts, they
19     will conclude that definitely not only
20     was I discriminated and denied equal
21     benefits under the workings of the
22     law, but also it would be clearly
23     shown that due to the nature of the

Page 87

1     matters and those involved and
2     equipment involved, which are owned by
3     white people, caused Mr. Clark to do
4     nothing, which would benefit all white
5     people.
6  Q. What evidence do you have, if any,
7     that Mr. Clark handled his
8     investigation in particular ways
9     because of either your race or the
10     race of the other people involved?
11  A. Well, he knew my race and he also knew
12     the race of all those people that were
13     involved. Plus, if you understand the
14     Alabama law as it relates to forestry
15     laws, you'll understand that he has
16     the full range of authority to get to
17     the bottom of what was going on and to
18     ascertain what needed to be done and
19     what needed not to be done at his
20     discretion, and he went above and
21     beyond that. And one of the first and
22     early on matters that seems to suggest
23     that he was somehow connected to a

Page 88

1     racial effort to not do was when he
2     congregated with those that actually
3     had actually done wrong and were
4     getting away from the property. So
5     you got different people, different
6     groups of people that were involved.
7  Q. Okay. And you said because you saw
8     Mr. Clark with those other groups of
9     people, that leads you to believe that
10     he discriminated against you?
11  A. Well, in order to prove
12     discrimination, I would think, and I'm
13     not a judge or justice of the supreme
14     court. I'm not a person that would
15     deal with the writing of the laws and
16     interpreting the laws. But I would
17     think that the way that I would want
18     to make the allegation, say that this
19     took place, would be to find whether
20     or not the forestry commission has
21     done similar matters or how have they
22     treated -- treated white people. And
23     I think that there will be enough

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 89

1  information, again, once the discovery
2  is done, to confirm this particular
3  matter. But I would leave it to the
4  judge and jury.
5  Q. Do you have any facts or
6  investigations or information or
7  evidence that the forestry commission
8  has treated black people differently
9  from white people?
10  A. Mr. Conway is not in here, but I think
11  I spoke with him by phone -- and he's
12  supposed to be a forestry commission
13  attorney -- and I asked that we do the
14  deposition of Clark and Chandler all
15  in one day so that we wouldn't have
16  the cart before the horse today are
17  the people that were blessed and
18  entitled with the Alabama law of
19  protection to investigate matters. I
20  was not given that authority to do so.
21  So I would need to question those
22  particular people extensively to come
23  to the conclusion. But as it stands

Page 90

1  now, I would rely on the judge and
2  jury to conclude that.
3      MS. BRELAND: Do you have any
4  personal knowledge of any
5  discrimination by Mr. Clark or
6  Mr. Chandler against any other person
7  than yourself?
8      MR. POGUE: I would have to --
9  please do understand that I do not
10  recognize Clark and Chandler as the
11  forestry commission. I recognize them
12  as agents. So I would be looking at
13  what the forestry commission has done,
14  what the forestry commission continues
15  to do, a pattern and practice there.
16  Q. Do you have any information that
17  Mr. Clark or Mr. Chandler have
18  discriminated against anybody as a
19  result of their race?
20  A. Yes, myself. And that's what this
21  case is about.
22  Q. All right. And the reason that you
23  believe they discriminated against you

Page 91

1  is because you were black and because
2  they and the other people that are
3  involved are white; is that correct?
4  A. I'm saying that the forestry laws
5  would dictate bearing out the truth of
6  the race and the truth of how I was
7  treated versus how others were treated
8  by the forestry commission --
9  Q. Have --
10  A. -- under like and similar
11  circumstances.
12  Q. Have you told me all the evidence or
13  facts that you have available to you
14  today that suggest that Mr. Clark or
15  Mr. Chandler discriminated against you
16  on the basis of race?
17  A. Well, as I said earlier, my Complaint
18  speaks for itself. And I'm
19  incorporating my Complaint in my
20  entire conversation. But as I said,
21  Mr. Conway did not make Chandler nor
22  Clark available to me so that I can
23  take their depositions and get the

Page 92

1  information that I know that they
2  would have to make my case for racial
3  discrimination. So discovery is just
4  beginning.
5  Q. Okay. But you've told me everything
6  that you know up to today, correct,
7  about any discrimination?
8  A. I've explained to you that according
9  to the laws and according to who I am
10  and according to who others were and
11  under like and similar circumstances,
12  I would think, and I strongly believe,
13  that racial discrimination has
14  occurred. I also believe that my
15  rights as a citizen have been
16  violated, and any protection clause
17  should support me in this effort.
18  Q. Mr. Pogue, did you ever speak with
19  anybody in the district attorney's
20  office about any so-called destruction
21  of property on Surveyors' Park?
22  A. I -- no, sir.
23  Q. Okay. Paragraph 20(a), Mr. Pogue,

23 (Pages 89 to 92)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 93

1    says, Clark did not prepare a report
2    in connection with theft of property,
3    nor did he seize Ingram's equipment.
4    What makes you believe that Clark did
5    not prepare a report?
6    A. Clark told me he didn't do it.
7    Q. What kind of report are you speaking
8    of?
9    A. Well, we need to go by -- like I said
10   earlier, we need to go by what the
11   forestry laws requires. The forestry
12   laws require that the forestry make
13   out a report detailing what the
14   complainant is complaining or alleging
15   and getting to the bottom of it, and
16   Clark didn't do that.
17   Q. Do you believe Mr. Clark should have
18   seized the equipment that you're
19   speaking of?
20   A. Yes, sir.
21   Q. Why?
22   A. Well, under the forestry laws -- and
23   I'm not the lawyer for the forestry

Page 94

1    commission -- but under the Alabama
2    laws, the related forestry laws, it
3    gives the forester, investigator,
4    broad authority and discretion. And
5    when something is on someone's
6    property or something is going on that
7    causes a person to file a complaint or
8    voice the complaint and it begins at
9    the main headquarters and then
10   trickles down to the actual local and
11   you discover property on -- theft of
12   forestry equipment and other property,
13   then naturally it's supposed to be a
14   custom and a policy and practice for
15   the forestry to at least identify this
16   particular property and make it known
17   to the landowner, make it known to the
18   person that is alleging that his
19   personal property has been violated.
20   Q. And are you saying that no such report
21   was made in this case?
22   A. Not given to me.
23   Q. Are you saying that Danny Clark did

Page 95

1    not give you such a report or are you
2    saying that nobody gave you any such
3    report?
4    A. Danny Clark didn't give me a report.
5    Q. Did anybody else give you a report?
6    A. No, sir.
7    Q. Have you ever seen a written report
8    about your allegations?
9    A. I wouldn't be able to answer that
10   question. But if you will rephrase
11   the question, I can answer as it
12   relates to a report.
13   Q. How do you want me to rephrase it?
14   A. Maybe if you ask me whether or not
15   I've seen something that looks to be
16   or was alleged to be a report, it
17   would be in the affirmative.
18   Q. Okay. Now, I just asked you that
19   question. Have you seen something
20   alleged to be a report?
21   A. Yes, I did.
22   Q. Okay. Why do you say it's not a
23   report?

Page 96

1    A. What I saw was something that was
2    shown to me by a young lady in Mobile
3    Federal District Court. And I told
4    her at that time I had nothing to do
5    with that, knew nothing about it, and
6    requested a copy of it.
7    Q. Did you ever come to this building to
8    pick something up at the front desk?
9    A. I do not recall.
10   Q. Did you come here intending to pick up
11   something at the front desk?
12   A. Do not recall.
13         (Defendants' Exhibits 6, 7,
14          and 8 were marked for
15          identification.)
16   Q. Mr. Pogue, I'm going to show you
17   documents that I've marked as
18   Defendants' Exhibits 6, 7, and 8.
19   A. Yes, sir.
20   Q. And I'll ask if any of those are the
21   documents that you saw in Mobile that
22   was described as a report to you.
23         (Mr. Pogue reviews documents.)

24 (Pages 93 to 96)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

---

Page 97

1  A. Ready?
2  Q. Yes.
3  A. As to Defendants' Exhibits 6, 7, and
4     8, these are not the documents that I
5     was shown or otherwise that I recall
6     intercepting in federal court in
7     Mobile, Alabama.
8  Q. You don't believe any of those are the
9     documents that somebody showed you
10    while you were in Mobile; correct?
11 A. Well, the lawyer -- the judge asked
12    the lawyer -- the magistrate asked the
13    lawyer to show me after I objected and
14    requested that I be shown what was
15    being ex parte shown to him. So these
16    are not the documents that I recall
17    seeing.
18       (Defendants' Exhibit 9 was
19       marked for identification.)
20 Q. I only have one copy of this document
21    that I've marked as Exhibit 9. May I
22    come over so we can look at it
23    together?

---

Page 98

1  A. Yes, sir.
2  Q. It's an area photograph, Mr. Pogue,
3     that I'll represent to you that
4     Mr. Conway was able to get off mapping
5     software that is of the property that
6     was labeled as the Darden estate.
7     And do you see where it reads State
8     Route 219?
9  A. Yes, sir.
10 Q. Do you recognize this to be the
11    property that is at issue in either
12    this case or in the Mobile lawsuit?
13 A. I would object as to what's going on
14    in the Mobile lawsuit. But I
15    cannot -- I can't see this. I can't
16    determine from this photograph because
17    it's not marked north, south, east, or
18    west, and it doesn't have the legend
19    on it to tell me exactly what it is.
20    So I can't identify -- I can't answer
21    that question.
22 Q. You're not able to tell me whether it
23    is or whether it is not the property?

---

Page 99

1  A. No, sir.
2       (Off-the-record discussion.)
3       (Defendants' Exhibit 10 was
4       marked for identification.)
5  Q. Mr. Pogue, I've handed you a document
6     marked as Defendants' Exhibit 10.
7     Do you recognize that document,
8     Mr. Pogue?
9  A. No, I do not.
10 Q. Is the signature that appears on
11    Exhibit 10 the signature of Valissa
12    Darden Pogue?
13 A. I would not know that, sir.
14 Q. Would you recognize Valissa Darden
15    Pogue's handwriting?
16 A. I can't -- I'm not a handwriting
17    expert. I can't do that.
18 Q. Does it appear to be your wife's
19    signature?
20 A. I would have to object to that
21    question. I would say I can't answer
22    that question.
23 Q. Do you have any idea whether or not

---

Page 100

1     that is your wife's signature?
2  A. No, I do not.
3  Q. Does Valissa Darden Pogue have an
4     address of Route 6, Box No. 334,
5     Selma, Alabama?
6  A. Not as I know of.
7  Q. Do you know what that -- whose address
8     that is, Route 6, Box 334, Selma,
9     Alabama?
10 A. That's an address that I'm familiar
11    with.
12 Q. How are you familiar with that
13    address?
14 A. I know it.
15 Q. How do you know it?
16 A. It's an address that I'm familiar
17    with.
18 Q. Who lives at that address?
19 A. No one lives at that address.
20 Q. What is located at that address?
21 A. That's a postal number that the -- I
22    think it gets -- you have to ask the
23    postal authority about that.

25 (Pages 97 to 100)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 101

1  Q. Do you know who gets mail at that
2     address?
3  A. I do.
4  Q. Does anyone reside at that address?
5  A. No, sir.
6  Q. Do you know if Valissa Darden Pogue
7     made a complaint to the Alabama
8     Forestry Commission?
9  A. No, sir.
10 Q. Do you know if she ever sent a letter
11    to the Alabama Forestry Commission?
12 A. No, sir.
13 Q. This Exhibit 10 purports to complain
14    about criminal trespass, destruction
15    of property, and transporting and
16    selling of stolen timber fiber from
17    property located at section 8,
18    township 18 north, at range 10 east,
19    Perry County, Alabama. Do you know
20    who owns that real property?
21 A. No, sir.
22 Q. Do you own that real property?
23 A. No, sir.

Page 102

1  Q. Do you know if your wife ever made a
2     complaint to the forestry commission
3     about stolen timber?
4  A. No, sir.
5  Q. Are you bringing this lawsuit on
6     behalf of your wife?
7  A. The lawsuit speaks for itself. The
8     one that I'm bringing is on behalf of
9     Paul Pogue and Paul Pogue in his
10    capacity of Surveyors' Park.
11 Q. You're intending to assert claims only
12    on behalf of Paul Pogue and who?
13 A. Exhibit 1 speaks for itself. Paul
14    Pogue and Paul Pogue in his capacity
15    as owner of Surveyors' Park.
16 Q. When you saw documents in Mobile,
17    Mr. Pogue --
18 A. Yes, sir.
19 Q. -- and I'm talking about the documents
20    that somebody said was a report but
21    you say is not a report. Do you know
22    what I'm speaking of?
23 A. Not exactly.

Page 103

1  Q. Okay. What did you see in Mobile,
2     what documents?
3  A. The document that Magistrate Cassady
4     instructed Sandra G. Robinson to show
5     to me that Sandra G. Robinson had gone
6     on her own to engage in ex parte
7     communications with Magistrate
8     Cassady. And I said to Mr. Cassady, I
9     would like to see exactly what she's
10    showing you. So those particular
11    documents that were shown to me are
12    different from what I can identify
13    here that you have marked as
14    Exhibit 6 --
15 Q. Did you receive --
16 A. -- 7.
17 Q. Did you receive a copy of the
18    documents that you saw in Mobile?
19 A. No, sir.
20 Q. Did you bring any documents with you
21    today, Mr. Pogue?
22 A. No, sir.
23 Q. What do you have in the notebook

Page 104

1     that's in front of you?
2  A. That's -- that's the notice of the
3     deposition of Paul Pogue.
4  Q. What else is in the notebook?
5  A. That's something of a commercial
6     business nature. Has nothing to do
7     with this case.
8  Q. Did you ever receive a fax from Tony
9     Chandler?
10 A. Could you rephrase your question?
11 Q. Did Tony Chandler ever send a fax to
12    you?
13 A. Tony Chandler faxed a report to the
14    forestry commission and I received a
15    copy from the Alabama Forestry
16    Commission.
17 Q. Do you still have that, Mr. Pogue --
18 A. No.
19 Q. -- that fax?
20 A. This -- you -- I think you -- you have
21    it. It's dealing with something that
22    Danny Clark -- yes, that's your
23    Exhibit 3.

26 (Pages 101 to 104)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 105

1  Q. Okay. It says, Please give this copy
2  of scale tickets to Paul Pogue?
3  A. Right.
4  Q. And is that all that you received from
5  Mr. Clark?
6  A. I didn't receive it from Mr. Clark.
7  Q. I beg your pardon. I meant from
8  Mr. Chandler. Is that all you
9  received from Tony?
10  A. I didn't receive it from Tony
11  Chandler.
12  Q. Who did you receive it from?
13  A. From the Alabama Forestry Commission.
14  Q. Is that all that you received from the
15  Alabama Forestry Commission?
16  A. And I think I received a letter from
17  an attorney from the Alabama Forestry
18  Commission.
19      MS. BRELAND: Would that have
20  been from me or Mr. Conway?
21      MR. POGUE: I don't remember
22  it being Mr. Conway.
23      MS. BRELAND: Would it have

Page 106

1  been from me?
2      MR. POGUE: I don't remember.
3  But it was someone that alleged to be
4  an attorney for the state.
5  Q. Do you have a copy of that?
6  A. No, I do not.
7  Q. What did you do with it?
8  A. Discarded it.
9  Q. What did it say?
10  A. I don't remember, but I do remember
11  that it was a letter from an attorney.
12  Q. What was it about?
13  A. I don't recall.
14  Q. Was it about Surveyors' Park or
15  Surveyors' Park property or
16  International Paper?
17  A. I don't recall. But I'm not the
18  attorney for the forestry commission.
19  Q. Did it have anything to do with this
20  lawsuit?
21  A. Not as I know of.
22      (Defendants' Exhibit 11 was
23  marked for identification.)

Page 107

1  Q. I'll show you a document marked as
2  Exhibit 11, Mr. Pogue.
3  A. Yes, sir.
4  Q. I've marked it as Exhibit 11. Have
5  you ever seen that document before
6  today?
7  A. I cannot say that I have. But I can
8  say that I've received something that
9  looks similar to this --
10  Q. Okay.
11  A. -- from the Alabama Forestry
12  Commission.
13  Q. Do you know what Exhibit 12 shows?
14  A. I don't have Exhibit 12.
15  Q. I beg your pardon. I meant 11. I
16  just misnumbered.
17      (No immediate response given.)
18  Q. Mr. Pogue, do you know what is shown
19  on Exhibit 11?
20  A. No, sir. But I've looked at it.
21  Q. Do you know if they are scale tickets?
22  A. It says, International Paper Riverdale
23  Mill, fiber scale ticket.

Page 108

1  Q. And you're not sure if this is what
2  was given to you previously by the
3  forestry commission?
4  A. No, sir.
5  Q. Did you receive any scale tickets from
6  the forestry commission?
7  A. I received from the front -- well,
8  Madison -- Madison 513 or 512 Madison
9  office this particular -- something
10  that looks similar to this particular
11  document and the document you've
12  identified as Exhibit 3.
13  Q. Did you keep that document?
14  A. Sir?
15  Q. Did you keep that document that you
16  received from the forestry commission?
17  A. No, sir.
18  Q. What did you do with it?
19  A. Discarded it.
20  Q. When did you discard it?
21  A. The day I received it.
22  Q. Why did you discard it?
23  A. Because it was nothing that I could

27 (Pages 105 to 108)

Page 109

1    recognize as identifying me; thought
2    it was an error.
3    Q. You thought they had sent you copies
4    of the wrong scale tickets?
5    A. No, I didn't say that. I said it had
6    nothing to do with me.
7    Q. Do you need a break, Mr. Pogue?
8    A. No, sir.
9    Q. I just didn't want to interrupt you.
10    We'll proceed.
11    A. Yes, sir.
12         (Defendants' Exhibit 12 was
13         marked for identification.)
14    Q. I'll show you Exhibit 12 and ask if
15    you've seen that document before?
16    A. I remember seeing and comprehending a
17    document similar to this, but that
18    document would have had someone's
19    initials on it. It's not signed by
20    Tony Chandler. I'd like to see the
21    original.
22    Q. What did you do with the one that you
23    received?

Page 110

1    A. That looked similar to the one that is
2    here?
3    Q. Correct.
4    A. I do not know at this time.
5    Q. Do you still have it?
6    A. I do not know if I have it at this
7    time.
8    Q. But did you get something that says
9    basically the same thing that
10    Exhibit 12 says?
11    A. I received something of this nature.
12    Q. Did you get something that says --
13    actually, let me ask a different
14    question.
15         Did you ever ask Tony Chandler to
16    send you a letter stating that you
17    have never officially signed or filed
18    a complaint in his office?
19    A. I remember telling Tony Chandler by
20    phone that he was engaging in racism
21    and that race played a role in it.
22    And I also asked him to remove himself
23    as a state employee dealing with this

Page 111

1    matter. I remember telling him that.
2    Q. Did you ask him to send you a letter
3    stating that you had never officially
4    signed or filed a complaint in his
5    office?
6    A. I don't recall asking him to do that
7    and I have not taken his deposition.
8    Q. Mr. Chandler wrote that he has a
9    complaint in this office that was
10    initially filed by your wife. Do you
11    know anything about that complaint?
12    A. No, sir.
13    Q. Do you remember Mr. Chandler informing
14    you about a complaint filed by your
15    wife?
16    A. No, sir.
17    Q. Did the letter that you receive have
18    this sentence in it?
19    A. Are you referring to Document 12?
20    Q. I am.
21    A. I think this is an altered -- altered
22    document and probably fraudulent as it
23    is presented to me. I do not remember

Page 112

1    anything of this nature.
2    Q. Have you ever spoken to Valissa Darden
3    Pogue about any conversation or
4    communication she had with the
5    forestry commission?
6    A. No, sir.
7    Q. Has she ever told you that she sent a
8    letter to the forestry commission?
9    A. No, sir.
10    Q. Does -- Valissa Darden Pogue, is she
11    aware of this lawsuit?
12    A. I wouldn't know. You'd have to ask
13    her that.
14    Q. Have you discussed it with her?
15    A. No, I have not talked -- spoken with
16    her about the lawsuit for which I
17    filed.
18    Q. Have you ever spoken to her about
19    Surveyors' Park?
20    A. Yes.
21    Q. Have you ever spoken to her about
22    allegedly stolen timber from the
23    property of Surveyors' Park?

28 (Pages 109 to 112)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 113

1  A.  No, I have not.
2  Q.  What did you discuss with her about
3      Surveyors' Park?
4  A.  I said I have not spoken with her
5      about Surveyors' Park.
6  Q.  I misunderstood.
7         (Defendants' Exhibit 13 was
8      marked for identification.)
9  Q.  Can you identify the document marked
10     as Defendants' Exhibit 13, Mr. Pogue?
11 A.  Document 13 is a document that appears
12     to be a document that I would know
13     something about.
14 Q.  What do you know about this document?
15 A.  It seems to be a document that was
16     written to Mr. Chandler and a copy to
17     the department of environmental
18     management.
19 Q.  Forestry assets are missing from my
20     property located in Perry County --
21     I'm reading from the first line.  What
22     property is this speaking of?
23 A.  This is a different matter that is not

Page 114

1      involving the case that we're in court
2      about.
3  Q.  So Exhibit 13 has nothing to do with
4      the allegations of this lawsuit; is
5      that correct?
6  A.  Right.
7  Q.  What property, then, is it speaking
8      of?
9  A.  I think this letter was written to
10     Tony Chandler because I was very much
11     concerned about the way he was
12     handling the investigation.  And I had
13     spoken where several forestry
14     commission employees, and they
15     instructed me to write him a letter to
16     get the investigative report that he
17     would have, which I had not received.
18 Q.  It's your contention that you never
19     received a copy of this investigation?
20 A.  He stated -- he stated that himself.
21     But I will have to take his deposition
22     to see if he sent me that.
23 Q.  Did you receive it?

Page 115

1  A.  I said I would have to take his
2      deposition.
3  Q.  You don't have to take his deposition
4      to tell me what you've received.  Did
5      you receive it or did you not?
6  A.  I don't recall receiving anything from
7      Mr. Tony Chandler.
8        MS. BRELAND:  Excuse me,
9      Mr. Pogue.  What report were you
10     asking for if you said this has
11     nothing to do with the lawsuit, your
12     request for a report?
13       MR. POGUE:  Attorney, you need
14     to read the entire letter, and then I
15     guess you would answer your own
16     question.  But --
17       MS. BRELAND:  Well, you
18     said --
19       MR. POGUE:  -- writing him a
20     letter -- writing him a letter for
21     matters that are different from this
22     particular matter would be what we
23     need to get straightened out here.

Page 116

1        MS. BRELAND:  Okay.  Well,
2      what --
3        MR. POGUE:  What I'm saying to
4      you, ma'am, is that if a copy went to
5      the Alabama Department of
6      Environmental Management, then we're
7      dealing with an issue that is a
8      different issue under the best
9      management practice law.  You need to
10     understand that.
11       MS. BRELAND:  Did you request
12     a report from Mr. Chandler about what
13     this lawsuit is about?
14       MR. POGUE:  I requested from
15     Mr. Chandler, according to this
16     particular letter -- and I would
17     object to all exhibits, because I
18     believe they are somewhat altered or
19     fraudulent.  But if it says the
20     Alabama Department of Environmental
21     Management, and if I had something to
22     do with the letter, this was dealing
23     specifically with the BMP and the laws

29 (Pages 113 to 116)

Page 117

1 pertaining to BMP.
2 MS. BRELAND: What was your
3 complaint to Mr. Chandler about this
4 lawsuit?
5 MR. POGUE: What are you
6 speaking of? You need to rephrase
7 your question.
8 MS. BRELAND: Okay. Did you
9 ask --
10 MR. POGUE: Are we leaving
11 Exhibit 13?
12 MS. BRELAND: Yes, since you
13 said it doesn't have to do with this
14 lawsuit.
15 MR. POGUE: It has something
16 to do with BMP.
17 MS. BRELAND: Okay. But it
18 doesn't have to do with this lawsuit?
19 MR. POGUE: Best management
20 practice.
21 MS. BRELAND: Does it have to
22 do --
23 MR. POGUE: That would

Page 118

1 probably be another matter.
2 MS. BRELAND: Okay. Well, did
3 you request a report from Mr. Chandler
4 about anything having to do with this
5 lawsuit?
6 MR. POGUE: I would say the
7 answer to that question, ma'am, when I
8 made the request with Mr. Chandler,
9 this lawsuit had not been filed. So
10 it wouldn't have been pertaining to
11 the lawsuit. It would have been
12 pertaining to what the State of
13 Alabama says that I'm entitled to as a
14 complainant.
15 MS. BRELAND: Okay. Well --
16 MR. POGUE: In other -- in
17 other words, making it clear, I'm
18 saying to you that you're putting the
19 cart before the horse. I was asking
20 Mr. Chandler for an investigative
21 report pertaining to all matters.
22 And, therefore, it would not have been
23 pertaining to this particular lawsuit.

Page 119

1 It would have been pertaining to his
2 investigation, period.
3 MS. BRELAND: Okay. His
4 investigation of what? What did --
5 MR. POGUE: Follow the --
6 MS. BRELAND: -- you ask him
7 to investigate?
8 MR. POGUE: Following the
9 laws, the forestry-related laws as it
10 deals with the enforcement of the
11 Alabama laws.
12 MS. BRELAND: Okay. But as --
13 MR. POGUE: So that's
14 inclusive.
15 MS. BRELAND: Okay. What did
16 you ask him to investigate, though?
17 MR. POGUE: The forestry
18 commission did that. I did not do
19 that.
20 MS. BRELAND: Okay. Well,
21 what did you --
22 MR. POGUE: I took my problem
23 to the forestry commission.

Page 120

1 MS. BRELAND: Okay. What did
2 you ask the forestry commission to
3 investigate?
4 MR. POGUE: To investigate any
5 and all matters pertaining to forestry
6 assets, manufactured and
7 unmanufactured forestry products.
8 MS. BRELAND: Belonging to
9 anybody?
10 MR. POGUE: That's right.
11 MS. BRELAND: Okay. And that
12 is what you are saying he
13 discriminated against you by not
14 conducting that investigation
15 properly?
16 MR. POGUE: I didn't say that.
17 I said that -- and my lawsuit speaks
18 for itself. And if you don't
19 understand it, file a Rule 12(b)
20 Motion. But going beyond that, I'm
21 saying to you that I wasn't the
22 investigator nor was I the initiator.
23 The initiation point for the

30 (Pages 117 to 120)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 121

1  investigation, which invokes the state
2  authority, comes by way of the
3  forestry commission and not me.
4  This -- this is what I'm saying about
5  these lines of questioning. You all
6  are seeming to think that I'm the
7  forestry commission. I'm not. I'm
8  not the investigator. What I did was
9  brought the problems to the forestry
10  commission and the forestry commission
11  then had access and authority to do
12  its investigation, hopefully pursuant
13  to State of Alabama laws. And these
14  particular parties and all that were
15  involved were white and I'm black and
16  I do know that I was discriminated
17  against under the laws of the State of
18  Alabama and federal laws and civil
19  rights laws that are designed to
20  protect me.
21      MS. BRELAND: And you told all
22  the ways that you were discriminated
23  against? You told those to

Page 122

1  Mr. Davis?
2      MR. POGUE: Remember, as I
3  said, I asked Mr. Conway for all of us
4  to get together and so we can do the
5  depositions, all, so that we can get
6  the matters resolved. But I have not
7  had an opportunity to talk to
8  Mr. Chandler nor Mr. Clark so that I
9  can take their deposition and get the
10  information and the accurate reports
11  or the authentic reports that they are
12  duty-bound to release to me. That has
13  not happened.
14      MR. DAVIS: Let's take a break
15  for a few minutes. Mr. Pogue, is that
16  okay with you?
17      MR. POGUE: Yes, sir.
18      MR. DAVIS: Thank you. Let's
19  come back in about five minutes.
20      (Short recess.)
21      (Defendants' Exhibit 14 was
22      marked for identification
23  Q. (By Mr. Davis) Mr. Pogue, can you

Page 123

1  identify for me the document marked as
2  Exhibit 14?
3  A. I cannot identify this document.
4  Q. Did you ever receive a copy of that
5  document?
6  A. No, sir.
7      (Defendants' Exhibit 15 was
8      marked for identification.)
9  Q. Exhibit 15 is a copy of a letter
10  addressed to Mrs. Valissa D. Pogue
11  from Tony Chandler. Have you ever
12  seen a copy of this document,
13  Mr. Pogue?
14  A. No, sir. I know nothing about it.
15  Q. Did you ever discuss this with
16  Mrs. Pogue?
17  A. No, sir. I know nothing about that.
18  Q. Going back to Exhibit 1, which is the
19  Complaint, Mr. Pogue --
20  A. Yes, sir.
21  Q. -- if I may refer you to paragraph 22
22  on page 6.
23  A. Oh, I left that document out in the

Page 124

1  car. We need to take a break and let
2  me go back and get it.
3  Q. That would be fine, if you wouldn't
4  mind. Did you take any of the other
5  exhibits out to the car?
6  A. No, sir. No, sir.
7  Q. Because we have to make sure those
8  stay with the court reporter.
9  A. Yes, sir.
10  Q. If you can get that.
11  A. I can get that.
12      (Off the record.)
13  Q. Page 6, paragraph 22. Are you ready?
14  A. Yes.
15  Q. Mr. Pogue, paragraph 22 of your
16  Complaint says that, Tony Chandler and
17  Danny Clark, quote, denied Plaintiff
18  an opportunity to file criminal
19  complaints, closed quote. How did
20  they deny you an opportunity to file a
21  criminal complaint?
22  A. Well, my role as a citizen would be to
23  ask that a criminal complaint be

31 (Pages 121 to 124)

Page 125

1  filed. I asked that a criminal
2  complaint be filed pertaining to the
3  matters that I allege in this lawsuit,
4  and nothing happened.
5  Q. What type of criminal complaint did
6  you wish to raise?
7  A. Well, that which is cited in the
8  Alabama related laws manual, all those
9  that a law enforcement official and
10  employee of the forestry commission
11  can conceivably file.
12  Q. Do you think somebody broke the law
13  with respect to personal property
14  owned by you?
15  A. I can't make that determination. As I
16  said, I'm dealing with law
17  enforcement. I'm not the
18  investigator.
19  Q. Okay. At the bottom of that page it
20  says that these people, quote, failed
21  to provide plaintiff with the same and
22  similar services as was provided to
23  white citizens. Are you saying that

Page 126

1  white citizens got better treatment
2  than you did from Mr. Chandler and
3  Mr. Clark?
4  A. Around the well -- around the well,
5  the conversation led me to believe
6  that.
7  Q. What was said that led you to believe
8  that?
9  A. If I had been a white person,
10  something would have been done for me.
11  Q. Who said that?
12  A. The people around the water well.
13  Q. Could you tell me the names?
14  A. No, sir.
15  Q. Is there anything else that leads you
16  to believe that Tony Chandler and
17  Danny Clark would have given white
18  people better treatment than they gave
19  to you?
20  A. That's what the conversation in the
21  community around the water well
22  · suggested to me.
23  Q. Could you name me any white person who

Page 127

1  has received better treatment from the
2  forestry commission than you?
3  A. I would have to get that information
4  from Chandler and Clark.
5  Q. As we sit here today, do you know of
6  any white people who got better
7  treatment than you?
8  A. That would be in the forestry
9  commission's office. I don't have
10  that information.
11  Q. Page 12 of your Complaint, Mr. Pogue.
12  A. Yes, sir.
13  Q. At the top of that page in the
14  paragraph marked 5 you say you want
15  the Court to compel Tony Chandler and
16  Danny Clark to get the FBI involved.
17  What is it that you want the FBI to
18  do?
19  A. Well, pursuant to the federal
20  authority that the FBI would have,
21  their scope and authority to find out
22  what's going on as relates to me and
23  my civil rights, my rights as a

Page 128

1  citizen to be free from acts that I'm
2  alleging in this entire Complaint.
3  Q. Mr. Pogue, are you seeking monetary
4  damages in this case?
5  A. I'm seeking damages in this case.
6  Q. What are you seeking?
7  A. I'm seeking damages from Tony
8  Chandler. I'm seeking damages from
9  Danny Clark in their individual
10  capacities, not in their physical
11  capacities.
12  Q. And what amount of damages are you
13  seeking?
14  A. Pursuant to this Complaint, as stated
15  in the Complaint.
16  Q. How did you calculate damages?
17  A. I think the jury will ultimately deal
18  with that matter. Their behavior and
19  the way that they did things, I think
20  it would be somewhat punitive in their
21  individual capacity, not in their
22  official capacity. But that will be
23  left up to a judge and jury. I just

32 (Pages 125 to 128)

Page 129

1     made the allegations.
2   Q. Are you claiming that they injured any
3     property that belonged to you?
4   A. I think in the Complaint it
5     specifically states that my property
6     rights as a citizen. I think in the
7     Complaint it talks about me and my
8     understanding --
9   Q. Are you employed, Mr. Pogue?
10  A. Yes, I am.
11  Q. Where are you employed?
12  A. I'm the president of the Alabama
13    Constitutional Institute and I'm a
14    practicing arbiter.
15  Q. You're a practicing --
16  A. -- arbiter. I arbitrate cases.
17  Q. Where is the Alabama Constitutional
18    Institute located?
19  A. Montgomery, Alabama.
20  Q. What is its address?
21  A. 1704 Goode, G-O-O-D-E, Street,
22    Montgomery, Alabama.
23  Q. How long have you been president of

Page 130

1     the Alabama Constitutional
2     Institution?
3   A. Since 1989. Excuse me.
4         (Phone interruption.)
5   Q. Do you need a break, Mr. Pogue?
6   A. No.
7   Q. Are you employed in any other matter?
8   A. As a consultant. I'm open for
9     consulting jobs.
10  Q. What type of consulting?
11  A. Any matters pertaining to research and
12    writing.
13  Q. Where did you work before 1989?
14  A. I was a student.
15  Q. Where were you a student?
16  A. At Jones School of Law.
17  Q. Did you receive a juris doctorate from
18    Jones School of Law?
19  A. No, I did not.
20  Q. How long did you attend Jones School
21    of Law?
22  A. I don't really recall because I go
23    there annually for their continuing

Page 131

1     legal courses, but I think it may have
2     been a year or so.
3   Q. Approximately two semesters?
4   A. Are you including the -- rephrase your
5     question.
6   Q. You were a student at Jones School of
7     Law for approximately one year?
8   A. If you're excluding the continuing
9     legal education classes that I take,
10    yes.
11  Q. And what were you doing before you
12    were a student at Jones School of Law?
13  A. I was a student at University of
14    Alabama and Miles School of Law.
15  Q. Did you receive a degree from the
16    University of Alabama?
17  A. No, I did not.
18  Q. How long did you attend the University
19    of Alabama?
20  A. I think it was a year.
21  Q. And you took classes at Miles;
22    correct?
23  A. Yes.

Page 132

1   Q. Have you been to any colleges other
2     than the University of Alabama?
3   A. Yes.
4   Q. Do you have a college degree?
5   A. Yes.
6   Q. Where did you get that degree?
7   A. Alabama State University at
8     Montgomery.
9   Q. What is your degree in?
10  A. Education.
11  Q. When did you get that degree?
12  A. I can't remember the year, but many
13    years ago.
14  Q. Approximately when was it?
15  A. Probably '94, '95.
16  Q. Have you ever worked as an educator?
17  A. Yes.
18  Q. Where?
19  A. The Alabama Constitutional Institute.
20  Q. Where do you live?
21  A. Within the State of Alabama.
22  Q. What is your residential address?
23  A. 301 K-A-H-N Street.

33 (Pages 129 to 132)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 133

1  Q.  K-A-H --
2  A.  N.
3  Q.  -- N Street.  Is that where you get
4      all your mail?
5  A.  Probably not.
6  Q.  Where else do you get mail?
7  A.  I can't recall at this time.  Oh, with
8      the exception of Route 6, Box 334.
9  Q.  The building at 301 K-A-H-N Street
10     appears to be abandoned, Mr. Pogue.
11     Is that, in fact, where you stay at
12     night?
13  A.  301 Kahn Street.
14  Q.  Mr. Pogue, do you not want to tell me
15     where you live?
16  A.  301 Kahn Street.  I gave you -- I
17     answered your question.
18  Q.  Is that --
19  A.  Now, if we need to go any further, we
20     need to take it to the judge as far as
21     where I live.  I said 301 Kahn Street.
22  Q.  Are you representing to me and to the
23     Court that that is, in fact, where you

Page 134

1      live, Mr. Pogue?
2  A.  That's right.
3  Q.  Is it, in fact, where you live?
4  A.  That's right.
5  Q.  Where does Mrs. Pogue live?
6  A.  Mrs. Pogue lives at P.O. Box 363,
7      Mobile, Alabama.
8  Q.  What is her residential address?
9  A.  Residential address would be 356 South
10     Lawrence Street.
11  Q.  Mobile?
12  A.  Yes, sir.
13  Q.  Do you ever reside at 356 South
14     Lawrence Street, Mobile, Alabama?
15  A.  If I choose to do so.
16  Q.  Does Mr. Pogue -- does Mrs. Pogue have
17     a residential address in Montgomery?
18  A.  Not as I know of.
19  Q.  Are you and Mrs. Pogue separated?
20  A.  I object to that question.  No, we're
21     not.
22  Q.  Have you ever been a member of any
23     branch of the military, Mr. Pogue?

Page 135

1  A.  Yes, I have.
2  Q.  What branch?
3  A.  The United States Armed Services, the
4      United States Army, proud United
5      States Army.
6  Q.  What years were you in the Army?
7  A.  I think it was '85 to '87.
8  Q.  What rank were you when you left the
9      Army?
10  A.  E-3.
11  Q.  And you received an honorable
12     discharge?
13  A.  Yes, service connected at that.
14  Q.  Have you ever been convicted of a
15     crime?
16  A.  No, I have not.
17  Q.  What does Mrs. Pogue do for a living?
18  A.  You would have to ask Mrs. Pogue that
19     question, sir.
20  Q.  Do you know what she does for a
21     living?
22  A.  Yes, I do.
23  Q.  And what is it?

Page 136

1  A.  Mrs. Pogue is -- she's self-employed.
2  Q.  In what way?
3  A.  Self-employed.  She owns her own
4      business.
5  Q.  What is the nature of her business?
6  A.  You would have to ask her specifically
7      what the nature of her business is,
8      but Mrs. Pogue has a general business.
9  Q.  Do you know what the nature of her
10     business is?
11  A.  No, sir.  I have not really worried
12     with that.
13  Q.  I have to say, I find it unusual that
14     you would not know the nature of your
15     wife's business, so I wonder if it is
16     that you just don't want to tell me.
17  A.  You can wonder as you please, but I'm
18     answering the question.
19  Q.  Did you file a lawsuit against Roy
20     Moore as Chief Justice of the Supreme
21     Court?
22  A.  Yes, I did.
23  Q.  What was the nature of that lawsuit?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 137

```
1   A. I can't recall.
2   Q. You have no idea what the allegations
3      were?
4   A. No, sir. I would have to go back and
5      get a copy of the lawsuit.
6   Q. Did you file a lawsuit against Felix
7      Baker?
8   A. I cannot recall.
9   Q. Do you know Felix Baker?
10  A. Yes, I do.
11  Q. How do you know Felix Baker?
12  A. He's a citizen of the State of
13     Alabama.
14  Q. Did you have a dispute with Mr. Baker?
15  A. Not as I recall.
16  Q. According to records for the court
17     system, there was a lawsuit filed in
18     1993 by Paul Pogue against Felix
19     Baker. Was that you?
20  A. I would have to see the document
21     you're speaking -- referring to, sir,
22     and object to the allegation that you
23     are making without first sharing with
```

Page 138

```
1      me what you have.
2   Q. I'll be delighted to show you. I just
3      had to look at it to know.
4   A. And allow me to have the document that
5      you have. I don't know what you're
6      referring to.
7   Q. This is a printout from AlaCourt,
8      which keeps records of lawsuits filed.
9      And it would not have a copy of the
10     Complaint, but it does have
11     information about the lawsuit, namely
12     the names of the parties and the case
13     number.
14  A. Okay. I'd like a copy of whatever you
15     refer to.
16  Q. You may have one. But do you know
17     what -- did you, in fact, have a
18     lawsuit against Felix Baker?
19  A. As I said, I don't recall that.
20  Q. Do you recall having any dispute with
21     Felix Baker?
22  A. As I said, I remember -- I remember --
23     assuming these papers are true and
```

Page 139

```
1      authentic, I think they speak for
2      themselves. But I don't see where it
3      says I have a dispute with Mr. Felix
4      Baker.
5   Q. Did you ever have a lawsuit involving
6      the Bell Building?
7   A. Not as I know of, sir. Bell Building.
8   Q. Are you aware of a lawsuit between one
9      Mamie Darden versus Lawrence Pryor
10     Edwards?
11  A. I have no -- I don't have -- I'm not
12     dealing with -- I'm not involved with
13     that.
14  Q. Do you know about it?
15  A. I don't recall.
16  Q. There is a Valissa Darden who is
17     listed as party. Is that the same as
18     Valissa Darden Pogue?
19  A. Please share with me what you're
20     referring to, sir.
21  Q. Sure.
22        (Witness reviews document.)
23  A. Could you repeat your question?
```

Page 140

```
1   Q. There's a Valissa Darden who is listed
2      as a party to that lawsuit, and I
3      wondered if that was the same Valissa
4      Darden who we have been referring to
5      as Valissa Darden Pogue?
6   A. I would have to go back and look at
7      that. I can't answer that question at
8      this time.
9   Q. Have you ever heard Mamie Mims Darden
10     or Valissa Darden Pogue speak of a
11     lawsuit that they're involved in?
12  A. They would have to come in and share
13     that information with you.
14  Q. I'm asking you if they have talked to
15     you about a lawsuit that they are
16     involved in?
17  A. Not that I know of that they're
18     involved in.
19  Q. Do you know who Lawrence Pryor Edwards
20     is?
21  A. No, sir.
22  Q. Have you ever heard of Lawrence Pryor
23     Edwards?
```

35 (Pages 137 to 140)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 141

1  A. May have heard of that name.
2  Q. Do you know what connection Lawrence
3     Pryor Edwards might have with Valissa
4     or Mamie Mims Darden?
5  A. No, sir. And I cannot represent Mamie
6     Darden nor Valissa Darden.
7  Q. I'm not asking you to. I just want to
8     know if you know anything about that
9     litigation.
10 A. Do not even recall what you are
11    referring to.
12 Q. Do you have a fax number?
13 A. No, sir.
14 Q. Do you receive income from any source
15    other than the Alabama Constitutional
16    Institute?
17 A. As I stated earlier, sir, I am a
18    consultant and I am available for
19    those people that need help in the
20    areas that I'm trained and specialized
21    to help.
22 Q. Has anybody hired you for consulting
23    purposes in the last year?

Page 143

1     someone I've -- I've taken people to
2     the forestry commission and I've
3     spoken directly with Mr. Conway
4     dealing with issues dealing with
5     forestry.
6  Q. Are you acting as a consultant in this
7     case?
8  A. Which case are you referring to, sir?
9  Q. The one that you filed against Tony
10    Chandler and Danny Clark.
11 A. That lawsuit speaks for itself. I'm
12    acting as the party, plaintiff. Read
13    the Complaint in its entirety.
14 Q. Who have you spoken to Mr. Conway
15    about?
16 A. I've -- I've referred people to this
17    forestry commission on many occasions.
18    I've done extensive writing
19    encouraging people to use the forestry
20    commission, whether they be black or
21    white or whatever their race and color
22    and creed would be. I also -- I think
23    there's a gentleman by the name of

Page 142

1  A. Yes, they have.
2  Q. Who has hired you?
3  A. That's confidential information, sir.
4     I can't reveal confidential
5     information of that nature.
6  Q. Why is that --
7  A. Over objection. So I would object to
8     it.
9  Q. Okay. What is the nature of the
10    consulting that you've done for these
11    people?
12 A. Could you rephrase your question?
13 Q. What have you done for these people
14    who have hired you as a consultant?
15 A. People contact me pertaining to agency
16    referral. I refer them to the various
17    agencies that may affect whatever they
18    are concerned about.
19 Q. You refer them to state agencies?
20 A. Right.
21 Q. What type of problems do they come to
22    you about?
23 A. Various problems. For an example, if

Page 144

1     Mr. Roth or somebody that was here
2     years ago dealing with setting up
3     volunteer fire departments throughout
4     the state. So I -- this is the not
5     the first time that I've been
6     acquainted with the forestry
7     commission.
8  Q. What type of arbitration are you
9     doing?
10 A. Presently I'm retired. But I deal
11    with matters pertaining to contracts,
12    so you would need to get a copy of the
13    report that says specifically what
14    arbitration I deal with.
15 Q. All right. Well, tell me about some
16    of the arbitrations that you've
17    handled.
18 A. I deal specifically with cases dealing
19    with insurance, cases dealing with
20    problems that bring in as it relates
21    to lemon laws and cars and things of
22    that nature.
23 Q. Are you practicing law?

36 (Pages 141 to 144)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 145

1    A.  Not at this time I am not practicing
2        law.  As I've said, I'm the president
3        of a private law institute, Alabama
4        Constitutional Institute, which
5        doesn't allow me to practice law.
6    Q.  Are you currently accepting work on
7        behalf of the Alabama Constitutional
8        Institute?
9    A.  Right now I'm retired.  I'm dealing
10       specifically with my case and cases.
11   Q.  Okay.
12   A.  So I have no time to do anything but
13       deal with these cases.
14   Q.  Do you have an arbitration today?
15   A.  I'm going down to evaluate an
16       arbitration issue.
17   Q.  Somebody who may be hiring the
18       Constitutional Institute?
19   A.  I didn't say that.
20   Q.  Well, what are you saying?
21   A.  I'm saying that -- over objection,
22       because that is a private matter that
23       has nothing to with this particular

Page 146

1        case -- I'm going down to supervise a
2        session, training session.
3    Q.  Does Alabama Constitutional Institute
4        have any employees?
5    A.  Not that I know of.
6    Q.  You're the president; right?
7    A.  I carry several titles.
8    Q.  Well, if there are any employees, you
9        would know, wouldn't you?
10   A.  Here again, I cannot represent a
11       corporation.
12   Q.  I'm not asking --
13   A.  So, therefore, you have to contact the
14       organization itself for that type
15       information.
16   Q.  So you're refusing to answer any
17       further questions about the Alabama
18       Constitutional Institute about whether
19       they have any employees?
20   A.  If the stenographer is writing it down
21       right, I have not refused to answer
22       any question.  I just said to you that
23       I am employed with the Alabama --

Page 147

1    Q.  Okay.  So you are the president of the
2        Alabama Constitutional --
3    A.  I think I -- I think I am at this
4        point.  It could change.
5    Q.  As of right now, as far as you know,
6        you are the president?
7    A.  I believe that I am.
8    Q.  And you don't know whether or not the
9        institute has any employees?
10   A.  That's right.
11   Q.  Do you know of anybody else who works
12       for the Alabama Constitutional
13       Institute?
14   A.  Not at this time.
15   Q.  Okay.  Have you ever practiced law?
16   A.  For myself, yes, I have.
17   Q.  Pro se?
18   A.  That's right.
19   Q.  Have you ever had a dispute with Roy
20       Moore?
21   A.  Not Mr. Roy Moore, not as I know of.
22   Q.  Have you ever had a dispute with the
23       Chief Justice of the Alabama Supreme

Page 148

1        Court?
2    A.  Not as I know of, sir.
3    Q.  Have you ever had a lawsuit against
4        the Chief Justice of the Alabama
5        Supreme Court?
6    A.  I think I brought a lawsuit pertaining
7        to my rights as an attorney in the
8        State of Alabama.
9    Q.  And what was the nature of that
10       lawsuit?
11   A.  I think it was to clarify the laws as
12       it pertains to who's recognized as an
13       attorney in the State of Alabama.
14   Q.  You wished to be authorized to
15       practice law?
16   A.  Could you rephrase the question?
17   Q.  Was it your goal to change the law so
18       that you could practice law as an
19       attorney?
20   A.  I don't recall exactly what my goal
21       was at that time, but I do remember,
22       as you were talking about the -- the
23       chief justice, so we would have to get

37 (Pages 145 to 148)

Case 2:06-cv-00148-MHT-SRW    Document 24-3    Filed 09/29/2006    Page 38 of 90

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 149

1    a copy of that particular --
2    Q. Okay.
3    A. -- Complaint and see what it was about
4    at that time.
5    Q. Is the address on Kahn Street the best
6    place for us to send you any mail?
7    A. Yes, sir.
8    Q. Have you sent any written discovery
9    request to the defendants in this
10    case?
11    A. Not as I can recall.  I don't think
12    the matter was -- as I said, over my
13    objection, the honorable magistrate
14    judge went on with the scheduling --
15    Rule 16 scheduling.
16    Q. Are you aware of any black citizens
17    who you claim to have been
18    discriminated against by the forestry
19    commission?
20    A. Black citizens?
21    Q. Yes.
22    A. I have not -- I can't answer that
23    question.

---

Page 150

1    Q. Okay.
2    A. In other words, I'd object to that
3    question as much as I'm not the
4    forestry commission so I couldn't
5    answer that question.  I haven't done
6    discovery with the forestry
7    commission.
8    Q. As we sit here today, does Paul Pogue
9    know of any African-American Alabama
10    citizens who have been discriminated
11    against by Tony Chandler or Danny
12    Clark?
13    A. Only myself, Paul Pogue.
14    Q. Do you know who owns the property that
15    was once owned by Emanuel Darden?
16    A. No, sir.
17    Q. Is it you?
18    A. Your question is so broad.  What are
19    you -- could you rephrase your
20    question, sir?
21    Q. Sure.  Do you know who owns the
22    property, the real property, that was
23    once owned by Emanuel Darden, the real

---

Page 151

1    property in Perry County, Alabama?
2    A. I told you early on in answering the
3    questions that I'm not that familiar
4    with Emanuel Darden other than by --
5    see, you would have to give me some
6    information other than what you're
7    asking me for me to understand it.
8    Q. Who is Emanuel Darden?
9    A. I don't know.
10    Q. Who was he?
11    A. I do not know, sir.
12    Q. Do you know if he has any relation to
13    Mamie Mims Darden?
14    A. No, I do not.
15    Q. Do you know if the property -- was
16    Surveyors' Park owns personal property
17    was ever owned by Emanuel Darden?
18    A. I have not done a title search to
19    verify any information of that nature.
20    Q. Do you know if anybody else owned
21    timber in or around where Surveyors'
22    Park owns timber?
23    A. I would not know that, sir.

---

Page 152

1    Q. Did you receive any money for the
2    cutting of timber?
3    A. Would you rephrase your question, sir?
4    Q. Anybody pay you for cutting timber?
5    A. No on paid me for cutting any timber.
6    Q. Did anybody pay Valissa Darden Pogue?
7    A. I wouldn't know that, sir.  I'll
8    object to that question.  I'm not
9    Valissa Darden Pogue.  I can't
10    represent her.
11    Q. Have you ever received any funds from
12    a Mr. Todd Slusher --
13    A. Paul Pogue?
14    Q. -- timber buyer?  Yes, Paul Pogue.
15    A. Paul Pogue, I have not received any
16    funds from a Todd Slusher.
17    Q. Has Surveyors' Park?
18    A. No, sir.
19    Q. Has Valissa Darden Pogue?
20    A. I wouldn't know that, sir.
21    Q. Do you know of anybody who has
22    received funds from Mr. Todd Slusher,
23    a timber buyer?

---

38 (Pages 149 to 152)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 153

1  A. No, sir. And you're not clarifying
2     what you mean by "funds."
3  Q. Money, check, legal tender, money.
4  A. Paul Pogue -- Paul Pogue has not
5     received any money from a Todd Slusher
6     that I can recall.
7  Q. What about Cherokee Timber Company?
8  A. I would have to go back and look at my
9     files to see whether or not I received
10    anything from Cherokee company.
11 Q. Mr. Pogue, I have tried every way I
12    can think of to ask you if you or
13    anybody you know has hired somebody to
14    cut timber in Perry County, Alabama,
15    and you have not answered that
16    question and I can't tell why. And I
17    think it's because you think that I've
18    somehow technically asked the
19    incorrect question. I want to ask you
20    again. Have you or anybody in your
21    family or anybody that you know hired
22    Cherokee -- Cherokee Timber Company or
23    Todd Slusher to cut timber in Perry

Page 155

1  A. Paul Pogue has not authorized anybody
2     to cut timber that would have anything
3     to do with the Alabama Forestry
4     Commission.
5  Q. Did anybody cut timber belonging to
6     Paul Pogue when they were not supposed
7     to?
8  A. I've got to get that answer from Tony
9     Chandler and Danny Clark.
10 Q. As we sit here today, do you claim
11    that somebody came in and cut timber
12    belonging to you when they had no
13    permission to do so?
14 A. I asked for an investigation and that
15    investigation has not produced
16    information for which I could rely on,
17    sir.
18 Q. Do you believe that you had timber,
19    that you owned timber, that somebody
20    else came in and cut when they were
21    not supposed to?
22 A. I can't answer that question. I would
23    object to it because it's asking me to

Page 154

1     County?
2  A. Cherokee Timber Company, Todd Slusher,
3     no -- for myself, no.
4  Q. Anybody else?
5  A. I can't answer for anybody else, sir.
6  Q. Okay. So as far as you know, nobody
7     that you know or in your family has
8     hired anybody to cut timber in Perry
9     County; is that correct?
10 A. My answer is, I cannot answer that
11    question.
12 Q. What's wrong?
13 A. It has to be rephrased.
14 Q. What's wrong with it?
15 A. I cannot represent anyone but myself,
16    Paul Pogue. If the question is
17    directed to Paul Pogue, Paul Pogue can
18    answer.
19 Q. Has Paul Pogue hired anybody to cut
20    timber?
21 A. Paul Pogue has not hired anybody to
22    cut timber.
23 Q. Have you authorized anybody to do so?

Page 156

1     describe or answer something that is
2     broad and I cannot answer that
3     question intelligently.
4  Q. As of 2005, did Paul Pogue own any
5     timber in Perry County, Alabama?
6  A. I believe I owned forestry products
7     unmanufactured and manufactured.
8  Q. Did anybody come in and take those
9     forestry products?
10 A. That is left to the investigators. I
11    turned it over to the investigators,
12    sir.
13 Q. So you don't know one way or the
14    other?
15 A. That's right. I turned it over to the
16    investigators and they have not
17    responded in a way that -- I would
18    need to take their deposition or do
19    interrogatories to get that answer.
20 Q. If the investigators conclude that no
21    one cut timber belonging to you
22    without permission, do you have any
23    evidence to dispute that?

39 (Pages 153 to 156)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 157

1   A. That's speculative and I cannot answer
2       that and I'll object to that question.
3   Q. Do you have any evidence to suggest
4       that somebody cut timber belonging to
5       you?
6   A. That would be left -- I left it in
7       the hands of Tony Chandler and Danny
8       Clark --
9   Q. So --
10  A. -- with the Alabama Forestry
11      Commission.
12  Q. So whatever Tony Chandler and Danny
13      Clark conclude, you don't have any
14      evidence to refute that; correct?
15  A. That's speculative and it's premature
16      for me to -- to elaborate on that, so
17      I would object to that question. But
18      I would go on and say that I would
19      have to evaluate their findings before
20      I would go any further.
21  Q. Did you give anybody permission to cut
22      timber belonging to you?
23  A. Not as I can recall at this time,

Page 158

1       Paul Pogue.
2   Q. Did anybody -- did anybody give
3       permission for somebody to cut timber
4       belonging to Paul Pogue?
5   A. I do not know the answer to that
6       question.
7   Q. Did somebody cut timber belonging to
8       you?
9   A. That -- the answer to that question,
10      sir, is in the hands of the
11      investigators at the Alabama Forestry
12      Commission.
13  Q. Mr. Pogue, you can go out to property
14      and you can tell if a tree is gone or
15      not. You don't need an investigator.
16      Do you have property where you go out
17      and there used to be trees at one time
18      but now there aren't trees anymore?
19  A. I will go out there and -- now that
20      you've explained that to me, I will go
21      out there to check, sir.
22  Q. Did you check before you filed this
23      lawsuit? Because you filed a lawsuit

Page 159

1       in federal court that says somebody
2       cut timber belonging to you.
3   A. Right.
4   Q. Did they -- did they or did they not?
5   A. This is what I'm trying to tell you.
6       You're trying to -- you can't -- you
7       can't compare and match up apples with
8       oranges; they're two different beings.
9       So I'm trying to make it clear here so
10      that the Federal District Court and
11      the Middle District of Alabama and the
12      U.S. Eleventh Circuit and on to the
13      Supreme Court would understand clearly
14      that this particular lawsuit, as it is
15      in its status and standing today, is
16      dealing with Danny Clark and Tony
17      Chandler, and I'm not accusing them of
18      cutting any timber.
19  Q. And I never have said that that was
20      what you were accusing them of. But
21      still, you allege in here that timber
22      was cut belonging to you and that you
23      wanted them to investigate it. That

Page 160

1       is part of your allegations. And I'm
2       trying to figure out -- and I've asked
3       every way I know how to ask -- what
4       evidence you have and where that
5       property is and who owns it and you've
6       never been able to tell me. I will
7       try one more time.
8   A. Yes, sir.
9   Q. Has anybody cut timber belonging to
10      Paul Pogue?
11  A. That report has not come out from the
12      Alabama Forestry Commission, which I
13      brought to the attention of the
14      forestry commission.
15  Q. Do you have any information on that
16      one way or the other?
17  A. I will be taking the deposition of
18      Tony Chandler and Danny Clark.
19  Q. Now, I'm asking you what you know
20      right now. Right now, as we sit here
21      today, do you claim that somebody else
22      came in and cut timber belonging to
23      Paul Pogue? Is that what you claim or

40 (Pages 157 to 160)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 161

1 not?
2 A. I'm incorporating my Complaint,
3 which you recognize as Defendants'
4 Exhibit 1.
5 Q. Do you believe that to be the case?
6 A. Yes, sir. I feel my Complaint has
7 merit and will -- and through the
8 process will prove itself out.
9 Q. Why do you believe that to be the
10 case?
11 A. Well, we have not done discovery with
12 the forestry commission at this point,
13 so you're trying to rush me to
14 judgment. I have paid for the
15 lawsuit. It is well on its way. The
16 magistrate just issued a Rule 16
17 scheduling order over my objection, so
18 therefore we'll -- the process has
19 begun.
20 Q. As we sit here today, at this moment
21 in time, do you have one shred of
22 evidence that any person came in and
23 cut timber belonging to you without

Page 162

1 permission?
2 A. Well, you didn't ask me to bring
3 anything with me here today. But I
4 would assume that if I could go out to
5 the property and do what you said I
6 can do, then I'll be able to produce
7 you with evidence.
8 Q. Do we have -- do you have any evidence
9 as we sit here today that anybody cut
10 timber without your permission?
11 A. Yes.
12 Q. What is that evidence?
13 A. That is with Mr. Danny Clark and Tony
14 Chandler.
15 Q. What evidence is it?
16 A. They said that this has happened. So
17 you need to talk to Danny Clark and
18 Tony Chandler.
19 Q. Okay.
20 A. They're the investigators.
21 Q. Do you have any evidence that they
22 have discriminated against you in any
23 way?

Page 163

1 A. As I've said earlier and I'm saying
2 again, that Danny Clark and Tony
3 Chandler should have followed the
4 Alabama laws pertaining to the rules
5 of the forestry laws, and I do not
6 feel that they have done that. But,
7 again, I need to take their
8 deposition.
9 Q. Okay. So until you take their
10 deposition, you have no evidence that
11 they discriminated against you?
12 A. Other than what they said.
13 Q. What did they say?
14 A. Tony Chandler and Danny Clark violated
15 my rights based on what I have alleged
16 in my Complaint, and they have said
17 that someone has taken my timber, as
18 you say.
19 Q. Okay.
20 A. And they have explained to me that
21 that has happened.
22 Q. Okay.
23 A. But they have led me in a direction

Page 164

1 that is not consistent with what the
2 State of Alabama laws require them to
3 do.
4 Q. What do you mean by that?
5 A. Follow the Alabama laws pertaining to
6 the forestry.
7 Q. What do you claim they should have
8 done differently?
9 A. Treated me equally as they have
10 treated other whites that have had the
11 same and similar problem.
12 Q. But as we sit here today, you can't
13 tell me any white person who's gotten
14 better treatment than you have;
15 correct?
16 A. That information is hidden within the
17 Alabama Forestry Commission, but it is
18 in the public domain.
19 Q. As we sit here today, you can't tell
20 me any black person other than
21 yourself that you claim that Tony
22 Chandler and Danny Clark have
23 discriminated against; correct?

41 (Pages 161 to 164)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 165

1    A. In their individual capacity and
2        official capacity as agents of the
3        Alabama Forestry Commission.
4    Q. And you don't have any evidence other
5        than your assumptions that they have
6        behaved the way they have on the basis
7        of your race; is that correct?
8    A. I'm saying to you again and again that
9        I'm standing by my lawsuit Complaint
10       and I'm going further by saying that
11       in the public domain it has been made
12       clear to me that I have been
13       discriminated against.
14   Q. What is it in the public domain
15       that --
16   A. That because of my race, Tony Chandler
17       and Danny Clark being white and all
18       the people involved being white, have
19       violated my rights --
20   Q. And you say --
21   A. -- by failing to follow the laws of
22       the State of Alabama.
23   Q. And why is it that you think that they

Page 166

1        failed to follow the laws of the State
2        of Alabama because --
3    A. Based on race.
4    Q. -- of your race?
5    A. Based on race.
6    Q. Why do you think that?
7    A. Because there would be a pattern
8        there, pattern and practice there. We
9        just need to find it. We need to do
10       their deposition.
11   Q. Okay. So you don't know that it's
12       there; you're just assuming that it's
13       there?
14   A. Well, it's in the public domain, as I
15       have been told, and I will look to see
16       whether or not this is accurate
17       information. You don't try your case
18       in your pleadings, sir.
19   Q. Let's take a minute. We'll make some
20       copies for you. Let me collect my
21       thoughts together. We may be
22       finished, but I may have another
23       question. Okay?

Page 167

1    A. Yes, sir. And I would hope that
2        you're not conspiring with
3        International Paper to ask questions
4        that are not relevant as it relates to
5        this particular lawsuit which is
6        involving Tony Chandler and Danny
7        Clark as it stands presently. I'm
8        hoping that it's not a fraudulent
9        matter.
10   Q. If you're accusing me of a fraudulent
11       matter, I would take that allegation
12       very seriously and I would not
13       appreciate it. But I will represent
14       to you I am here, as I have indicated,
15       on behalf of Tony Chandler and Danny
16       Clark. And I'll have nothing else to
17       say to respond to your allegations
18       about me personally.
19   A. Well, I only wanted to say that I'm
20       not referring to you personally. And
21       I also want to go forward and say that
22       these questions seem to be those that
23       are totally irrelevant and biased to

Page 168

1        the process, if you were look in a
2        cause of action legal form book. It
3        doesn't seem that these questions are
4        dealing with Tony Chandler and Danny
5        Clark. It seems to be dealing more
6        with helping or aiding International
7        Paper in matters that are not relevant
8        in this particular case.
9    Q. Thank you. We'll be back in just a
10       few minutes.
11           (Short recess.)
12   Q. Mr. Pogue, we have no further
13       questions today. Thank you for
14       coming.
15   A. I would like to close out by saying I
16       object to all of the exhibits filed
17       and hope that they can be
18       authenticated. And also would like to
19       object to the proceeding that has
20       taken place here. And I am of the
21       mindset that this is nothing more than
22       an exercise to assist and help
23       International Paper and it is designed

42 (Pages 165 to 168)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 169

1  to continue in the ways of the
2  de facto counseling that has taken
3  place in the middle district by the
4  Honorable Magistrate Susan Russ
5  Walker. I have nothing further to
6  say.
7      MR. CONWAY: Are you alleging
8  that Judge Walker is acting
9  improperly?
10     MR. POGUE: I said what I had
11 to say, sir. That's not my statement.
12 But I will go on to say to you that I
13 believe the honorable magistrate judge
14 is acting in a way that is not fair to
15 me, and she has allowed a scheduling
16 order to be issued while parties (sic)
17 are still pending in the appellate
18 stage before the Honorable District
19 Judge Myron Thompson. And I feel that
20 is a total disrespect to me, total
21 disrespect to the federal rules, total
22 disrespect to the judiciary, and that
23 she's biased and has done all that she

Page 170

1  can do to not only delay the justice
2  but deny me the rights as a common
3  citizen that has paid for a lawsuit.
4  And for that reason, this is the way
5  that I feel.
6      MR. DAVIS: Do you have
7  anything further to add?
8      MR. POGUE: Yes. I would also
9  like to add for the record that I
10 brought my problems to the forestry
11 commission and I expect the forestry
12 commission to follow the law,
13 irrespective of race, color, creed or
14 national origin. I have nothing
15 further to say.
16     MR. DAVIS: Then we're off the
17 record.
18
19
20 (The deposition of Paul Pogue
21 concluded at 12:35 p.m. on August 2,
22 2006.)
23

Page 171

1      * * * * * * * * * * *
2      REPORTER'S CERTIFICATE
3      * * * * * * * * * * *
4  STATE OF ALABAMA
5  COUNTY OF MONTGOMERY
6      I hereby certify that the
7  above and foregoing proceeding was
8  taken down by me by stenographic
9  means, and that the content herein was
10 produced in transcript form by
11 computer aid under my supervision, and
12 that the foregoing represents, to the
13 best of my ability, a true and correct
14 transcript of the proceedings
15 occurring on said date at said time.
16     I further certify that I am
17 neither of counsel nor of kin to the
18 parties to the action; nor am I in
19 anywise interested in the result of
20 said case.
21
22
       Bridgette Mitchell
23     Reporter and Notary Public

43 (Pages 169 to 171)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 172

**A**

abandoned 133:10
ability 171:13
able 57:1 95:9 98:4
  98:22 160:6 162:6
accept 11:6 22:1
  52:7
accepted 30:14
accepting 145:6
access 121:11
accuracy 78:8
accurate 122:10
  166:16
accusing 53:22
  159:17,20 167:10
acknowledged
  30:10
acquainted 144:6
act 52:11
acting 143:6,12
  169:8,14
action 1:9 7:17,18
  9:5 51:19 168:2
  171:18
activity 38:6
actors 7:1,1
acts 6:23 22:4 52:1
  128:1
actual 94:10
add 170:7,9
address 23:2 100:4
  100:7,10,13,16,18
  100:19,20 101:2,4
  129:20 132:22
  134:8,9,17 149:5
addressed 123:10
adequate 85:13
adjacent 50:22
administrative 22:4
admittance 56:18
adopt 21:20 22:1
advantage 15:6
affect 142:17
affirmative 95:17
African-American
  71:17 150:9
Afro-American
  79:8
age 6:1
agencies 142:17,19
agency 142:15
agents 90:12 165:2
ago 132:13 144:2
agree 38:16,17

48:21
agreed 3:3 4:2,13
  85:4
ahead 40:6 45:2
aid 46:12 171:11
aiding 168:6
al 1:12
Alabama 1:2,17,18
  1:21 2:5,13,16,18
  2:21,23 3:13,23
  10:18 11:11 12:15
  12:20,22 13:1,18
  15:3 17:1,6,7 18:8
  20:8,10,14 21:10
  21:12,14,18,20
  22:2,3,10,20,22
  23:4,15 26:13
  28:9 29:3,4 34:1
  34:12,19 35:5,13
  37:6,9,23 38:11
  38:20,20 39:3,6
  46:5,7,9,21 48:1,4
  49:4,6 50:2,5,8,13
  50:23 51:13 52:13
  52:16,17 54:10
  56:8 68:15 69:16
  76:20 87:14 89:18
  94:1 97:7 100:5,9
  101:7,11,19
  104:15 105:13,15
  105:17 107:11
  116:5,20 118:13
  119:11 121:13,18
  125:8 129:12,17
  129:19,22 130:1
  131:14,16,19
  132:2,7,19,21
  134:7,14 137:13
  141:15 145:3,7
  146:3,17,23 147:2
  147:12,23 148:4,8
  148:13 150:9
  151:1 153:14
  155:3 156:5
  157:10 158:11
  159:11 160:12
  163:4 164:2,5,17
  165:3,22 166:2
  171:4
AlaCourt 138:7
alive 26:4
allegation 85:16
  88:18 137:22
  167:11

allegations 14:10
  15:5 24:5 44:7
  95:8 114:4 129:1
  137:2 160:1
  167:17
allege 68:10 125:3
  159:21
alleged 12:11,14
  95:16,20 106:3
  163:15
allegedly 112:22
alleging 51:21,23
  93:14 94:18 128:2
  169:7
allow 64:22 81:2
  138:4 145:5
allowed 79:5
  169:15
alteration 10:4
altered 111:21,21
  116:18
altering 41:15
amending 41:16
amount 128:12
announce 25:21
  26:3 31:16
announced 25:13
  25:17 31:15
announcement
  25:15,16 32:2
  72:15
annually 130:23
answer 8:8 9:3 13:5
  13:22 14:8 18:23
  19:23 28:3 29:23
  30:2 33:9 39:2
  40:17 44:5 56:21
  58:20 64:23 95:9
  95:11 98:20 99:21
  115:15 118:7
  140:7 146:16,21
  149:22 150:5
  154:5,10,10,18
  155:8,22 156:1,2
  156:19 157:1
  158:5,9
answered 133:17
  153:15
answering 65:4
  136:18 151:2
anybody 31:2,9
  39:23 46:18 49:23
  58:15 67:14 68:9
  68:16 80:14 90:18

92:19 95:5 120:9
  141:22 147:11
  151:20 152:4,6,21
  153:13,20,21
  154:4,5,8,19,21
  154:23 155:1,5
  156:8 157:21
  158:2,2 160:9
  162:9
anybody's 35:23
anymore 158:18
anyone's 36:2
anywise 171:19
apologetic 75:20
apparently 43:21
  62:13
appear 24:5 80:17
  99:18
APPEARANCES
  2:1
appeared 73:10
appearing 2:2,7
  7:18
appears 36:19
  99:10 113:11
  133:10
appellate 169:17
apples 159:7
apply 84:4
appreciate 167:13
appropriate 6:13
approximately
  131:3,7 132:14
arbiter 129:14,16
arbitrate 129:16
arbitration 144:8
  144:14 145:14,16
arbitrations 144:16
area 56:20 57:10,12
  62:9 77:10 98:2
areas 141:20
Armed 135:3
Army 135:4,5,6,9
arrangements
  48:16
ascertain 87:18
asked 15:3 17:7
  34:14 41:6 59:7,8
  67:7 76:12 89:13
  95:18 97:11,12
  110:22 122:3
  125:1 153:18
  155:14 160:2
asking 27:20,22

62:7 65:3 111:6
  115:10 118:19
  140:14 141:7
  146:12 151:7
  155:23 160:19
assert 102:11
assets 113:19 120:6
assist 168:22
assistant 2:9 7:12
assume 8:9 30:9
  31:6 78:7 162:4
assumed 30:8,10,17
  30:19 31:8
assuming 138:23
  166:12
assumption 30:8
assumptions 165:5
assured 46:21
ast 157:23
attached 9:8 10:1
attend 130:20
  131:18
attention 6:11 10:4
  68:14 71:22 84:13
  160:13
attorney 2:9,10
  7:12,17 53:13
  89:13 105:17
  106:4,11,18
  115:13 148:7,13
  148:19
attorney's 92:19
August 1:22 170:21
authentic 9:17
  122:11 139:1
authenticated
  168:18
authority 21:11
  23:16 28:9 29:6
  44:23 45:11 72:23
  84:5 87:16 89:20
  94:4 100:23 121:2
  121:11 127:20,21
authorized 148:14
  154:23 155:1
available 91:13,22
  141:18
Avenue 1:18 2:17
  2:22 22:14 23:3,7
  48:20
aware 38:16 43:6
  112:11 139:8
  149:16
a.m 1:23

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 173

---

**B**

back 14:9 15:21
39:22 44:19 45:8
45:13,20 59:6
60:6 65:1 68:3
73:5,14 77:14,19
122:19 123:18
124:2 137:4 140:6
153:8 168:9
Baker 137:7,9,11
137:14,19 138:18
138:21 139:4
bark 28:16
based 9:15 17:7
163:15 166:3,5
basically 51:23 52:2
110:9
basis 11:9 86:2,16
91:16 165:6
bearing 91:5
beg 105:7 107:15
beginning 92:4
begins 94:8
begun 161:19
behalf 1:16 3:7
40:14 102:6,8,12
145:7 167:15
behaved 165:6
behavior 14:20
128:18
beings 159:8
belief 67:14
believe 9:23 41:4
56:13 64:10,13
66:10 70:7,11
73:19 75:17 76:6
85:10,12,18 88:9
90:23 92:12,14
93:4,17 97:8
116:18 126:5,7,16
147:7 155:18
156:6 161:5,9
169:13
believed 63:17 64:1
64:6
Bell 139:6,7
belong 19:4
belonged 129:3
belonging 120:8
155:5,12 156:21
157:4,22 158:4,7
159:2,22 160:9,22
161:23
benefit 87:4

benefits 86:21
best 9:21 116:8
117:19 149:5
171:13
better 126:1,18
127:1,6 164:14
beyond 87:21
120:20
biased 167:23
169:23
big 54:3
bitty 81:12
black 24:10 89:8
91:1 121:15
143:20 149:16,20
164:20
blessed 89:17
blood 58:15
blue 66:18 67:2,16
67:19 68:1,11,18
BMP 116:23 117:1
117:16
book 168:2
bother 82:1
bothering 82:2
bottom 87:17 93:15
125:19
Box 100:4,8 133:8
134:6
boy 81:10,19
branch 134:23
135:2
branches 28:17
break 44:18 45:7
109:7 122:14
124:1 130:5
Breland 2:15 41:17
41:20 42:1,9 43:3
43:21 70:20 71:2
71:6 90:3 105:19
105:23 115:8,17
116:1,11 117:2,8
117:12,17,21
118:2,15 119:3,6
119:12,15,20
120:1,8,11 121:21
Brewton 77:13,14
Bridgette 1:19 3:11
171:22
bring 23:19 53:23
103:20 144:20
162:2
bringing 102:5,8
broad 20:23,23

94:4 150:18 156:2
broke 125:12
brothers 58:22
brought 6:10 68:14
84:13 121:9 148:6
160:13 170:10
building 23:5,8
77:17 96:7 133:9
139:6,7
business 24:18,21
37:23 38:6 104:6
136:4,5,7,8,10,15
buyer 152:14,23

---

**C**

C 2:15
calculate 128:16
call 10:3
called 77:13,14
calling 46:13
calls 79:12
capacities 128:10
128:11
capacity 1:6,12
10:20,21 11:1,1
13:23 14:1,18
15:23 19:19
102:10,14 128:21
128:22 165:1,2
car 124:1,5
care 72:20
carry 146:7
cars 144:21
cart 89:16 118:19
case 4:3,7 8:20
15:10,20 19:13
29:13 43:6 51:3
64:11,14 77:6
90:21 92:2 94:21
98:12 104:7 114:1
128:4,5 138:12
143:7,8 145:10
146:1 149:10
161:5,10 166:17
168:8 171:20
cases 129:16 144:18
144:19 145:10,13
Cassady 103:3,8,8
Caucasian 64:2
71:17 73:8
Caucasians 81:2
cause 67:19 168:2
caused 68:10 87:3
causes 94:7

cell 79:11
certain 54:4 62:4
CERTIFICATE
171:2
certified 10:10
certify 171:6,16
Chandler 1:11 7:14
8:22 10:15,19,20
11:4,14 14:10,15
15:22 16:12,19
18:3,4,11 19:16
19:17 20:3,5
40:13,15 70:23
71:3 89:14 90:6
90:10,17 91:15,21
104:9,11,13 105:8
105:11 109:20
110:15,19 111:8
111:13 113:16
114:10 115:7
116:12,15 117:3
118:3,8,20 122:8
123:11 124:16
126:2,16 127:4,15
128:8 143:10
150:11 155:9
157:7,12 159:17
160:18 162:14,18
163:3,14 164:22
165:16 167:6,15
168:4
change 84:10 147:4
148:17
character 84:10
characterization
41:13
Charles 2:20
check 153:3 158:21
158:22
chemicals 68:2
84:20
Cherokee 38:21
39:11 153:7,10,22
153:22 154:2
chief 136:20 147:23
148:4,23
choose 134:15
chooses 42:21
Christian 83:17,18
Circuit 52:5 159:12
circumstances
91:11 92:11
cited 125:7
citizen 14:23 53:15

92:15 124:22
128:1 129:6
137:12 170:3
citizens 66:19 67:3
125:23 126:1
149:16,20 150:10
Civic 37:6,9 38:1,11
38:20 39:3,6
civil 1:9 3:22 10:17
121:18 127:23
claim 14:11 30:12
149:17 155:10
160:21,23 164:7
164:21
claimed 30:11 31:8
72:11
claiming 12:8 52:8
52:10 129:2
claims 11:3 14:14
16:9,18 102:11
clarification 51:8
clarify 53:7 58:14
58:18 148:11
clarifying 153:1
Clark 7:14 8:21
10:15,22 11:4,17
14:11,15 15:23
16:12,18 18:3,4
18:12 19:16,17
20:2,4 40:13,16
68:20,21,22 69:1
69:22 70:3,4 71:1
71:11,21 72:8,9
72:10,14 73:9,15
73:20 74:8,23
75:3,13,14,18,20
75:21 76:4,12,15
76:19 77:1,23
78:2,10,14 79:1,4
79:10,22,23 80:4
80:13,22 81:1,5
81:23 82:2,5,20
83:5,7 84:2,4,23
85:5,6,8 86:15
87:3,7 88:8 89:14
90:5,10,17 91:14
91:22 93:1,4,6,16
93:17 94:23 95:4
104:22 105:5,6
122:8 124:17
126:3,17 127:4,16
128:9 143:10
150:12 155:9
157:8,13 159:16

---

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 174

160:18 162:13,17
163:2,14 164:22
165:17 167:7,16
168:5
**Clark's** 73:13 85:19
**classes** 131:9,21
**clause** 92:16
**clear** 8:4 15:22 18:9
26:21 29:8 51:4
53:6,12 79:4
118:17 159:9
165:12
**clearly** 86:22
159:13
**clerk** 10:9
**close** 168:15
**closed** 53:13 124:19
**code** 22:2
**cognizant** 42:19
**collateral** 15:18
53:9
**collect** 166:20
**collectively** 8:22
**college** 132:4
**colleges** 132:1
**color** 86:12 143:21
170:13
**come** 30:6 44:18
45:8 46:11 49:21
63:2 65:18 77:21
82:19 89:22 96:7
96:10 97:22
122:19 140:12
142:21 156:8
160:11
**comes** 27:1 121:2
**coming** 46:12 66:5
72:13 168:14
**commencing** 1:22
**commercial** 104:5
**commingle** 15:17
53:8
**commission** 1:17
2:16,21 3:14 7:15
15:4 17:2,4,6,8
18:8 20:7,9,14,17
21:3,5,6,14,18
22:8,11,20,23
23:11 28:10 40:23
41:7 42:4 46:6,8
46:10,16,22 47:11
47:16 48:2,9,11
49:5,7,10,18,22
50:1 51:10 53:18

53:22 67:15,17
68:15,17 69:16
76:20 78:4 79:18
84:14 88:20 89:7
89:12 90:11,13,14
91:8 94:1 101:8
101:11 102:2
104:14,16 105:13
105:15,18 106:18
107:12 108:3,6,16
112:5,8 114:14
119:18,23 120:2
121:3,7,10,10
125:10 127:2
143:2,17,20 144:7
149:19 150:4,7
155:4 157:11
158:12 160:12,14
161:12 164:17
165:3 170:11,12
**commissioner**
47:15
**commissions** 47:15
48:5 79:21 84:22
**commission's** 21:11
23:16 47:14 127:9
**committed** 52:1
**common** 170:2
**communicating**
40:21
**communication**
112:4
**communications**
103:7
**community** 65:19
70:14 126:21
**company** 38:22
39:12 51:18 63:22
69:14,19 70:13,16
73:23 75:4,7 76:7
153:7,10,22 154:2
**compare** 159:7
**compel** 127:15
**complain** 68:9,13
101:13
**complainant** 93:14
118:14
**complaining** 42:13
42:15 43:9 93:14
**complaint** 9:4,9
10:2 11:5,7,19
12:5,6 17:1 24:1
25:12 26:7 31:19
39:17,19,22 40:5

41:14 42:8,20
43:14 44:1,3
45:21 46:4,5
54:18 66:18 84:15
86:2 91:17,19
94:7,8 101:7
102:2 110:18
111:4,9,11,14
117:3 123:19
124:16,21,23
125:2,5 127:11
128:2,14,15 129:4
129:7 138:10
143:13 149:3
161:2,6 163:16
165:9
**complaints** 41:8
124:19
**complies** 45:23
**comprehending**
109:16
**computer** 171:11
**conceivably** 125:11
**concern** 11:10,13
11:15,18 20:12,17
20:19,20,22,23
21:22 24:19 43:1
46:5 47:1,5,6 48:2
49:19,20 70:1
73:2 77:5,6,20
**concerned** 19:9,13
19:15,20 21:8
22:6 23:17,18
40:8 114:11
142:18
**concerns** 21:1,17
**conclude** 86:19
90:2 156:20
157:13
**concluded** 170:21
**conclusion** 89:23
**conduct** 40:13
**conducting** 120:14
**confident** 27:8
**confidential** 142:3
142:4
**confirm** 89:2
**confirmed** 75:5,12
**confused** 15:14
**congregate** 65:18
**congregated** 88:2
**connected** 87:23
135:13
**connection** 93:2

141:2
**consent** 82:17
**conservation** 17:19
**considered** 17:18
24:15
**consistent** 164:1
**conspiracy** 6:23
**conspiring** 167:2
**Constitutional**
129:13,17 130:1
132:19 141:15
145:4,7,18 146:3
146:18 147:2,12
**consultant** 130:8
141:18 142:14
143:6
**consulting** 130:9,10
141:22 142:10
**consumer** 14:22
16:21 53:15
**consumers** 23:18
**contact** 20:13 22:15
22:17,18 48:1
142:15 146:13
**contacted** 47:16
48:3,6
**contained** 28:13
**containing** 28:11
**content** 171:9
**contention** 114:18
**context** 58:6
**continuation** 34:13
84:15
**continue** 42:23 44:8
44:10,19,22 45:8
45:14,18 51:7
169:1
**continues** 90:14
**continuing** 130:23
131:8
**contract** 13:15,20
14:2,5 38:19
39:10,14 40:1,8
**contracts** 144:11
**control** 27:4
**controversial** 45:3
**conversation** 61:9
61:12 62:1 66:4
69:4 73:22 74:5,7
75:19,22,23 76:3
91:20 112:3 126:5
126:20
**conversion** 52:2,11
54:16

**converted** 52:9
**convicted** 135:14
**Conway** 2:20 89:10
91:21 98:4 105:20
105:22 122:3
143:3,14 169:7
**copies** 9:23 109:3
166:20
**copy** 80:3,6,8,11,15
83:19 96:6 97:20
103:17 104:15
105:1 106:5
113:16 114:19
116:4 123:4,9,12
137:5 138:9,14
144:12 149:1
**corporation** 37:11
37:12,15,18,21
38:3 39:4,5,11
146:11
**correct** 16:13 18:17
20:18,21 27:20
32:20 41:11 48:18
49:13 57:8 70:5,9
75:2,11 76:10
83:3 91:3 92:6
97:10 110:3 114:5
131:22 154:9
157:14 164:15,23
165:7 171:13
**correctly** 16:23
18:2
**counsel** 3:3 4:2
42:22 43:19
171:17
**counseling** 169:2
**count** 78:7
**counting** 78:12,13
**county** 11:11 12:15
12:19,21 13:1,3
13:17 14:5 15:8
23:20 34:12,18
35:5,12 50:2,5,23
51:13 52:17 54:10
56:8 62:3,8 77:8,9
77:15 101:19
113:20 151:1
153:14 154:1,9
156:5 171:5
**course** 80:23
**courses** 131:1
**court** 1:1 6:15,20
52:6 88:14 96:3
97:6 114:1 124:8

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 175

127:15 133:23
136:21 137:16
148:1,5 159:1,10
159:13
create 15:18 53:9
creed 86:13 143:22
170:13
crime 135:15
criminal 101:14
124:18,21,23
125:1,5
crossbreed 71:19
currently 145:6
custom 94:14
cut 13:16 17:21,22
18:12,13 41:5
54:9 153:14,23
154:8,19,22 155:2
155:5,11,20
156:21 157:4,21
158:3,7 159:2,22
160:9,22 161:23
162:9
cutting 11:10,14,15
14:6 40:2,9 152:2
152:4,5 159:18

**D**

D 123:10
damage 26:11,16
27:18 29:1,16
67:19,23 68:10
72:17
damages 128:4,5,7
128:8,12,16
Danny 7:14 10:22
11:16 68:19,21,22
69:1,22 70:3,4
71:1,11 72:8,9,10
72:14 73:9,13,15
73:20 74:7,13,22
75:3,13,14,18,20
75:21 76:4,12,15
76:18,23 77:23
78:2,10,14 79:1,4
79:10,22,23 80:4
80:13 82:5 83:5,7
94:23 95:4 104:22
124:17 126:17
127:16 128:9
143:10 150:11
155:9 157:7,12
159:16 160:18
162:13,17 163:2

163:14 164:22
165:17 167:6,15
168:4
Darden 36:22 37:1
38:9,10 56:11,16
57:17,20,23 58:4
58:8,10,13,16,23
59:3,12,13,19,21
59:22,22,23 60:1
60:3,4 98:6 99:12
99:14 100:3 101:6
112:2,10 139:9,16
139:18 140:1,4,5
140:9,10 141:4,4
141:6,6 150:15,23
151:4,8,13,17
152:6,9,19
date 74:19 171:15
DAVID 41:19
Davis 2:8 4:22 6:5
7:11 44:4 122:1
122:14,18,23
170:6,16
day 31:20,21,22
89:15 108:21
de 42:22 43:19
169:2
deal 16:1 22:15
84:22 88:15
128:17 144:10,14
144:18 145:13
dealing 6:23 15:22
15:23 16:3 49:2
52:13 54:13,14,15
104:21 110:23
116:7,22 125:16
139:12 143:4,4
144:2,18,19 145:9
159:16 168:4,5
deals 11:20 20:12
119:10
dealt 6:19 39:15
debris 68:6
deceased 58:1
decline 44:5
defendant 8:19
defendants 1:13,16
2:7 3:7 5:2,3,4,5,6
5:7,8,9,10,11,12
5:13,14,15,16,18
8:16,19 9:12 24:2
36:8,18 39:21
45:22 56:4 96:13
96:18 97:3,18

99:3,6 106:22
109:12 113:7,10
122:21 123:7
149:9 161:3
defined 34:10 52:12
definitely 86:19
degree 131:15
132:4,6,9,11
delay 170:1
delighted 138:2
demeanor 14:19
denied 86:20
124:17
deny 124:20 170:2
department 62:14
113:17 116:5,20
departments 144:3
deposition 1:14 3:5
3:10,19 4:4,6,16
7:11,20 8:13 43:4
44:19 45:1,15
63:18 64:9 89:14
104:3 111:7
114:21 115:2,3
122:9 156:18
160:17 163:8,10
166:10 170:20
depositions 45:4
91:23 122:5
describe 50:19
156:1
described 96:22
describing 55:12
designated 46:23
47:4,6 49:18
designed 121:19
168:23
desk 96:8,11
destruction 72:18
84:7,8,16 86:4
92:20 101:14
detailing 93:13
details 12:13 44:6
determination
125:15
determine 27:13
33:2 47:21 54:1
84:6 98:16
determined 85:22
developer 24:11
development 25:3
dictate 91:5
different 8:6 15:12
15:14,15 50:16

61:16 67:13 88:5
88:5 103:12
110:13 113:23
115:21 116:8
159:8
differently 89:8
164:8
difficulty 40:20
directed 16:23
77:19 154:17
direction 51:9 73:6
163:23
directly 143:3
director 37:17
dirt 28:16,16 61:14
61:15,16,19,20,23
62:6 69:6 71:13
disabled 81:5,18
discard 108:20,22
Discarded 106:8
108:19
discharge 135:12
discover 94:11
discovered 54:21
73:7
discovery 6:13 9:19
15:19 74:18 89:1
92:3 149:8 150:6
161:11
discretion 87:20
94:4
discriminated
86:15,20 88:10
90:18,23 91:15
120:13 121:16,22
149:18 150:10
162:22 163:11
164:23 165:13
discrimination
88:12 90:5 92:3,7
92:13
discuss 23:13 113:2
123:15
discussed 23:14
112:14
discussing 15:9
discussion 99:2
dispatcher 46:14,20
47:12 48:3 49:16
76:23 77:3,4
dispute 137:14
138:20 139:3
147:19,22 156:23
disrespect 169:20

169:21,22
district 1:1,2 6:15
6:20 10:18 92:19
96:3 159:10,11
169:3,18
division 1:3 24:14
doctorate 130:17
document 9:2,6,10
24:1,8 36:7,11,13
36:16,19,21 38:14
39:20 46:2,17
56:3 59:6 72:16
83:19 97:20 99:5
99:7 103:3 107:1
107:5 108:11,11
108:13,15 109:15
109:17,18 111:19
111:22 113:9,11
113:11,12,14,15
123:1,3,5,12,23
137:20 138:4
139:22
documents 8:14
9:11,17 96:17,21
96:23 97:4,9,16
102:16,19 103:2
103:11,18,20
doing 23:22 24:17
62:21 63:13 67:6
74:4 131:11 144:9
domain 63:21 64:15
164:18 165:11,14
166:14
drawings 56:23
dress 81:16
drink 45:6
drove 71:12
due 86:23
duly 6:2
duty-bound 12:1
122:12

**E**

earlier 10:3 11:19
14:14 19:11 28:8
32:15 38:15 43:14
47:13 51:4 55:18
76:21 84:18 91:17
93:10 141:17
163:1
early 87:22 151:2
earth 28:11,14,15
east 56:9 98:17
101:18

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 176

eastward 73:6,12
education 131:9
132:10
educator 132:16
Edwards 139:10
140:19,23 141:3
effort 83:22 88:1
92:17
eight 81:11
either 4:8 45:5 87:9
98:11
elaborate 157:16
electing 44:13
Eleventh 52:5
159:12
Emanuel 56:11,16
57:17,20,23 58:4
58:8,10 150:15,23
151:4,8,17
employed 67:15
129:9,11 130:7
146:23
employee 9:20
10:21 11:2 47:15
47:17 64:5 65:7
69:14,19 70:8,13
70:16 72:4 73:21
74:1,9 75:1,4,7,16
76:8 78:4 110:23
125:10
employees 11:22
14:17 16:3,5 18:7
22:11,22 42:3
46:15,22 48:4,5,6
48:10,11 49:6
69:17 114:14
146:4,8,19 147:9
encouraging 143:19
enforcement 28:9
119:10 125:9,17
engage 42:22 43:19
103:6
engaged 38:5 52:11
engaging 110:20
enter 13:20 14:5
40:1
entered 13:15 14:2
69:23 70:2
entire 91:20 115:14
128:2
entirety 143:13
entitled 43:10 89:18
118:13
environment 27:2,4

environmental
113:17 116:6,20
equal 86:20
equally 164:9
equipment 54:22
55:21 60:11,12,23
61:8 63:1,2,5,6,8
63:9,11,13,23
66:11 73:4 74:1
87:2 93:3,18
94:12
error 109:2
Esquire 2:8,15,20
established 27:2,7
estate 25:2 56:11,16
98:6
et 1:12
evaluate 145:15
157:19
events 73:18
eventually 52:4
evidence 3:20 12:9
74:6,11,15,21
75:8 86:14 87:6
89:7 91:12 156:23
157:3,14 160:4
161:22 162:7,8,12
162:15,21 163:10
165:4
ex 97:15 103:6
exactly 11:7 20:15
26:2 42:5,12 84:6
98:19 102:23
103:9 148:20
EXAMINATION
4:21 6:4
example 142:23
exception 133:8
excluding 39:19
131:8
excuse 26:9 35:1
60:7 65:21 115:8
130:3
exercise 168:22
exhibit 5:2,3,4,5,6,7
5:8,9,10,11,12,13
5:14,15,16 8:16
10:6 24:2 36:8,18
38:8 39:21,23
40:3 45:22 56:4,6
56:10,18 57:5
59:6 60:7,8,9
97:18,21 99:3,6
99:11 101:13

102:13 103:14
104:23 106:22
107:2,4,13,14,19
108:12 109:12,14
110:10 113:7,10
114:3 117:11
122:21 123:2,7,9
123:18 161:4
exhibits 5:1,18 9:8
9:12,13 10:1
96:13,18 97:3
116:17 124:5
168:16
expect 170:11
experience 42:18
experienced 26:9
28:23
experiencing 82:7
expert 99:17
explained 32:15
75:22 82:5 83:7
83:16 92:8 158:20
163:20
explaining 62:23
extensive 76:2
143:18
extensively 67:4
89:22
extent 25:9
eyes 74:12
E-3 135:10

**F**

fact 47:23 75:5 82:4
133:11,23 134:3
138:17
facto 42:22 43:19
169:2
facts 86:18 89:5
91:13
factual 24:4
failed 125:20 166:1
failing 165:21
fair 8:10 169:14
falsely 53:21
familiar 38:14,19
59:19,20 80:21
100:10,12,16
151:3
family 58:16 153:21
154:7
far 41:3 133:20
147:5 154:6
fax 104:8,11,19

141:12
faxed 104:13
FBI 127:16,17,20
federal 6:15 51:16
54:16 96:3 97:6
121:18 127:19
159:1,10 169:21
feel 6:12,17,18 27:7
161:6 163:6
169:19 170:5
Felix 137:6,9,11,18
138:18,21 139:3
fiber 101:16 107:23
figure 160:2
file 42:20 43:2 94:7
120:19 124:18,20
125:11 136:19
137:6
filed 7:16 9:5 10:14
10:17 42:2 51:17
53:11 110:17
111:4,10,14
112:17 118:9
125:1,2 137:17
138:8 143:9
158:22,23 168:16
files 153:9
filing 4:4,11 25:12
26:7 31:18 46:3
filled 66:6
find 42:5,14 88:19
127:21 136:13
166:9
findings 157:12
fine 78:9 124:3
finish 64:22
finished 166:22
fire 144:3
first 6:2 8:15 22:15
22:17,18 38:8
56:17 69:15 79:8
85:21 87:21
113:21 137:23
144:5
five 45:14 122:19
five-minute 44:18
flower 81:15
follow 119:5 164:5
165:21 166:1
170:12
followed 163:3
Following 119:8
follows 6:3
foregoing 171:7,12

forest 26:12,17
27:10,19,21 28:5
28:18 29:2,17,21
30:4 34:23 35:14
35:15,20 36:5
39:16 40:10
forester 72:11 83:8
94:3
forestry 1:17 2:16
2:21 7:15 14:17
15:3,6 17:2,4,6,8
17:10,10,12,14,16
18:8,16,19 19:3
19:10 20:6,8,12
20:14,16,19,20,21
20:22 21:2,3,4,6
21:11,14,18,21
22:5,7,10,20,22
23:10,16 28:10
29:12 33:13,17
34:6,9,11,16
40:23 41:7 42:4
46:6,7,9,16,22
47:10,11,13,14,16
48:1,4,9,11 49:4,6
49:9,18,22 50:1
53:12,18,22 60:13
67:15,17 68:15,17
69:16 73:13 76:20
78:4 79:17,21
84:14,22 86:9
87:14 88:20 89:7
89:12 90:11,13,14
91:4,8 93:11,11
93:12,22,23 94:2
94:12,15 101:8,11
102:2 104:14,15
105:13,15,17
106:18 107:11
108:3,6,16 112:5
112:8 113:19
114:13 119:17,23
120:2,5,7 121:3,7
121:9,10 125:10
127:2,8 143:2,5
143:17,19 144:6
149:18 150:4,6
155:3 156:6,9
157:10 158:11
160:12,14 161:12
163:5 164:6,17
165:3 170:10,11
forestry-related
119:9

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 177

**form** 3:16 37:12
168:2 171:10
**formalities** 3:8
**formality** 3:14
**former** 59:2
**forward** 10:11
167:21
**found** 60:10 63:5
**four** 13:13 81:2
**fraud** 9:9,10
**fraudulent** 111:22
116:19 167:8,10
**free** 128:1
**front** 96:8,11 104:1
108:7
**frustration** 82:6
**full** 83:11 87:16
**fully** 12:7
**funds** 152:11,16,22
153:2
**further** 4:1,12
133:19 146:17
157:20 165:10
168:12 169:5
170:7,15 171:16

_____

**G**

**G** 103:4,5
**general** 2:9,10 7:12
53:15 136:8
**generally** 63:20
64:2
**gentleman** 62:18
76:1 77:7,9,11
79:6 143:23
**gentleman's** 68:19
79:6
**getting** 47:9 51:8
76:2 88:4 93:15
**gift** 30:23 31:1
**girl** 81:12,19
**give** 30:22 31:2
95:1,4,5 105:1
151:5 157:21
158:2
**given** 7:20 89:20
94:22 107:17
108:2 126:17
**gives** 94:3
**go** 6:9 9:21 10:10
14:9 20:4,4 35:19
36:1,4 39:2 40:6
45:1,5 47:20 51:7
52:4 55:7,23 59:6

60:6 72:21 77:19
81:4,6,8,13,14
93:9,10 124:2
130:22 133:19
137:4 140:6 153:8
157:18,20 158:13
158:16,19,20
162:4 167:21
169:12
**goal** 148:17,20
**going** 7:23 8:8 9:18
15:21 39:22 42:19
44:5,8,9,12 47:21
51:9 73:5 77:1
83:10 87:17 94:6
96:16 98:13
120:20 123:18
127:22 145:15
146:1 165:10
**good** 71:14 79:9
**Goode** 129:21
**gossip** 74:5,7
**gotten** 164:13
**grandparents** 58:21
**greet** 69:15
**ground** 54:23 55:3
55:5,9
**grounds** 55:11
69:17
**ground/soil** 26:11
26:16 27:18 29:1
29:16
**group** 33:17 37:7,9
38:1,12,21 39:3,7
**groups** 88:6,8
**guess** 9:21 46:13
50:17 115:15
**G-O-O-D-E** 129:21

_____

**H**

**handed** 9:19 99:5
**handled** 87:7
144:17
**handles** 76:21
**handling** 114:12
**hands** 157:7 158:10
99:16
**handwriting** 99:15
99:16
**happen** 82:8,12
**happened** 9:15
23:21 41:4,9 53:3
53:17 68:4 72:9
73:12 74:10 82:19
84:6,9 122:13

125:4 162:16
163:21
**headed** 73:12
**headquarters** 94:9
**hear** 86:18
**heard** 37:3,6 50:19
58:3,7,7,9 75:10
140:9,22 141:1
**help** 23:23 56:23
64:22 65:1 141:19
141:21 168:22
**helping** 168:6
**hereto** 4:8,14
**hidden** 54:22
164:16
**highway** 50:6,7,8
50:10,12,13,15,16
50:17,18,22 52:16
52:18 54:10 61:17
61:22 62:14 73:12
**hired** 141:22 142:2
142:14 153:13,21
154:8,19,21
**hiring** 145:17
**Hold** 6:8 23:2
**home** 80:8
**honorable** 135:11
149:13 169:4,13
169:18
**hope** 167:1 168:17
**hopefully** 121:12
**hoping** 167:8
**horse** 89:16 118:19
**hour** 76:4
**House** 2:11
**Hudson** 79:5,7,14
79:15,20 82:1,2
**Hudson's** 79:11

_____

**I**

**idea** 99:23 137:2
**identification** 5:20
96:15 97:19 99:4
106:23 109:13
113:8 122:22
123:8
**identified** 19:14
30:15 39:20 60:10
63:4 65:14 66:13
70:15 78:3 79:15
108:12
**identify** 36:11
60:20 61:7 62:22
66:8,9 69:21

72:22 78:21 94:15
98:20 103:12
113:9 123:1,3
**identifying** 8:17
109:1
**ID'd** 46:18
**immediate** 107:17
**improperly** 169:9
**inappropriate** 6:18
**inasmuch** 6:10
56:18
**incident** 66:22
**including** 131:4
**inclusive** 21:13 34:5
34:8 119:14
**income** 141:14
**incorporated** 28:8
38:1,22 39:7
**incorporating**
91:19 161:2
**incorrect** 153:19
**INDEX** 4:19
**indicated** 167:14
**indication** 85:3
**indications** 86:17
**individual** 1:11
10:19,23 14:18
19:18 70:15 76:6
78:2 128:9,21
165:1
**industry** 53:13,14
**information** 35:3
35:10 39:10 57:19
57:22 89:1,6
90:16 92:1 122:10
127:3,10 138:11
140:13 142:3,5
146:15 151:6,19
155:16 160:15
164:16 166:17
**informing** 111:13
**Ingram** 63:15,19
64:4 65:7,14
66:11,13
**Ingram's** 93:3
**inhis** 1:5
**initially** 111:10
**initials** 109:19
**initiation** 120:23
**initiator** 120:22
**injured** 129:2
**institute** 129:13,18
132:19 141:16
145:3,4,8,18

146:3,18 147:9,13
**Institution** 130:2
**instructed** 103:4
114:15
**insurance** 144:19
**insurgency** 26:10
26:15,23 28:23
**insurgery** 26:9
**intelligently** 56:17
156:3
**intend** 66:7
**intending** 96:10
102:11
**intercepting** 97:6
**interest** 18:14 32:11
34:3 37:20
**interested** 171:19
**intermingling** 16:7
**Internation** 72:3
**International** 51:17
51:22 52:1,9,10
53:2 63:22 64:5,7
65:7 69:14,18
70:8,12,16 73:21
73:23 74:9,16
75:1,4,6,15 76:7
106:16 107:22
167:3 168:6,23
**interpreting** 88:16
**interrogatories**
156:19
**interrupt** 109:9
**interruption** 130:4
**intertwine** 15:17
53:8
**intertwining** 16:7
**introduce** 79:1
**introduced** 4:6
**investigate** 41:7
85:11 89:19 119:7
119:16 120:3,4
159:23
**investigated** 41:9
83:2 85:7,9
**investigates** 83:8
**investigation** 40:14
41:10 53:5 85:13
85:14,19 87:8
114:12,19 119:2,4
120:14 121:1,12
155:14,15
**investigations** 89:6
**investigative**
114:16 118:20

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 178

investigator 19:8
  27:13 54:1 84:5
  94:3 120:22 121:8
  125:18 158:15
investigators 19:7
  33:1 71:5 156:10
  156:11,16,20
  158:11 162:20
invokes 121:1
involved 26:20
  43:16,18 53:10
  74:3 83:9 85:23
  87:1,2,10,13 88:6
  91:3 121:15
  127:16 139:12
  140:11,16,18
  165:18
involving 114:1
  139:5 167:6
in-laws 59:3
irrelevant 167:23
irrespective 86:12
  170:13
issue 98:11 116:7,8
  145:16
issued 161:16
  169:16
issues 6:21 15:15,18
  19:15 20:13 21:21
  23:14 44:13 47:9
  53:7,9 54:13
  143:4
Ive 56:3

__J__

James 2:8
Jim 7:11
Jimmy 63:15,19
  64:4 65:6,14
  66:13
job 12:2,5
jobs 130:9
Jones 130:16,18,20
  131:6,12
judge 6:15,21 43:16
  88:13 89:4 90:1
  97:11 128:23
  133:20 149:14
  169:8,13,19
judgment 161:14
judiciary 169:22
jugs 66:6
juris 130:17
jury 86:17 89:4

90:2 128:17,23
justice 88:13
  136:20 147:23
  148:4,23 170:1

__K__

Kahn 2:4 133:13,16
  133:21 149:5
keep 108:13,15
keeps 138:8
kids 81:3
kin 58:15 171:17
kind 83:21 93:7
knew 59:10 84:11
  87:11,11 96:5
know 7:23 8:5 9:3
  9:16 10:8 13:8
  14:7 16:16 18:15
  18:22 19:6 26:14
  26:23 29:23 31:22
  36:20,22 37:1,23
  38:5,7 42:2,10
  43:10 44:2,3
  48:13 49:8 50:9
  50:15 55:19,20
  57:7,15,17 59:8
  59:14 62:19,19
  63:19 71:4,6 76:9
  78:17 79:7 80:11
  80:15 81:22 82:10
  85:2,6 92:1,6
  99:13 100:6,7,14
  100:15 101:1,6,10
  101:19 102:1,21
  106:21 107:13,18
  107:21 110:4,6
  111:11 112:12
  113:12,14 121:16
  123:14,17 127:5
  134:18 135:20
  136:9,14 137:9,11
  138:3,5,16 139:7
  139:14 140:17,19
  141:2,8,8 146:5,9
  147:5,8,11,21
  148:2 150:9,14,21
  151:9,11,12,15,20
  151:23 152:7,20
  152:21 153:13,21
  154:6,7 156:13
  158:5 160:3,19
  166:11
knowledge 34:21
  90:4

known 16:2 94:16
  94:17
K-A-H 133:1
K-A-H-N 132:23
  133:9

__L__

labeled 98:6
lady 81:7 96:2
land 12:18 17:17
  67:10,13 84:8
landowner 94:17
large 1:21 3:13
  25:14 33:16
law 11:23 17:16
  20:11 21:12 22:3
  44:9 86:22 87:14
  89:18 116:9 125:9
  125:12,16 130:16
  130:18,21 131:7
  131:12,14 144:23
  145:2,3,5 147:15
  148:15,17,18
  170:12
lawful 6:1
Lawrence 134:10
  134:14 139:9
  140:19,22 141:2
laws 21:20 86:10
  87:15 88:15,16
  91:4 92:9 93:11
  93:12,22 94:2,2
  116:23 119:9,9,11
  121:13,17,18,19
  125:8 144:21
  148:11 163:4,5
  164:2,5 165:21
  166:1
lawsuit 7:15 8:2
  10:14,16,17 11:9
  11:12 25:6,8,10
  42:3 44:7 51:5,11
  51:12,15,16,17
  52:8 53:2 54:16
  57:3 61:6 98:12
  98:14 102:5,7
  106:20 112:11,16
  114:4 115:11
  116:13 117:4,14
  117:18 118:5,9,11
  118:23 120:17
  125:3 136:19,23
  137:5,6,17 138:11
  138:18 139:5,8

140:2,11,15
  143:11 148:3,6,10
  158:23,23 159:14
  161:15 165:9
  167:5 170:3
lawsuits 53:11
  138:8
lawyer 93:23 97:11
  97:12,13
leads 88:9 126:15
learned 69:13
leave 89:3
leaves 28:17
leaving 63:14 73:11
  117:10
led 61:6 66:10
  73:19 126:5,7
  163:23
left 27:12 33:1 68:8
  73:3 83:15 123:23
  128:23 135:8
  156:10 157:6,6
legal 131:1,9 153:3
  168:2
legend 98:18
lemon 144:21
letter 101:10
  105:16 106:11
  110:16 111:2,17
  112:8 114:9,15
  115:14,20,20
  116:16,22 123:9
let's 14:9 15:13
  22:15 24:4 43:16
  60:6 122:14,18
  166:19
Linda 2:15
line 26:20 38:8
  113:21
lines 54:5 121:5
listed 139:17 140:1
litigated 54:5
litigation 141:9
little 15:11 81:9,12
  81:14,16
live 132:20 133:15
  133:21 134:1,3,5
lives 100:18,19
  134:6
living 135:17,21
load 53:19
local 94:10
located 12:21 13:2
  13:4 18:20 27:11

140:2,11,15
  143:11 148:3,6,10
  158:23,23 159:14
  161:15 165:9
  167:5 170:3
lawsuits 53:11
  138:8
lawyer 93:23 97:11
  97:12,13
leads 88:9 126:15
learned 69:13
leave 89:3
leaves 28:17
leaving 63:14 73:11
  117:10
led 61:6 66:10
  73:19 126:5,7
  163:23
left 27:12 33:1 68:8
  73:3 83:15 123:23
  128:23 135:8
  156:10 157:6,6
legal 131:1,9 153:3
  168:2
legend 98:18
lemon 144:21
letter 101:10
  105:16 106:11
  110:16 111:2,17
  112:8 114:9,15
  115:14,20,20
  116:16,22 123:9
let's 14:9 15:13
  22:15 24:4 43:16
  60:6 122:14,18
  166:19
Linda 2:15
line 26:20 38:8
  113:21
lines 54:5 121:5
listed 139:17 140:1
litigated 54:5
litigation 141:9
little 15:11 81:9,12
  81:14,16
live 132:20 133:15
  133:21 134:1,3,5
lives 100:18,19
  134:6
living 135:17,21
load 53:19
local 94:10
located 12:21 13:2
  13:4 18:20 27:11

27:14,23 28:20
  29:22 32:1,13
  34:12,18,23 35:6
  35:14 46:10 52:15
  54:8:9 55:4,22
  56:15 57:4 61:19
  65:20,22 69:10
  100:20 101:17
  113:20 129:18
location 32:20
  55:13 56:1 61:6
  69:23 73:15 77:20
  82:20
locations 47:18
long 129:23 130:20
  131:18
look 15:4 17:9 21:6
  35:19 36:4 66:14
  68:4 70:21 71:14
  83:9 84:3,23
  97:22 138:3 140:6
  153:8 166:15
  168:1
looked 13:8 68:7
  71:18 107:20
  110:1
looking 86:9 90:12
looks 95:15 107:9
  108:10
lot 68:2
lucky 52:6

__M__

machinery 54:23
  60:11,23 63:5
Madison 1:18 2:17
  2:22 22:14 23:3,7
  48:19,20 108:8,8
  108:8
magistrate 43:18
  97:12 103:3,7
  149:13 161:16
  169:4,13
mail 101:1 133:4,6
  149:6
main 94:9
making 14:23 15:21
  79:11 118:17
  137:23
male 60:21,22 64:3
Mamie 36:22 38:9
  59:12,19,22,23
  60:1 139:9 140:9
  141:4,5 151:13

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 179

man 61:7 81:5,6
management
113:18 116:6,9,21
117:19
manner 4:8
manual 125:8
manufactured
120:6 156:7
map 56:7 57:4,9
mapping 98:4
marked 5:19 8:16
9:11 10:6 24:2
36:8,17 45:21
56:3 57:5 96:14
96:17 97:19,21
98:17 99:4,6
103:13 106:23
107:1,4 109:13
113:8,9 122:22
123:1,8 127:14
match 159:7
matter 6:19,22
19:12 29:14 38:23
49:2 52:3 62:12
66:3 68:14 73:1
85:9,11 89:3
111:1 113:23
115:22 118:1
128:18 130:7
145:22 149:12
167:9,11
matters 6:14 11:21
12:10 15:11,12,15
16:4 17:9,19
20:11 21:7 22:16
53:14 54:4,15
76:22 84:1,12
86:6 87:1,22
88:21 89:19
115:21 118:21
120:5 122:6 125:3
130:11 144:11
168:7
ma'am 42:8 116:4
118:7
mean 29:10,11
30:19 52:23 59:17
153:2 164:4
means 44:3 171:9
meant 55:8 105:7
107:15
meet 22:19 48:8,17
48:21 49:1,23
50:4 69:15 75:3

76:12,15,18 77:1
meeting 22:8 23:1,5
73:20 74:8,13,23
75:15 80:23 83:6
member 24:10
63:22 134:22
merit 161:7
met 7:10 50:6 72:14
82:4
middle 1:2 10:18
159:11 169:3
Miles 131:14,21
military 134:23
Mill 107:23
Mims 59:19,23 60:1
140:9 141:4
151:13
mind 124:4
mindset 168:21
mine 30:10,11,14
31:8,10
minute 166:19
minutes 45:7,14
76:3 122:15,19
168:10
misnumbered
107:16
missing 10:5 17:10
18:16,19,21 19:3
19:5,10 20:20
21:1 33:7 113:19
misunderstood
113:6
Mitchell 1:19 3:11
171:22
Mobile 51:13 54:6
54:14,17 96:2,21
97:7,10 98:12,14
102:16 103:1,18
134:7,11,14
moment 6:8 23:3
161:20
monetary 128:3
money 152:1 153:3
153:3,5
Montgomery 1:18
2:5,13,18,23 23:4
77:8,9,15 129:19
129:22 132:8
134:17 171:5
months 13:14
Moore 136:20
147:20,21
mother-in-law 60:1

Motion 42:20 43:2
120:20
moved 73:15
Myron 169:19
mysteriously 73:10

_____ N _____

N 133:2,3
name 6:6 7:2,5,8,11
38:18 50:12,14
58:3,7,8,9,23 59:3
59:20 68:19 69:21
76:10 78:22 79:7
79:8 126:23 141:1
143:23
named 57:23 58:12
names 23:9 37:3
49:8,14 59:11
66:9 68:16 126:13
138:12
narrow 19:14 33:18
55:6,6
national 86:13
170:14
natural 17:18 28:12
28:15
naturally 94:13
nature 10:13 11:3
44:15 51:15 86:23
104:6 110:11
112:1 136:5,7,9
136:14,23 142:5,9
144:22 148:9
151:19
near 69:9 73:1
necessarily 29:10
need 3:17 9:1 13:5
18:9 29:7 38:16
43:15,17 56:20
57:10 81:1 89:21
93:9,10 109:7
115:13,23 116:9
117:6 124:1 130:5
133:19,20 141:19
144:12 156:18
158:15 162:17
163:7 166:9,9
needed 83:9 87:18
87:19
needs 45:5
neither 171:17
never 46:18 64:8
110:17 111:3
114:18 159:19

160:6
new 34:14,16 53:11
news 80:3,17
newspaper 80:20
newspapers 80:18
nice 81:14
night 133:12
nine 81:11
nonprofit 83:22
north 56:9 98:17
101:18
NORTHERN 1:3
Notary 1:20 3:12
171:23
notebook 103:23
104:4
notice 1:15 3:6
79:10 104:2
number 50:9
100:21 138:13
141:12
numerous 17:5,14

_____ O _____

object 6:9,16 33:22
39:1 41:12 51:1
56:17 98:13 99:20
116:17 134:20
137:22 142:7
150:2 152:8
155:23 157:2,17
168:16,19
objected 44:12
97:13
objection 45:1
142:7 145:21
149:13 161:17
objections 3:15,16
obliteration 26:11
26:16 27:18 29:2
29:16
occasions 143:17
occupied 66:19
occurred 75:21
92:14
occurring 171:15
offered 3:20
office 2:10 47:14
92:20 108:9
110:18 111:5,9
127:9
officer 37:17
official 1:12 10:21
19:18 125:9

128:22 165:2
officially 110:17
111:3
officials 67:17
Off-the-record 99:2
Oh 40:6 71:6
123:23 133:7
oil 68:2 84:19
okay 16:17 17:3
19:3 20:16 21:9
22:19 24:9 28:4
28:18 30:22 33:10
33:16 40:6 44:20
45:10 48:13,16
49:17,23 50:21
54:12 70:19 71:14
71:16 75:9 76:23
77:22 78:13 79:13
81:18 82:18 88:7
92:5,23 95:18,22
103:1 105:1
107:10 116:1
117:8,17 118:2,15
119:3,12,15,20
120:1,11 122:16
125:19 138:14
142:9 145:11
147:1,15 149:2
150:1 154:6
162:19 163:9,19
163:22 166:11,23
old 81:11
once 89:1 150:15,23
open 130:8
opened 68:5
operated 63:12
operating 63:11
opinion 33:3,6
opportunity 122:7
124:18,20
option 48:23
orally 25:18,20
oranges 159:8
ordeal 14:21
order 30:12 31:6
44:11 88:11
161:17 169:16
organization
146:14
origin 86:13 170:14
original 109:21
outside 77:10
owned 27:14 28:21
29:5,20 30:2 35:4

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 180

66:11 67:20 87:2
125:14 150:15,23
151:17,20 155:19
156:6
owner 1:6 14:4
24:11 63:23
102:15
owners 14:3
ownership 18:14
29:9,11 32:11
37:20
owns 34:22 55:19
61:23 62:8,15,17
74:1 101:20 136:3
150:14,21 151:16
151:22 160:5

_____

**P**
page 4:21 5:1 24:5
24:6 66:17 123:22
124:13 125:19
127:11,13
pages 10:5
paid 152:5 161:14
170:3
paper 31:2,5 51:18
51:22 52:1,9,10
53:2 63:22 64:5,7
65:8 69:14,18
70:8,12,16 72:3
73:21,23 74:9,16
75:1,4,6,15 76:7
106:16 107:22
167:3 168:7,23
papers 138:23
paragraph 24:6,9
24:17 25:11 26:6
26:18,19 27:9,21
28:6,20 30:15
32:17 34:17 35:9
35:17,21 38:13
46:1,2,19 47:8
49:12 54:18 60:8
60:9 63:16 66:14
69:12 92:23
123:21 124:13,15
127:14
pardon 105:7
107:15
parenthesis 38:11
parents 58:22
park 1:6 14:1 24:12
24:13,14,15,18,22
25:2,5,7,13 26:1,4

26:8 55:1,3,5,9,11
55:15,17 61:4
66:1 67:12,21
68:8 69:18 72:13
72:16 82:9 83:12
83:19 84:11 86:7
92:21 102:10,15
106:14,15 112:19
112:23 113:3,5
151:16,22 152:17
Park's 60:14
part 9:7 14:4 25:1,7
25:9 26:4 33:10
57:3 160:1
parte 97:15 103:6
participate 44:8,10
44:15
particular 10:5
11:12 15:7,10,19
15:20 19:12,12
26:19 28:18 29:13
29:14 31:20 32:16
36:21 47:7 49:11
51:3,16 56:22
57:9 59:9,15 61:4
61:5,8 62:11,20
63:3,7,14 65:19
66:12,23 69:20
71:18 76:1,5,22
77:6,8,17 82:10
87:8 89:2,22
94:16 103:10
108:9,10 115:22
116:16 118:23
121:14 145:23
149:1 159:14
167:5 168:8
parties 3:4 4:3,13
6:22 53:10 121:14
138:12 169:16
171:18
party 4:8 45:5
51:12 139:17
140:2 143:12
path 51:7
pattern 90:15 166:7
166:8
Paul 1:5,5,14 2:3
3:5 4:5 6:1 7:4
13:22,23 24:14
27:15 32:10 38:10
38:12,18 39:8
50:21 59:10 60:2
60:5 72:14 102:9

102:9,12,13,14
104:3 105:2
137:18 150:8,13
152:13,14,15
153:4,4 154:16,17
154:17,19,21
155:1,6 156:4
158:1,4 160:10,23
170:20
pay 71:22 152:4,6
pending 6:14 51:13
169:17
people 15:6 22:21
23:10 27:1 32:6,7
46:11,14 48:17,19
48:21 49:1,3,9
58:8,11 59:9,15
64:19 65:12,17
66:5 67:2,16
68:11 70:14,18
72:2,6,12,21 73:3
73:7,16,19 74:2
78:1,5,6,15,18,21
80:1 81:8 82:3,8
82:11,12,15,22
85:23 86:3,8 87:3
87:5,10,12 88:5,6
88:9,22 89:8,9,17
89:22 91:2 125:20
126:12,18 127:6
141:19 142:11,13
142:15 143:1,16
143:19 165:18
period 119:2
permission 36:1,2
82:16 83:1,11
155:13 156:22
157:21 158:3
162:1,10
Perry 11:11 12:15
12:19,21 13:1,3
13:17 14:4 15:8
23:20 34:12,18
35:5,12 50:1,4,23
52:16 54:10 56:8
101:19 113:20
151:1 153:14,23
154:8 156:5
person 16:6 22:9
22:14,18 27:3
57:23 60:19,20
61:10 62:20 63:3
63:7 69:2,3,20,22
70:12 71:10,12,16

71:18 72:7,10
73:20 74:10 77:13
79:8,9,16 81:18
83:17 88:14 90:6
94:7,18 126:9,23
161:22 164:13,20
personal 29:12,19
30:2,6 31:3,7
32:12,18,19,21
33:10 35:6,7
55:12,13,13 56:13
57:2 67:11,20
69:10 90:4 94:19
125:13 151:16
personally 32:10
35:11 167:18,20
person's 76:9
perspective 59:11
pertaining 117:1
118:10,12,21,23
119:1 120:5 125:2
130:11 142:15
144:11 148:6
163:4 164:5
pertains 148:12
phone 22:13 46:20
47:17 48:12,14
77:12,18 79:11
89:11 110:20
130:4
photograph 56:21
57:10,12 98:2,16
physical 128:10
pick 96:8,10
piece 31:2
pinned 81:15
place 23:1 47:1,4,6
49:19 61:13 62:2
62:12 65:17 66:4
69:5 74:5 76:5
77:12 86:4,5,6
88:19 149:6
168:20 169:3
places 46:14
plaintiff 1:7 24:9
25:8 43:7 46:4,21
46:23 51:19 54:21
60:14 69:13
124:17 125:21
143:12
Plaintiff's 25:12
26:8
plan 25:1
played 110:21

pleadings 166:18
please 6:7 7:3,6
10:12 21:16 58:14
64:21 66:14 90:9
105:1 136:17
139:19
Plus 87:13
Pogue 1:5,5,14 2:3
3:5 4:5 6:1 7:7,10
7:17 10:12 12:4
13:22,23 24:7,15
27:15 30:18 32:10
36:9 38:9,10,12
38:18 39:8 41:21
44:4 45:4,18,20
50:21 54:19 56:2
56:6 59:10,21
60:2,3,4,5,6 64:21
66:15 69:12 70:22
71:4,8 72:14
85:17 90:8 92:18
92:23 96:16,23
98:2 99:5,8,12
100:3 101:6 102:9
102:9,12,14,14,17
103:21 104:3,17
105:2,21 106:2
107:2,18 109:7
112:3,10 113:10
115:9,13,19 116:3
116:14 117:5,10
117:15,19,23
118:6,16 119:5,8
119:13,17,22
120:4,10,16 122:2
122:15,17,23
123:10,13,16,19
124:15 127:11
128:3 129:9 130:5
133:10,14 134:1,5
134:6,16,16,19,23
135:17,18 136:1,8
137:18 139:18
140:5,10 150:8,13
152:6,9,13,14,15
152:19 153:4,4,11
154:16,17,17,19
154:21 155:1,6
156:4 158:1,4,13
160:10,23 168:12
169:10 170:8,20
Pogue's 99:15
point 10:9 41:16
53:6 63:17 74:18

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 181

77:20 120:23
147:4 161:12
pointed 72:17
policy 94:14
polite 79:9
popular 50:14
postal 100:21,23
practice 90:15
94:14 116:9
117:20 145:5
148:15,18 166:8
practiced 147:15
practicing 129:14
129:15 144:23
145:1
precipitates 53:10
prejudice 44:13
premature 44:14,14
157:15
prepare 93:1,5
present 22:13 32:4
32:6,8 35:11 66:3
presented 111:23
presently 144:10
167:7
president 129:12,23
145:2 146:6 147:1
147:6
press 25:18
pretty 81:16
previously 5:19
108:2
printout 138:7
prior 7:10 72:12
76:1
private 7:1 145:3
145:22
pro 2:2 7:18 147:17
probably 52:5
111:22 118:1
132:15 133:5
problem 119:22
164:11
problems 121:9
142:21,23 144:20
170:10
procedural 3:8
procedure 3:22
22:4
proceed 109:10
proceeding 6:10,17
168:19 171:7
proceedings 171:14
process 6:13 15:20

26:23 161:8,18
168:1
produce 162:6
produced 155:15
171:10
product 60:13
products 15:7
17:10,11,12,15,16
18:17,20 19:4,10
20:21 21:2 26:12
26:17 27:11,19,21
28:5,19 29:3,13
29:17,21 30:5
33:14,15,17 34:6
34:9,11,17,23
35:14,16,20 36:5
39:16 40:10 47:11
120:7 156:6,9
promotor 24:11
proper 27:8 41:22
42:23 43:3 59:11
59:12,13,14,18
properly 120:15
properties 55:12,14
property 12:14,16
12:18,19 13:4,7,9
13:11,17 14:3
15:7,8 18:5,13
23:19,21 27:14
28:21 29:5,6,11
29:12,19,20 30:3
30:7 31:4,7 32:12
32:13,18,19,21
33:11 34:22 35:4
35:6,7,12 36:1,3
47:20 50:22 55:10
55:16,18,20 56:7
56:14,15 57:2,13
61:23 62:6,8,17
63:14 65:21,22
67:6,9,11,20 69:9
69:10,23 70:3
75:2 76:13,16,19
77:2 81:3,13
82:14,16 83:16
84:7,9,16 85:22
88:4 92:21 93:2
94:6,11,12,16,19
98:5,11,23 101:15
101:17,20,22
106:15 112:23
113:20,22 114:7
125:13 129:3,5
150:14,22,22

151:1,15,16
158:13,16 160:5
162:5
proprietary 24:19
prosecuted 83:2
protect 121:20
protection 89:19
92:16
proud 135:4
prove 88:11 161:8
provide 125:21
provided 3:21 4:9
125:22
Pryor 139:9 140:19
140:22 141:3
public 1:20 3:12
25:14,22,23 31:13
31:14,15,17 32:3
36:6 58:11 63:21
64:15,19,20 72:15
164:18 165:11,14
166:14 171:23
publications 22:5
punitive 128:20
purchase 30:16
purports 101:13
purpose 3:21 9:18
51:11
purposes 33:19
141:23
pursuant 1:15 3:6
12:1 21:12 44:9
44:10 121:12
127:19 128:14
put 59:10
putting 118:18
P-O-G-U-E 7:9
p.m 170:21
P.O 134:6

_____
            Q
_____
question 8:3,4,8
12:23 13:6,21
14:8 18:23 19:2,7
20:1 28:1,2 30:1
30:21 32:14 33:8
33:9,20,22 34:2
34:13,15,16 35:2
35:18 36:15 37:13
39:1 40:7,16,17
41:18,21 47:19
51:1 52:21,23
54:3 56:22 58:14
58:18,19,19 59:7

64:23 65:2,3 67:7
70:23 81:4,9,12
89:21 95:10,11,19
98:21 99:21,22
104:10 110:14
115:16 117:7
118:7 131:5
133:17 134:20
135:19 136:18
139:23 140:7
142:12 146:22
148:16 149:23
150:3,5,18,20
152:3,8 153:16,19
154:11,16 155:22
156:3 157:2,17
158:6,9 166:23
questioned 67:4
questioning 121:5
questions 3:5,17
8:1,14 12:6,12
41:1 43:7 44:6
146:17 151:3
167:3,22 168:3,13
quite 27:7
quote 124:17,19
125:20

_____
            R
_____
race 24:10 86:12,16
87:9,10,11,12
90:19 91:6,16
110:21 143:21
165:7,16 166:3,4
166:5 170:13
racial 85:15,20 88:1
92:2,13
racism 110:20
raise 125:6
raised 16:10
range 56:9 83:11
87:16 101:18
rank 135:8
read 57:9 83:20
115:14 143:12
reading 47:2 60:15
66:20 113:21
reads 98:7
ready 9:3 45:18
97:1 124:13
real 12:18 25:2
29:10,20 32:12
34:22 35:4,12
50:22 55:9,15,17

55:19 62:5,17
84:8 101:20,22
150:22,23
really 6:12 21:23
53:6 62:19 71:15
78:7 130:22
136:11
reason 8:2 28:13
75:9 85:10,12
90:22 170:4
reasons 85:15,20
recall 23:22 26:2
31:23 32:5 96:9
96:12 97:5,16
106:13,17 111:6
115:6 130:22
133:7 137:1,8,15
138:19,20 139:15
141:10 148:20
149:11 153:6
157:23
receive 103:15,17
104:8 105:6,10,12
108:5 111:17
114:23 115:5
123:4 130:17
131:15 141:14
152:1
received 104:14
105:4,9,14,16
107:8 108:7,16,21
109:23 110:11
114:17,19 115:4
127:1 135:11
152:11,15,22
153:5,9
receiving 115:6
recess 45:17 122:20
168:11
recognize 90:10,11
98:10 99:7,14
109:1 161:3
recognized 46:15
64:2 148:12
record 6:7,9 7:3
124:12 170:9,17
records 137:16
138:8
refer 18:16 45:20
123:21 138:15
142:16,19
reference 49:12
referral 142:16
referred 34:17 35:8

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 182

52:18 63:15 77:4
143:16
**referring** 8:18,21
9:13 28:14 30:3
32:16,17 33:11,13
40:4 46:17 47:8
47:22,23 56:14
60:18 61:3 62:13
67:12 111:19
137:21 138:6
139:20 140:4
141:11 143:8
167:20
**refers** 27:22 38:9
38:13 56:10
**refused** 146:21
**refusing** 146:16
**refute** 157:14
**regarding** 15:5 17:9
**regardless** 4:10
**relate** 16:19
**related** 14:20 58:12
86:10 94:2 125:8
**relates** 6:21 11:13
11:16,21 14:19,22
15:12 16:4 21:21
23:15,17 26:18
51:2,10 53:16
87:14 95:12
127:22 144:20
167:4
**relation** 151:12
**relationship** 84:10
**release** 25:19 80:3
80:17 122:12
**relevant** 167:4
168:7
**rely** 90:1 155:16
**remember** 13:12
23:9 68:23 105:21
106:2,10,10
109:16 110:19
111:1,13,23 122:2
132:12 138:22,22
148:21
**remove** 110:22
**repeat** 35:1,18
139:23
**rephrase** 12:23
19:1,23 28:2
30:20 32:14 33:8
34:2 36:15 37:13
51:2 95:10,13
104:10 117:6

131:4 142:12
148:16 150:19
152:3
**rephrased** 154:13
**report** 93:1,5,7,13
94:20 95:1,3,4,5,7
95:12,16,20,23
96:22 102:20,21
104:13 114:16
115:9,12 116:12
118:3,21 144:13
160:11
**reporter** 1:20 3:11
124:8 171:23
**REPORTER'S**
171:2
**reports** 122:10,11
**represent** 7:13 39:4
39:6 40:18,19
56:6 98:3 141:5
146:10 152:10
154:15 167:13
**representing** 3:4
4:3 133:22
**represents** 171:12
**request** 14:23 15:2
16:11,19 17:3
115:12 116:11
118:3,8 149:9
**requested** 96:6
97:14 116:14
**requests** 17:5
**require** 93:12 164:2
**requirements** 3:9
**requires** 93:11
**research** 130:11
**reserved** 3:18
**reside** 101:4 134:13
**residential** 132:22
134:8,9,17
**resolve** 53:1
**resolved** 52:22 84:1
122:6
**resources** 17:18
28:12,15
**respect** 3:8 10:22
125:13
**respectfully** 6:16
**respond** 167:17
**responded** 156:17
**response** 107:17
**responsibilities**
12:3
**responsibility** 11:22

14:16
**resting** 82:20
**restroom** 45:6
**rests** 53:17
**result** 41:10 90:19
171:19
**retired** 144:10
145:9
**reveal** 142:4
**review** 8:13 9:2
**reviewed** 12:4
**reviews** 9:6 96:23
139:22
**right** 11:23 18:10
45:1 60:6 64:19
69:11 70:2,6 73:5
78:16 83:4 90:22
105:3 114:6
120:10 134:2,4
142:20 144:15
145:9 146:6,21
147:5,10,18
156:15 159:3
160:20,20
**rights** 10:17 72:23
92:15 121:19
127:23,23 129:6
148:7 163:15
165:19 170:22
**right-of-way** 62:11
62:16
**Riverdale** 107:22
**road** 36:6 53:20
61:14,15,16,19,20
62:1,5,6 69:6
71:13
**Robinson** 103:4,5
**role** 11:21 14:16
110:21 124:22
**roster** 64:8
**Roth** 144:1
**Route** 98:8 100:4,8
133:8
**Roy** 136:19 147:19
147:21
**Rule** 120:19 149:15
161:16
**rules** 3:22 163:4
169:21
**ruling** 3:18
**rulings** 6:21
**rush** 161:13
**Russ** 6:11 42:21
169:4

| | S |
|---|---|
**S** 2:12
**Sandra** 103:4,5
**satisfied** 75:7,9
**saw** 70:3 71:12
74:11,13 75:3
77:23 78:1 88:7
96:1,21 102:16
103:18
**saying** 17:21 53:3
54:2 62:8 91:4
94:20,23 95:2
116:3 118:18
120:12,21 121:4
125:23 145:20,21
163:1 165:8,10
168:15
**says** 22:2,3 24:9
25:11 26:6 31:3
44:1 46:2,19
54:21 60:9 63:4
69:12 93:1 105:1
107:22 110:8,10
110:12 116:19
118:13 124:16
125:20 139:3
144:13 159:1
**scale** 105:2 107:21
107:23 108:5
109:4
**scheduling** 44:11
149:14,15 161:17
169:15
**School** 130:16,18
130:20 131:6,12
131:14
**science** 28:11,15
**scope** 21:10 23:15
127:21
**se** 2:2 7:18 147:17
**search** 151:18
**section** 101:17
**see** 15:14 24:6
33:14 46:19 47:1
53:19 55:23 56:9
60:15 63:2 66:20
71:10 73:13 74:10
82:8,22 98:7,15
103:1,9 109:20
114:22 137:20
139:2 149:3 151:5
153:9 166:15
**seeing** 97:17 109:16
**seek** 27:5

**seeking** 128:3,5,6,7
128:8,13
**seen** 36:13,16,20
60:23 95:7,15,19
107:5 109:15
123:12
**seize** 93:3
**seized** 93:18
**self-employed**
136:1,3
**selling** 101:16
**Selma** 100:5,8
**semesters** 131:3
**send** 104:11 110:16
111:2 149:6
**sent** 101:10 109:3
112:7 114:22
149:8
**sentence** 111:18
**separated** 134:19
**sequence** 73:18
**serious** 85:16
**seriously** 167:12
**service** 135:13
**services** 16:20
125:22 135:3
**session** 146:2,2
**setting** 144:2
**seven** 66:19 78:6,14
78:18,20 81:10
**severed** 60:12 63:7
**share** 139:19
140:12
**shareholder** 37:14
**sharing** 137:23
**Short** 45:17 122:20
168:11
**shorter** 71:20
**Shorthand** 1:19
3:11
**show** 36:7 55:7,22
56:2 57:10 96:16
97:13 103:4 107:1
109:14 138:2
**showed** 97:9
**showing** 103:10
**shown** 86:23 96:2
97:5,14,15 103:11
107:18
**shows** 107:13
**shred** 161:21
**sic** 21:23 42:21
169:16
**signature** 4:15

99:10,11,19 100:1
signed 109:19
110:17 111:4
similar 88:21 91:10
92:11 107:9
108:10 109:17
110:1 125:22
164:11
simply 6:13
sir 6:8 7:19 8:7,11
8:23 12:17 13:19
14:7 15:10 16:14
18:2,15,18,23
19:8 20:22 23:12
23:22 24:3,8,8
25:4 28:3 30:17
32:3 33:5 34:2
35:2,10,22 36:10
36:15 40:4,7,12
45:12 47:3 48:15
50:11 56:5,12
57:6,14,16 58:2
58:14 60:16 61:1
64:17 65:5 66:2
66:16,21 67:13
72:5 78:12,19,23
80:7,10,16 92:22
93:20 95:6 96:19
98:1,9 99:1,13
101:5,9,12,21,23
102:4,18 103:19
103:22 107:3,20
108:4,14,17 109:8
109:11 111:12,16
112:6,9 122:17
123:6,14,17,20
124:6,6,9 126:14
127:12 134:12
135:19 136:11
137:4,21 139:7,20
140:21 141:5,13
141:17 142:3
143:8 148:2 149:7
150:16,20 151:11
151:23 152:3,7,18
152:20 153:1
154:5 155:17
156:12 158:10,21
160:8 161:6
166:18 167:1
169:11
sisters 58:22
sit 21:23 74:19
127:5 150:8

155:10 160:20
161:20 162:9
164:12,19
sitting 39:9
six 78:6,14,17,20
skilled 15:16
slanted 85:14,19
Slusher 152:12,16
152:22 153:5,23
154:2
software 98:5
soil 60:14
solely 75:10
solution 48:8
somebody 17:21
18:11 30:16,22
40:1 41:5 50:15
64:16 65:6 74:14
74:15 76:18 77:1
77:12,14 79:20
97:9 102:20
125:12 144:1
145:17 153:13
155:11,19 157:4
158:3,7 159:1
160:21
someone's 94:5
109:18
somewhat 61:21
68:7 116:18
128:20
sorry 30:18
sort 66:1
source 141:14
south 98:17 134:9
so-called 92:20
speak 11:8 26:22
27:16 42:10,11
43:22 46:7 68:21
92:18 139:1
140:10
speaking 12:17
17:13 28:19 35:15
39:18 61:5 65:16
67:23 69:19 84:17
93:7,19 102:22
113:22 114:7
117:6 137:21
speaks 10:16 11:6
11:20 24:16 26:19
27:9 38:3 41:14
42:8 43:14 66:18
67:1 91:18 102:7

102:13 120:17
143:11
specialized 141:20
Specialty 37:7,9
38:1,11,21 39:3,6
specific 43:7
specifically 18:22
28:22 30:1 68:23
72:19 86:10
116:23 129:5
136:6 144:13,18
145:10
spectator 60:10,17
60:19 62:21 63:4
66:13
speculative 157:1
157:15
spell 7:8
spelled 7:9
spoke 22:10 46:20
47:17 48:13 49:3
49:9 68:18 69:1
77:11 81:1 89:11
spoken 112:2,15,18
112:21 113:4
114:13 143:3,14
spouse 59:2,2
stage 169:18
standing 36:6 65:13
69:8 77:16 82:21
159:15 165:9
stands 89:23 167:7
start 29:9
started 73:16
state 1:21 2:11 3:12
3:22 6:6 7:1,2,5
9:20 10:21 11:2
11:22 15:3 16:2,4
17:1,6 18:7 20:11
21:23 26:13 28:22
29:3 33:23 50:6,7
50:8,17 52:12,16
61:17,21 62:14
65:21,22 72:11
73:11,13 79:16
83:8 98:7 106:4
110:23 118:12
121:1,13,17 132:7
132:21 137:12
142:19 144:4
148:8,13 164:2
165:22 166:1
171:4
stated 11:7 72:19

77:9 114:20,20
128:14 141:17
statement 41:14
169:11
statements 44:14
77:4
states 1:1 129:5
135:3,4,5
stating 39:2 110:16
111:3
status 159:15
Statute 4:9
stay 124:8 133:11
stem 14:15
stenographer
146:20
stenographic 171:8
stipulated 3:2 4:1
4:12
stipulation 1:15 3:6
STIPULATIONS
3:1
stolen 101:16 102:3
112:22
stop 43:15,17 44:23
stopped 67:4
straightened
115:23
street 2:4,12 46:13
129:21 132:23
133:3,9,13,16,21
134:10,14 149:5
strictly 16:8
strip 55:6 67:10
69:9
strongly 92:12
student 130:14,15
131:6,12,13
subject 39:16,18
substances 68:3
sued 10:23
suggest 87:22 91:14
157:3
suggested 38:15
126:22
suing 42:6 43:9,11
43:13
supervise 146:1
supervision 171:11
support 83:21
92:17
supports 12:10
supposed 41:6
89:12 94:13 155:6

155:21
supreme 52:6 88:13
136:20 147:23
148:5 159:13
sure 12:7 35:3 65:2
108:1 124:7
139:21 150:21
surrounding 62:6
surveyor 13:5
61:20
Surveyors 1:6 14:1
24:12,12,14,15,18
24:21 25:2,5,7,13
26:1,3,8 54:23
55:3,5,9,11,15,17
60:14 61:4 67:12
67:21 68:8 69:17
72:13,16 82:9
83:12 84:11 86:7
92:21 102:10,15
106:14,15 112:19
112:23 113:3,5
151:16,21 152:17
Susan 6:11 42:21
169:4
sustained 26:8
sworn 6:2
system 137:17

**T**

T 2:20
take 9:1 23:1 27:6
44:18 45:7 61:12
69:4 86:4,5,6
91:23 114:21
115:1,3 122:9,14
124:1,4 131:9
133:20 156:8,18
163:7,9 166:19
167:11
taken 1:14 3:5,10
63:18 64:9 72:20
111:7 143:1
163:17 168:20
169:2 171:8
talk 48:10 65:18
122:7 162:17
talked 65:11 112:15
140:14
talking 15:11 17:23
18:2 27:17,17
28:6,7 29:9,15,18
33:16 35:16,21
56:19 73:16 77:5

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 184

86:1 102:19
148:22
talks 129:7
taller 71:20
tax-paying 14:23
tear 27:5
technically 153:18
telephone 22:12,17
48:17,22 49:1
69:2
tell 10:12 20:2,6
21:16 26:14 31:9
31:14 32:7 41:2
57:1 61:2 64:16
65:6 66:22 68:16
75:14 79:13,17,19
79:20,23 98:19,22
115:4 126:13
133:14 136:16
144:15 153:16
158:14 159:5
160:6 164:13,19
telling 43:23 110:19
111:1
tells 86:10
tender 153:3
term 43:13
terms 8:17 42:19
84:7
terrorists 27:5
terrorist-style
26:10,15 29:1
testified 6:3
Thank 45:13
122:18 168:9,13
theft 54:22 55:21
86:5 93:2 94:11
thing 33:18 42:23
43:4 110:9
things 12:13 44:1
73:4 84:21,23
128:19 144:21
think 11:5 16:22
17:15 18:3 21:4
47:7,18 49:20
52:3 53:20 54:11
62:3,10,10,14,18
64:18 75:12 79:4
80:19 81:7 85:18
86:17 88:12,17,23
89:10 92:12
100:22 104:20
105:16 111:21
114:9 121:6

125:12 128:17,19
129:4,6 131:1,20
135:7 139:1
143:22 147:3,3
148:6,11 149:11
153:12,17,17
165:23 166:6
thirty 76:3
Thompson 169:19
thought 72:3 109:1
109:3
thoughts 166:21
three 13:13 81:2
ticket 107:23
tickets 105:2
107:21 108:5
109:4
timber 11:10,14,16
13:7,16 14:6
15:13 19:20 33:12
33:19,23 34:3,4
34:10 38:22 39:12
40:2,9 41:5 52:14
52:15 54:8,22
55:21 101:16
102:3 112:22
151:21,22 152:2,4
152:5,14,23 153:7
153:14,22,23
154:2,8,20,22
155:2,5,11,18,19
156:5,21 157:4,22
158:3,7 159:2,18
159:21 160:9,22
161:23 162:10
163:17
time 3:18,19 6:20
9:1 13:9,10 19:21
19:22 21:7,19
24:23 25:4 26:20
39:14 45:10,15
47:7,19 49:11,21
66:12 72:21 74:19
75:13 76:11 81:20
82:7 96:4 110:4,7
133:7 140:8 144:5
145:1,12 147:14
148:21 149:4
157:23 158:17
160:7 161:21
171:15
times 8:12
title 151:18
titles 12:2 146:7

today 12:5 23:6
39:9 42:14 58:4
74:20 80:6 89:16
91:14 92:6 103:21
107:6 127:5
145:14 150:8
155:10 159:15
160:21 161:20
162:3,9 164:12,19
168:13
Todd 152:12,16,22
153:5,23 154:2
told 19:11 31:13
47:12 55:18 59:9
60:22 63:3 65:10
76:21 81:5,8
91:12 92:5 93:6
96:3 112:7 121:21
121:23 151:2
166:15
Tony 1:11 7:13
10:19,20 11:13
70:23 71:2 104:8
104:11,13 105:9
105:10 109:20
110:15,19 114:10
115:7 123:11
124:16 126:16
127:15 128:7
143:9 150:11
155:8 157:7,12
159:16 160:18
162:13,18 163:2
163:14 164:21
165:16 167:6,15
168:4
top 127:13
total 9:7 169:20,20
169:21
totally 167:23
township 56:8
101:18
trail 69:6,8 82:10
83:12
trained 141:20
training 146:2
transcript 65:1
171:10,14
transporting
101:15
trash 68:7
traveling 53:19
73:11 82:9
treated 14:21 88:22

88:22 89:8 91:7,7
164:9,10
treatment 126:1,18
127:1,7 164:14
tree 158:14
trees 17:21 18:12
158:17,18
trends 38:15
trespass 101:14
trial 4:7
trick 41:1
trickles 94:10
tried 153:11
truck 73:13
true 138:23 171:13
trust 9:16 10:8
truth 91:5,6
try 28:3,4 42:14
160:7 166:17
trying 16:9 41:2
42:5 51:4 52:19
52:21 53:1 159:5
159:6,9 160:2
161:13
turned 156:11,15
two 9:11 26:6 31:18
131:3 159:8
type 125:5 130:10
142:21 144:8
146:14
types 68:3 84:21
Typically 45:4

_____

U

ultimately 128:17
undefined 24:23
25:4
understand 8:3
12:7,9 16:9,17
18:10 28:1 29:7
30:19 39:8 40:19
41:2,3 42:12
58:17 59:17 64:4
74:13 87:13,15
90:9 116:10
120:19 151:7
159:13
understanding
16:22 18:1 20:10
40:22 72:1 129:8
understood 8:9
63:20 85:21
unintentional 16:8
uninvited 27:1

Union 2:12
United 1:1 135:3,4
135:4
University 131:13
131:16,18 132:2,7
Unknown 66:5
unmanufactured
26:12,17 27:10,19
28:5 29:2,17,21
30:4 35:13,15,20
36:5 39:15 40:10
60:13 120:7 156:7
unnamed 60:19
61:14
unusual 136:13
use 50:19 58:8,9
143:19
U.S 52:6 159:12

_____

V

Valissa 37:1 38:10
59:13,21,21 60:3
60:4 99:11,14
100:3 101:6 112:2
112:10 123:10
139:16,18 140:1,3
140:5,10 141:3,6
152:6,9,19
van 66:19 67:3,16
67:18,19 68:1,1,5
68:11,18
various 8:12 23:14
74:2 142:16,23
verify 151:19
versus 91:7 139:9
violated 92:16
94:19 163:14
165:19
visit 46:23 49:17
61:3,6
voice 94:8
voiced 46:4 47:10
48:2
volumous 21:22
volunteer 144:3
vs 1:9

_____

W

W 2:8
waived 3:9 4:5,16
waiving 4:10
walk 82:13 83:11
Walker 6:11 169:5
169:8

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 185

| | | | | |
|---|---|---|---|---|
| want 6:8 19:1 20:13 | 81:7,10,12,18 | years 26:7 31:18 | 18 56:8 101:18 | 87 135:7 |
| 29:8 33:17 36:7 | 86:3,8 87:3,4 | 81:11 132:13 | 1989 130:3,13 | |
| 42:2 45:3 53:6,11 | 88:22 89:9 91:3 | 135:6 144:2 | 1993 137:18 | **9** |
| 66:8 81:23 82:11 | 121:15 125:23 | young 61:7 81:19 | | 9 26:6 30:15 34:17 |
| 83:1 88:17 95:13 | 126:1,9,17,23 | 81:19 82:8 96:2 | **2** | 35:9,17,21 97:18 |
| 109:9 127:14,17 | 127:6 143:21 | | 2 1:22 36:8,18 38:8 | 97:21 |
| 133:14 136:16 | 164:13 165:17,18 | **#** | 39:21 59:7 170:21 | 9:05 1:23 |
| 141:7 153:19 | whites 164:10 | #1 5:2 | 2:06CV148-MHT | 94 132:15 |
| 167:21 | wife 60:4 102:1,6 | #10 5:11 | 1:9 | 95 132:15 |
| wanted 84:2,4 | 111:10,15 | #11 5:12 | 20(a) 92:23 | 97 5:10 |
| 159:23 167:19 | wife's 99:18 100:1 | #12 5:13 | 2005 156:4 | 99 5:11 |
| wants 55:23 | 136:15 | #13 5:14 | 2006 1:22 170:22 | |
| wasn't 84:12 | wish 125:6 | #14 5:15 | 219 50:18,22 52:18 | |
| 120:21 | wished 148:14 | #15 5:16 | 54:10 61:17 98:8 | |
| water 45:6 65:11,13 | witness 4:14,15 9:6 | #2 5:3 | 22 123:21 124:13 | |
| 65:15,20 66:3,6 | 41:22 42:7,17 | #3 5:4 | 124:15 | |
| 70:18 72:2,7 73:9 | 43:12 45:23 | #4 5:5 | | |
| 74:22 75:11 | 139:22 | #5 5:6 | **3** | |
| 126:12,21 | woman 77:12 | #6 5:7 | 3 9:12 10:6 24:5,6 | |
| way 8:6 25:19 27:3 | wonder 136:15,17 | #7 5:8 | 104:23 108:12 | |
| 28:4 41:8 57:1 | wondered 140:3 | #8 5:9 | 301 2:4 132:23 | |
| 59:16 83:21 88:17 | wood 53:19 | #9 5:10 | 133:9,13,16,21 | |
| 114:11 121:2 | words 10:13 118:17 | | 303 2:11 | |
| 128:19 136:2 | 150:2 | **1** | 334 100:4,8 133:8 | |
| 153:11 156:13,17 | work 130:13 145:6 | 1 5:18 8:16 24:2 | 356 134:9,13 | |
| 160:3,16 161:15 | worked 74:15 79:14 | 39:23 40:3 45:22 | 36130 2:13,18,23 | |
| 162:23 165:6 | 79:21 132:16 | 60:8 102:13 | 363 134:6 | |
| 169:14 170:4 | workings 86:21 | 123:18 161:4 | | |
| ways 87:8 121:22 | works 79:16 147:11 | 10 46:1,2 56:9 99:3 | **4** | |
| 169:1 | worried 136:11 | 99:6,11 101:13,18 | 4 9:12 10:7 | |
| went 20:2,6,8,16 | wouldn't 35:10 | 106 5:12 | | |
| 21:2,4 22:7 23:23 | 44:15 59:14 63:18 | 109 5:13 | **5** | |
| 36:4 40:22 81:16 | 89:15 95:9 112:12 | 11 2:12 46:19 49:12 | 5 5:2,3,4,5,6,7,8,9 | |
| 87:20 116:4 | 118:10 124:3 | 106:22 107:2,4,15 | 56:4,6,10,18 57:5 | |
| 149:14 | 146:9 152:7,20 | 107:19 | 66:17 127:14 | |
| weren't 41:6 | write 114:15 | 113 5:14 | 512 108:8 | |
| west 61:21 98:18 | writing 88:15 | 12 54:18 107:13,14 | 513 1:17 2:17,22 | |
| we'll 12:12 45:13 | 115:19,20 130:12 | 109:12,14 110:10 | 23:3,7 46:10 | |
| 45:14 109:10 | 143:18 146:20 | 111:19 127:11 | 48:20 108:8 | |
| 161:18 166:19 | written 51:6 59:16 | 12(b) 42:20 43:2 | | |
| 168:9 | 67:1 95:7 113:16 | 120:19 | **6** | |
| we're 15:11 16:3 | 114:9 149:8 | 12:35 170:21 | 6 4:22 96:13,18 | |
| 17:23 23:5 29:18 | wrong 14:13 51:9 | 122 5:15 | 97:3 100:4,8 | |
| 42:4,13 44:12 | 88:3 109:4 154:12 | 123 5:16 | 103:14 123:22 | |
| 52:19,21 67:11 | 154:14 | 13 60:7,8,9 62:13 | 124:13 133:8 | |
| 77:5 86:1 114:1 | wronged 86:7 | 113:7,10,11 114:3 | | |
| 116:6 134:20 | wrote 111:8 | 117:11 | **7** | |
| 170:16 | | 14 63:16 122:21 | 7 24:6,9,17 96:13 | |
| we've 24:1 42:16 | **Y** | 123:2 | 96:18 97:3 103:16 | |
| whereabouts 33:2 | Yeah 41:19 45:16 | 15 123:7,9 | | |
| 53:4,16 54:2 | 49:3 63:8 | 16 66:14 149:15 | **8** | |
| 55:23 67:5 74:2 | year 25:11 46:3 | 161:16 | 8 5:18 25:11 96:14 | |
| white 60:21,22 64:3 | 131:2,7,20 132:12 | 17 69:12 | 96:18 97:4 101:17 | |
| 66:19 67:3 81:3,6 | 141:23 | 1704 129:21 | 85 135:7 | |

### IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| PAUL POGUE and<br>PAUL POGUE, in his capacity<br>as owner of SURVEYORS' PARK ]<br><br>Plaintiff,<br><br>Vs.<br><br>TONY CHANDLER, in his<br>individual and official<br>capacity, SANDY G.<br>ROBINSON, a for-profit<br>Representative of INTERNATIONAL<br>PAPER COMPANY,DANNY CLARK, in<br>his individual and official<br>capacity, and A, B, & C who<br>are those people, partnerships,<br>associates, corporations or<br>agents who participated in the<br>actions made the basis of this<br>Complaint and who are<br>presently unknown to the<br>Plaintiff, but who will be<br>added as Defendants when<br>ascertained.<br><br>Defendants. | Civil Action No. 2:06CV148-MHT<br><br>Jury Demand |

## COMPLAINT

### I. Introduction and Jurisdictional Statement

1.    This is a civil action seeking compensatory and

punitive damages, along with injunctive relief, for the

deprivation of Plaintiff's federal civil rights under color

of state law.    More specifically, Plaintiff claims that

through custom, policy and/or practice, the individual

defendants, employees of the Alabama Forestry Commission,

1

DEFENDANT'S
EXHIBIT

1

denied Plaintiff an opportunity to file criminal complaints against a person because he was a member of the white race and the owner of Ingram's Company.  Plaintiff is a member of the black race and the owner of Surveyors' Park.  By the acts of Tony Chandler and Danny Clark, Plaintiff was deprived of his rights under 42 U.S.C. 1983 and also denied equal protection and due process of law as guaranteed and protected under the Fourteenth Amendment to the United States Constitution and Plaintiff's rights under 42 U.S.C. 1985.

2.    The jurisdiction of this honorable Court is invoked under 28 U.S.C. 1343 et seq., this being an action under the laws of the United States of America as above described.  This suit is filed within of year of the cause of action.

## 2. **PARTIES**

3.    Plaintiff, Paul Pogue, is over the age of twenty Years and he is a resident of Alabama.

3(a).  Plaintiff in his capacity as Surveyors' Park, in such capacity, Plaintiff is the owner of a development known to be a Park and located within the State of Alabama.

4.    Defendant, Tony Chandler is an employee of the

2

Alabama Forestry Commission, and is here by sued in both his individual and official capacities; his address is 2584 Ridge Road, Brewton, Alabama 36426.

5.   Defendant, Danny Clark is an employee of the Alabama Forestry Commission, and is here by sued in both his individual and official capacities; his address is 1349 County Road 61, Clanton, Alabama 35046.

6.   Defendant, Sandy G. Robinson, is a for-profit professional representative for International Paper Company; her address is 63 South Royal Street, Suite 700, Mobile, Alabama 36602.

### 3. FACTS

7.   Plaintiff is a member of the black race and the owner, developer and promoter of Surveyors' Park and all individual defendants are members of the white race. Plaintiff's mailing address is 301 Kahn Street, Montgomery, Alabama 36104.

8.   Within a year of the filing of this Complaint, Plaintiff's Surveyors' Park was announced to the public at large.

9.   Within two years of the filing of this Complaint, Plaintiff's Surveyors' Park sustained and experienced "insurgency" and "terrorist" style ground/soil damage and

3

obliteration of unmanufactured forest products within the
State of Alabama.

10.  Within a year of the filing of this Complaint,
Plaintiff, voiced his complaint of concern to the
Alabama Forestry Commission, located at 513 Madison Avenue,
Montgomery, Alabama involving matters set forth at sentence
number 9.

11.  Defendant, Alabama Forestry Commission's
dispatcher    contacted    an    Alabama    Forestry    Commission
employee, who spoke by phone with Plaintiff and assured
Plaintiff that other Alabama Forestry Commission employees
would visit Plaintiff at the designated place of concern.

12.  Within a year of the filing of this Complaint,
Plaintiff  discovered  hidden  timber  theft  equipment  and
machinery on the ground of Surveyors' Park.

13.  A spectator identified the found equipment and
machinery  as  that  equipment  which  most  likely  severed
unmanufactured     forestry     products     from     Plaintiff's
Surveyors' Park's soil.

14.  Jimmy Ingram, is a person believed to be known
to International Paper Company and owner of the equipment
described in sentence 12 and 13.

4

14(a). Jimmy Ingram is a person believed to be known to the Alabama Forestry Commission and the owner of the equipment described in sentence 12 and 13.

15. The spectator identified Jimmy Ingram to be the registered owner of the equipment and or machinery referred to in paragraphs 12 and 13.

16.  Within a year of the filing of this Complaint, Plaintiff discovered that Surveyors' Park was invaded by a "blue van" occupied by seven white citizens. Oil and other environmental hazardous debris were left on the ground of Surveyors' Park

17. Within a year of the filing of this Complaint, Plaintiff learned that an International Paper Company employee was the first to greet and meet with the Alabama Forestry Commission employees on the grounds of Surveyors' Park.

18. Within a year of the filing of this Complaint, Plaintiff learned that the International Paper Company employee met with the Alabama Forestry Commission employees on the grounds of Surveyors' Park prior to Plaintiff's arrival to Surveyors' Park.

19.  Within a year of the filing of this Complaint, Plaintiff met with Alabama Forestry Commission's

5

employee, Danny Clark and voiced concern about the shape and condition of Surveyors' Park.  Plaintiff encouraged Clark to invoke the applicable laws under the circumstances and condition of Surveyors' Park.

20. Plaintiff hand delivered a copy of a news release about Surveyors' Park to Danny Clark. Ingram has not been charged with theft of unmanufactured nor manufactured forest products of private property.

20(a). Clark did not prepare a report in connection with theft of property, nor did he seize Ingram's equipment, including a log truck, a shredder and a loader.

21. Defendant, Danny Clark informed Plaintiff that services would be rendered to address the condition of Surveyors' Park.  Clark did not timely release a documented and/or witnessed account of his area of enforcement and the availability of services to be offered under the circumstances pursuant to the agency laws and related forestry laws of Alabama.

22. Defendant, Tony Chandler, and Defendant, Danny Clark, employees of the Alabama Forestry Commission, denied Plaintiff an opportunity to file criminal complaints and together, and or in part, fabricated a forestry investigation, and failed to provide Plaintiff with the same and similar services as was provided to white citizens

6

that experienced the same and similar treatment involving the equipment of Jimmy Ingram.

23. Chandler and Clark have failed to invoke the criminal procedure law against Jimmy Ingram (a white citizen), because of Plaintiff's race and to this day has failed to provide Alabama Forestry Commission services pursuant to the Alabama Forestry Commission's *Forestry and Related Laws publication.*

24. Clark's and Chandler's job performance amount to intentionally and deliberately malfeasance and misfeasance. Plaintiff, a member of the black race, remains deprived of his rights under 42 U.S.C. 1983; 42 U.S.C. 1985 and the equal protection and due process of law as guaranteed and protected under the Fourteenth Amendment to the United States Constitution and the Alabama Constitution.

25. Prior to the filing of this Complaint, the Alabama Forestry Commission attempted to falsify Macon County, Alabama property as the property of Plaintiff.

26. Tony Chandler and Danny Clark failed to invoke the enforcement provisions of the *Forestry and Related Laws publication* because to do so would be a service to a black citizen and a black citizen's Park development.

27. Chandler and Clark failed to track down and preserve

Surveyors' Park unmanufactured forest products before they escaped to the primary and secondary forest industries.

28. Tony Chandler and Danny Clark failed or refused to arrest the trespassers to Surveyors' Park, those people and/or primary and secondary forest industries who came in contact with Plaintiff's Surveyors' Park un-manufactured and manufactured forest products.

29. Clark and Chandler did not visit nor inspect the primary and secondary forest industries to determine the rightful Macon County, Alabama fiber property owner.

30. Clark and Chandler failed to seize the inventory and financial books of the forest industries of Alabama to locate the unmanufactured and manufactured forest products of Surveyors' Park.

31. Clark and Chandler have manipulated the acts and events to such an extent that their failures to report the truth by design have a negative impact on Plaintiff's ability to report the whereabouts of Surveyors' Park unmanufactured and manufactured forest products.

32. The Alabama Forestry Commission employees Clark and Chandler attempted to mislead Plaintiff to believe and accept a Macon County, Alabama forest product report to be that of Plaintiff's forest products report which would have originated in Perry County, Alabama.

8

33. Tony Chandler refused or failed to fax to Plaintiff the Alabama Forestry Commission's report, but Chandler and Clark aided or abetted International Paper Company by faxing to International Paper Company their pretext of a cover up report believed to contain Macon County, Alabama data.

34. The Alabama Forestry Commission's report was discovered to be in the custody and control of a white citizen, Sandy G. Robinson and said report and its entirety was used or otherwise fabricated for the use of deflecting Plaintiff's federal efforts to redress a grievance by invoking the tort theory of conversion against International Paper Company.

35. Defendant, Sandy G. Robinson, conspired with the Alabama Forestry Commission employees, Clark and Chandler to falsify the truth as to International Paper Company involvement and contact with Plaintiff's Surveyors' Park's manufactured and unmanufactured forest products.

36. Plaintiff, and Plaintiff is his capacity as Surveyors' Park was humiliated and deprived of his federally protected civil rights.

### 4. COUNT ONE
**Violation of 42 U.S.C. 1981(a) under 42 U.S.C. 1983.**

37. Plaintiff re-alleges paragraphs 1 thru 36 above as though specifically set forth herein

9

38.   This lawsuit is a lawsuit filed for damages and other relief resulting from malfeasance perpetrated by the Alabama Forest Commission employees Tony Chandler and Danny Clark and a claim as Plaintiff alleges that International Paper Company did conspire with the state actors and with its private actor Sandy G. Robinson to damage the rights and freedoms of Plaintiff and Plaintiff's right and rights to redress a grievance free from the acts of state employees in concert with a private actor for the benefit of a private company or corporation; namely International Paper Company.

39. A copy of the false Alabama Forestry Commission's report is attached hereto and marked Exhibit "A" in support of the Complaint.

40. A copy of Plaintiff's letter to International Paper Company alerting the Company about theft of property is attached hereto and marked Exhibit "B" in support of the Complaint.

**4. COUNT ONE**
**Violation of 42 U.S.C. 1981(a) under 42 U.S.C. 1983.**

41. Plaintiff re-alleges paragraphs 1 thru 40 above as though specifically set forth herein.

42. Plaintiff alleges that the individual employees of the Alabama Forest Commission failed to apply

the Forestry and Related Laws enforcement provisions against Jimmy Ingram, because of Plaintiff's race and because Surveyors' Park is owned by a black citizen. By such acts and omissions, the individual employees of the Alabama Forestry Commission deprived Plaintiff of his right to receive the full and equal benefit of all laws and proceedings for the security of property as is enjoyed by white citizens as guaranteed and protected under 42 U.S.C. 1981(a) and under 42 U.S.C.1983.

WHEREFORE, THESE PREMISES CONSIDERED, Plaintiff prays:

1. That process issue requiring all named defendants to answer this Complaint within the time required by law.

2. That Plaintiff be granted a jury trial wherein he be awarded seventy five thousand dollars ($75,000.00) compensatory damages and one million dollars ($1,000.000.00) punitive damages against each defendant, jointly and severally.

3. That the individual Alabama Forestry Commission employees be enjoined from denying Plaintiff his civil rights as above described.

4. That this honorable Court grant Plaintiff such further relief that it deems just and proper.

11

5. That this honorable Court compel Tony Chandler and Danny Clark to engage the Federal Bureau of Investigation and the Alabama Bureau of Investigation to assist in the discovery and recovery of Plaintiff's unmanfactured and manufactured products.

**6.** That this honorable Court compel Tony Chandler and Danny Clark to disclose if they received any benefits from International Paper Company or its representative Sandy G. Robinson for their labor in producing their report.

### 5. COUNT TWO.
**Violation of 42 U.S.C. 1985 and the Alabama Constitution**

43. Plaintiff re-alleges paragraphs 1 thru 42 above as though specifically set forth herein.

44. Plaintiff alleges that Chandler and Clark did all that they could do to unlawfully help, and assist Sandy G. Robinson to reap profit from her services as a professional for hire, for International Paper Company by releasing a pre-text of a "cover up" report. Clark and Chandler chose to bypass and refuse to follow the *Forestry and Related Laws* publication when they were confronted with the duty to assist Plaintiff, which is black and the owner of a Park. Clark and Chandler had to come together with International Paper Company prior to releasing the forestry

report containing Macon County, Alabama data. Clark and Chandler did nothing to help the cause but did almost all they could do to undermine the truth and not report the truth as to the whereabouts of Plaintiff's Surveyors' Park manufactured and unmanufactured forest products.

WHEREFORE, THESE PREMISES CONSIDERED, Plaintiff seeks the same relief in Count Two above and additionally

1.  Plaintiff seeks One Million Dollars against International Company and its representative Sandy G. Robinson.

2.  Plaintiff prays that this honorable court compel International Paper Company and its representative, Sandy G. Robinson, disclose the whereabouts of Plaintiff's forestry products and Plaintiff's forestry product in their unmanufactured form and in their manufactured form.

3.  That International Paper Company by and through its representative disclose all telephone records and correspondences held with Danny Clark and Tony Chandler.

Respectfully submitted,

PAUL POGUE and PAUL POGUE

13

FOR SURVEYORS' PARK
301 Kahn Street
The Mays Building
Montgomery, Alabama 36104
(334) 561-2240

Done this ___17ᵗʰ___ day of February 2006.

**14**

*Cherokee Timber*

Marnie Darden, Valissa Darden and Paul Pogue (Alabama Civic Specialty Group, Inc.) wish to include the essential items into the timber sale contract:

1. Agreement entered into this 11ᵗʰ day of February, 2005, between Alabama Civic Specialty Group, Incorporated hereinafter called the seller , and Cherokee Timber Company Incorporated hereinafter called the buyer.

2. The Timber Sale Contract shall be governed by the laws of the State of Alabama.

3. Seller is the legal owner of said timber and warrants the title to the timber hereby conveyed against the lawful claims of all third parties.

4. ~~A down payment of three thousand dollars shall be made to the seller upon execution of this contract.~~ *Trees marked with blue paint shall not be cut* *deleted*

5. All timber marked or products included in this contract, until paid in full, shall remain as the property of the seller.

6. This agreement will be in effect from February 11, 2005 to July 12, 2005, after which time the contract is null and void, unless written extension is granted by the seller. If no extension is granted, all rights to remaining timber return to the seller.

7. The seller is free from responsibility for any injury, death or property damage caused by the buyer's logging operation in the sale area during the tenure of this agreement.

8. It is understood by both parties that the buyer is an independent contractor and not an employee of the seller.

9. If requested by seller, buyer agrees to furnish current certificates for worker's compensation and public liability insurance.

10. SELLER MAY SUSPEND OPERATIONS, including removal of cut timber, if conditions of the contract are violated. Violations of conditions of the contract are sufficient grounds for termination.

11. Any modifications or amendments, to this contract must be written, dated, signed, and witnesses.

12. Prior to commencing harvesting operations, the buyer shall post a performance bond with in the amount of three hundred dollars. The bond is returned to the buyer upon satisfactory completion of the sale.

13. This agreement shall be binding on the heirs, administrators, executors, successors or assigns of both parties.

14. In witness whereof, the parties hereto have executed this Agreement this *17ᵗʰ* day of *February*, 2005.

Paul Pogue for Seller(s) *_____ cont for V. Darden + M. Darden   2-7-05*

Mr. Todd Slumber for the BUYER, *Todd Slumber*

DEFENDANT'S
EXHIBIT

2

*Page 3 of 3*

27/25/2005  07:30    2057553043

*Exhibit "A"*



# ALABAMA FORESTRY
# COMMISSION

### Fax Transmittal Cover Sheet

Fax # _____

| Alabama Forestry Commission (Chilton) | Phone: | 205-755-3042 |
| 221 County 423 | | |
| Clanton, AL· 35045 | Fax: | 205-755-3043 |

*name deleted as to privacy 15/6/05*

**Send To:**

Name: ~~_____~~

Company: _____

Fax #: _____

**Sent From:**

Name: *Denny Clark*

Date: *7-6-05*    Number of Pages: *2*
(including cover page)

**Comments:** *Please Give this copy of scale tickets to Paul Pogue.*

*Thanks*

**DEFENDANT'S EXHIBIT**

3

KWIK KOPY                    Fax:334-2449390                    *Exhibit "B"*

## \*\* Transmit Conf. Report \*\*

P.1                                                      Jul  7 2005   9:03

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 1334 0230 | NORMAL | 7, 9:03 | 0'31" | 1 | ※ O K | |

Numbr dereto do to privacy right

FAX — 334- ▆▆U-0230

T̶▆▆▆▆▆▆▆

Several FNOWN and UNKNOWN Mills.

FAX  (334) 624-0230

Timber theft and somebody needs
to reveal what has happen in this matter.
A lot of timber was removed From
our property. ̶▆▆▆▆▆       July 7, 05

Copy to MD Felix Baker


P.S  I truly hope the International Paper
Company send this matter to the
appropriate criminal justice authority.

DEFENDANT'S
EXHIBIT
4

DEFENDANT'S EXHIBIT

5

| 1 INCIDENT ☒ OFFENSE | | 2 CASE # | | 3 SPZ |
|---|---|---|---|---|
| ☐ SUPPLEMENT | | 1.4.0299.09.0 | | |

| 1,0 | | 5 DATE AND TIME OF THIS REPORT | 08:30 AM ☒ PM | 7 AGENCY NAME Alabama Forestry Commission | 8 INCIDENT DATE |
|---|---|---|---|---|---|
| 0,3,1,0,0,0 | 07 08 05 | | | 9 ADDRESS (STREET, CITY, STATE, ZIP) 221 Co.Rd.423 Clanton, AL 35645 | 10 PHONE (205) 755-3142 |
| PORTED BY ☐ VICTIM OR | | | | | |

| 15 VICTIM LAST, FIRST, MIDDLE NAME | 1 P ☐ B ☐ | 16 ADDRESS (STREET, CITY, STATE, ZIP) | 17 PHONE ( ) |
|---|---|---|---|
| Pigue, Paul | | | |
| 18 EMPLOYEE/SCHOOL | 19 OCCUPATION | 17 ADDRESS (STREET, CITY, STATE, ZIP) | 18 PHONE ( ) |

| 20 ☐ RESIDENT ☐ NON-RESIDENT | 21 INJURY | 23 RACE | 25 SEX | 33 HGT | 34 WGT | DOB | 36 AGE | 37 WAS OFFENDER KNOWN TO VICTIM? ☐ Y ☐ N | 38 VICTIM WAS (EXPLAIN RELATIONSHIP) |
|---|---|---|---|---|---|---|---|---|---|
| | ☐ N | ☐ W ☐ B ☐ A | ☐ MALE ☐ FEMALE | - - | | M    D    Y | | | |

| 29 TYPE INCIDENT OR OFFENSE ☐ FEL. ☐ MISD. | | 31 DEGREE (CIRCLE) 1  2  3 | 32 STATE CODE/LOCAL ORDINANCE 9-13-60 |
|---|---|---|---|
| Unauthorized Cutting | | 30 DEGREE (CIRCLE) 1  2  3 | 33 STATE CODE/LOCAL ORDINANCE |
| 31 TYPE INCIDENT OR OFFENSE ☐ FEL. ☐ MISD. | | | |

| 35 PLACE OF OCCURRENCE | 39 SECTOR |
|---|---|

| 39 POINT OF ENTRY ☐ DOOR ☐ ROOF ☐ WINDOW ☐ OTHER | 41 METHOD OF ENTRY ☐ FORCIBLE ☒ ATT. FORCIBLE ☐ NO FORCE | 42 ASSAULT ☐ SIMPLE ☒ AGGR. | TREATMENT FOR ☐ Y ASSAULT INJURY ☐ N |
|---|---|---|---|

| OCCURRED ON OR BETWEEN | | 45 TIME | 46 WEATHER ☒ NATURAL ☐ MOON ☐ ART. EXT. ☐ ART. INT. ☐ UNK. | 47 WEATHER ☐ CLEAR ☐ CLOUDY ☐ RAIN ☐ FOG ☐ SNOW ☐ HAIL ☐ UNK. | 48 PREMISE ☐ HWY—ST—ALLEY ☐ RAILROAD ☐ RESIDENCE ☐ CHURCH ☐ SCHOOL ☐ CONVENIENCE ☐ INDUSTRIAL ☐ SERVICE STA. | ☐ BANK ☐ DRUG STORE ☐ APT./TWN. HSE. ☐ SHOPPING CENTER ☐ PARKING LOT ☐ OTHER COMMER. ☒ OTHER Forestland |
|---|---|---|---|---|---|---|
| 06 30 05 | | 8:00 AM ☒ PM | | | | |
| 07 05 05 | | 11:00 AM ☒ PM | | | | |
| 54 VERIFY FOR ☐ Y | TREAT. FOR ☐ Y ☐ N | 49 CIRCUMSTANCES HOMICIDE & ASSAULT | 47 CODE | | | |
| RAPE EXAM ☐ N | RAPE INJURY ☐ N | LOCATION: RAPE | | | | |

| 50 WEAPON USED ☐ FIREARM ☐ KNIFE | ☐ HANDS, FISTS, VOICE, ETC. ☐ OTHER DANGEROUS | 51 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE DESCRIBE: | ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ UNKNOWN |
|---|---|---|---|

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE | | | |
|---|---|---|---|---|---|
| | | STOLEN | DAMAGED | DATE | VALUE |
| | About 3 acres of timber cut | | | | |
| | on wrong side of road. | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | ☐ CONTINUED IN NARRATIVE | | | | |

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D | S R D | S R D | S R D | S R D | S R D |

| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS |
|---|---|---|---|---|
| S R D | S R D | S R D | S R D | S R D |

| 75 CHECK CATEGORIES | ☐ STOLEN ☐ RECOVERED ☐ SUSPECTS VEH. ☐ VICTIMS VEH. ☐ UNAUTH. USE ☐ ABANDONED |
|---|---|

| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG COLOR | 81 VIN | | |
|---|---|---|---|---|---|---|---|
| 82 YR | 83 VMA | 84 VMO | 85 VST | 86 VCO | TOP: BOTTOM: | 87 ADDITIONAL DESCRIPTION | |

| STOLEN ENTRY VEH ONLY | 88 AREA STOLEN ☐ BUS. ☐ RES. ☐ RUR. | 89 OWNERSHIP VERIFIED BY | TAG RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ OTHER | 90 WARRANT ISSUED ☐ Y ☐ N # |
|---|---|---|---|---|
| 91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | | | | 92 PHONE ( ) |

| AGENCY USE ONLY | 93 STOLEN IN YOUR JURISDICTION? ☐ ☐ WHERE? | | 94 RECOVERED IN YOUR JURISDICTION? ☐ ☐ WHERE? | |
|---|---|---|---|---|

**TYPE OR PRINT IN BLACK INK**

DEFENDANT'S EXHIBIT

AC/IC—32 REV. 10-90

6

ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| | |
|---|---|
| ☐ INCIDENT ☒ OFFENSE ☐ SUPPLEMENT | CASE # 1 4 0 2 9 9 0 9 0 |

**DATE AND TIME OF THIS REPORT** 07 08 05 08:30 AM

0 3 1 0 0 0  REPORTED BY ☐ VICTIM OR

**AGENCY NAME** Alabama Forestry Commission

**ADDRESS (STREET, CITY, STATE, ZIP)** 221 Co.Rd.423 Clanton, AL 35045

**PHONE** (205) 755-3042

**VICTIM (LAST, FIRST, MIDDLE NAME)** Pigue, Paul

**TYPE INCIDENT OR OFFENSE** ☒ FEL. ☐ MISD.  Unauthorized Cutting

**DEGREE (CIRCLE)** 1 2

**STATE CODE/LOCAL ORDINANCE** 9-13-60

**STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.)**

About 3 acres of timber cut an wrong side of road.

TYPE OR PRINT IN BLACK INK

DEFENDANT'S EXHIBIT

7

ACJIC—32 REV. 10-89

# ALABAMA UNIFORM INCIDENT/OFFENSE REPORT

| VICTIM SSN | | COMPLAINANT SSN | | 1 ☐ INCIDENT ☐ SUPPLEMENT ☒ OFFENSE | 2 CASE # 5 3 0 4 1 1 1 0 9 | 3 SFX |
|---|---|---|---|---|---|---|

| 4 ORI 0 3 1 0 0 0 | 5 DATE AND TIME OF THIS REPORT 1 0 0 6 0 5  1400 ☐ AM ☐ PM | 6 AGENCY NAME Alabama Forestry Commission | 7 ☐ SUPPLEMENT ORIGINAL OFFENSE DATE |
|---|---|---|---|

REPORTED BY ☒ VICTIM OR | 9 ADDRESS (STREET, CITY, STATE, ZIP) | 10 PHONE ( )

| 12 VICTIM (LAST, FIRST, MIDDLE NAME) 1P 2R 3S Pogue, Valissa Darden and Paul | 13 ADDRESS (STREET, CITY, STATE, ZIP) Rt. 6 Box 334  Selma, AL 36701 | 14 PHONE (334) 269-4178 |
|---|---|---|
| 15 EMPLOYER/SCHOOL | 16 OCCUPATION | 17 ADDRESS (STREET, CITY, STATE, ZIP) | 18 PHONE ( ) |

| 19 ☒ RESIDENT ☐ NON-RESIDENT | 20 INJURY ☐ Y | 21 RACE | 22 SEX ☐ MALE ☐ FEMALE | 23 HGT 5'8 | 24 WGT | 25 DOB 1 1 2 8 6 2 | 26 AGE 42 | 27 WAS OFFENDER KNOWN TO VICTIM ☐ Y | 28 VICTIM WAS (EXPLAIN RELATIONSHIP) Timber Client | 29 CODE |
|---|---|---|---|---|---|---|---|---|---|---|

| 30 TYPE INCIDENT OR OFFENSE Unauthorized Cutting of Timber | ☐ FEL. ☒ MISD. | 31 DEGREE (CIRCLE) 1  2  3 | 32 UCR CODE | 33 STATE CODE/LOCAL ORDINANCE 9-13-60 |
|---|---|---|---|---|
| 34 TYPE INCIDENT OF OFFENSE | ☐ FEL. ☐ MISD. | 36 DEGREE (CIRCLE) 1  2  3 | 36 UCR CODE | 37 STATE CODE/LOCAL ORDINANCE |

| 38 PLACE OF OCCURRENCE S8 T18N R10E in Perry County Alabama | 39 SECTOR |
|---|---|

| 40 POINT OF ENTRY ☐ DOOR ☐ WINDOW ☐ OTHER | ☐ ROOF | 41 METHOD OF ENTRY | ☐ FORCIBLE ☐ ATT. FORCIBLE ☐ NO FORCE | 42 ASSAULT ☐ SIMPLE ☐ AGGR. | 43 TREATMENT FOR ASSAULT INJURY ☐ Y ☐ N |
|---|---|---|---|---|---|

| 44 OCCURRED ON OR BETWEEN 0 6 2 8 0 5 | 45 TIME 0800 ☐ AM ☐ PM ☐ MIL | 46 S M ☒ T W T F S | 47 LIGHTING ☐ NATURAL ☐ MOON ☐ ART. EXT. ☐ ART. INT. ☐ UNK | 48 WEATHER ☐ CLEAR ☐ CLOUDY ☐ RAIN ☐ FOG. ☐ SNOW ☐ HAIL ☐ UNK. | 49 PREMISE ☐ HWY. - ST. - ALLEY ☐ RAILROAD ☐ RESIDENCE ☐ CHURCH ☐ SCHOOL ☐ CONVENIENCE ☐ INDUSTRIAL ☐ SERVICE STA. | ☐ BANK ☐ DRUG STORE ☐ APT./TWN. HSE. ☐ SHOPPING CENTER ☐ PARKING LOT ☐ OTHER COMMER. ☐ OTHER  Forestland | 50 CODE |
|---|---|---|---|---|---|---|---|
| 0 7 0 5 0 5 | 53 TIME 0800 ☐ AM ☐ PM ☐ MIL | S M ☒ T W T F S | | | | | |

| 54 VERIFY FOR RAPE EXAM ☐ Y ☐ N | 55 TREAT: POR RAPE INJURY ☐ Y ☐ N | 56 CIRCUMSTANCES W/SUICIDE & ASSIST ☐ | 57 CODE | 58 LOCATION: RAPE |
|---|---|---|---|---|

| 59 WEAPON USED ☐ FIREARM | ☐ HANDS, FISTS, VOICE, ETC ☐ OTHER DANGEROUS | 58 DESCRIPTION OF WEAPONS/FIREARMS/TOOLS USED IN OFFENSE DESCRIBE: | ☐ HANDGUN ☐ RIFLE ☒ SHOTGUN ☐ UNKNOWN |
|---|---|---|---|

| 60 QUANTITY | 61 STOLEN, RECOVERED, LOST, POUND, OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, SERIAL NUMBER, COLOR, ETC.) | 62 DOLLAR VALUE | | 63 RECOVERED | |
|---|---|---|---|---|---|
| | | STOLEN | DAMAGED | DATE | VALUE |
| 4 | Loads of wood cut and removed without authorization. | | | | |
| | (See ticket breakdown for volumes and prices) | | | | |
| | | | | | |

☐ CONTINUED IN NARRATIVE

| 64 MOTOR VEHICLE | 65 CURRENCY, NOTES | 66 JEWELRY | 67 CLOTHING/FURS | 68 FIREARMS | 69 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 70 ELECTRONICS | 71 HOUSEHOLD | 72 CONSUMABLE GOODS | 73 LIVESTOCK | 74 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

| 75 CHECK CATEGORIES | ☐ STOLEN | ☐ RECOVERED | ☐ SUSPECTS VEH. | ☐ VICTIMS VEH. | ☐ UNAUTH. USE | ☐ ABANDONED |
|---|---|---|---|---|---|---|

| 76 # STOLEN | 77 LIC. | 78 LIS. | 79 LIY. | 80 TAG. COLOR | 81 VIN |
|---|---|---|---|---|---|

| 82 VYR | 83 VMA | 84 VMO | 85 VST | 86 VCO | TOP: BOTTOM: / | 87 ADDITIONAL DESCRIPTION |
|---|---|---|---|---|---|---|

| STOLEN MTR VEH ONLY | 88 AREA STOLEN ☐ BUS. ☐ RES. ☐ RUR. | 89 OWNERSHIP VERIFIED BY: ☐ THIS RECEIPT ☐ BILL OF SALE ☐ TITLE ☐ OTHER | 90 WARRANT SIGNED ☐ N ☐ Y # |
|---|---|---|---|
| 91 AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | | | 92 PHONE |

| VEHICLE INFO RECOVERY ONLY REQUIRED FOR POLICE USE | 93 STOLEN IN YOUR JURISDICTION? ☐ Y ☐ N. WHERE? | 94 RECOVERED IN YOUR JURISDICTION? ☐ Y ☐ N. WHERE? |
|---|---|---|

## TYPE OR PRINT IN BLACK INK

ACJIC-32 REV. 10-90

INCHES    1    2    3    4    5    6

**OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION**

| CIDENT/OFFENSE |  |  |  | DATE AND TIME OF REPORT |  |  | 97 SFX | 98 | OFFENDER |  | ☑ CHECK IF MULTIPLE |
|---|---|---|---|---|---|---|---|---|---|---|---|

EPORT CONTINUED | 1 0 0 6 0 5 | 1400 | 5 3 0 4 1 1 1 0 9 | SUSPECT MISSING PERSON

| NAME (LAST, FIRST, MIDDLE) |  | 105 NICKNAME/ALIAS | 101 RACE | 102 SEX | 103 DOB |  | 104 AGE |
|---|---|---|---|---|---|---|---|
| Todd Slusher, Cherokee Timber Company |  |  | W | M ☐ F | 0 1 1 2 9 6 1 | 44 |

| ADDRESS (STREET, CITY, STATE, ZIP) | 106 HGT | 107 WGT | 108 EYE | 109 HAIR | 110 COMPLEXION |
|---|---|---|---|---|---|
| 3608 Willow Lane Drive, Montgomery, AL 36109 | 5'11 | 220 | Blu | Bro |  |

PROBABLE DESTINATION
334-224-6903    334-567-0637 CELL

| CLOTHING |  | 112 ARRESTED? ☐ Y ☐ N | 113 WEAPON |
|---|---|---|---|

| | ☐ SCARS ☐ MARKS ☐ TATOOS | 116 ☐ ARRESTED ☐ WANTED |

| NAME (LAST, FIRST, MIDDLE) |  | 117 NICKNAME/ALIAS | 118 RACE | 119 SEX | 120 DOB |  | 104 AGE |
|---|---|---|---|---|---|---|---|
| Mark Kynard |  |  | B | M ☐ F | 1 1 2 2 6 7 | 37 |

| ADDRESS (STREET, CITY, STATE, ZIP) | 122 HGT | 124 WGT | 125 EYE | 126 HAIR | 127 COMPLEXION |
|---|---|---|---|---|---|
| 101 Houser Street, Montgomery, AL 36110   334-269-5312 HOME | 5'10 | 129 | BRO | BRO |  |

PROBABLE DESTINATION

| CLOTHING |  | 129 ARRESTED? ☐ Y ☐ N | 130 WEAPON |
|---|---|---|---|

| | ☐ SCARS ☐ MARKS ☐ TATOOS | 132 ☐ ARRESTED ☑ WANTED |

| 133 NAME (LAST, FIRST, MIDDLE) SEX, RACE, DOB |  | 134 ADDRESS (STREET, CITY, STATE, ZIP) | 135 RES. PHONE | 136 BUS. PHONE |
|---|---|---|---|---|
| #1 | SEX ☐ M ☐ F   RACE H W A |  | ( ) | ( ) |
| #2 | SEX ☐ M ☐ F   RACE H W A |  | ( ) | ( ) |
| #3 | SEX ☐ M ☐ F   RACE H W A |  | ( ) | ( ) |
| #4 | SEX ☐ M ☐ F   RACE H W A |  | ( ) | ( ) |

| WITNESS #1 SSN | WITNESS #2 SSN | WITNESS #3 SSN | WITNESS #4 SSN |
|---|---|---|---|

187

On July 26, 2005 I received a faxed complaint from Darden concerning an alleged timber theft, criminal trespass, and BMP violation. I told Darden that I could not investigate the BMP violation, but gave her information on how to report it through channels. According to her complaint, she along with Paul Pogue had signed a timber contract with Cherokee timber to cut 30 acres of a 50 acre tract. The area to be cut had been flagged prior to logging. They had discovered that the logger, Mark Kynard had started cutting timber in the wrong area. They had requested that the operation be stopped and that the logger leave the property. Kynard left upon the advise of his boss, Todd Slusher. Initially the complaint had been serviced by Officer Danny Clark and Perry Co. Manager Cedric Hudson. They made a site visit, and met with the Landowner and the Timber Buyer. According to Clark, the incident appeared to be an unintentional timber trespass. He handled the complaint in this manner: He advised Slusher that he was liable for his logger cutting in the wrong area and he was bound by law to pay the landowner double fair market value for any timber removed from this area. Clark told me that the discussion got heated between Pogue and Slusher, and he almost had to get between them. He advised the parties to work out an agreement and felt that this was a civil matter between the parties. He left the scene that day, and turned the investigation over to me when I returned from Vacation in early July.

| | | CONTINUED ON SUPPLEMENT ☑ Y ☐ N |
|---|---|---|
| | ASSISTING AGENCY ORI | ASSISTING AGENCY CASE #   SFX |

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned.

| SIGNATURE | | | | | 138 LOCAL CODE |
|---|---|---|---|---|---|
| | | | | | 139 STATE CODE |

| TITLE ID REQ | 140 CASE # | 141 SFX | 142 CASE # | 143 SFX | 144 CASE # | 145 SFX | ADDITIONAL CASES CLOSED W/THIS ONE ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

| 147 CASE STATUS | 148 CASE DISPOSITION: | ☑ EXCEPTIONAL CLEARANCE: | 149 REPORTING OFFICER | ID # |
|---|---|---|---|---|
| ☑ PENDING ☐ INACTIVE ☐ CLOSED | ☐ CLEARED BY ARREST (JUV.) | ☐ SUSPECT/OFFENDER DEAD ☐ OTHER PROSECUTION ☐ EXTRADITION DENIED | T. Chandler | 411 |
|  | ☐ CLEARED BY ARREST (ADULT) | ☐ LACK OF PROSECUTION ☐ JUVENILE, NO REFERRAL | 150 REPORTING OFFICER | ID # |
| STOLEN PROPERTY ADDED ☐ Y ☐ N | ☐ UNFOUNDED | ☐ DEATH OF VICTIM | 151 SUPERVISOR APPROVAL   ID # | 152 WATCH CMDR.   ID # |

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

## ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED

| 3 DATE AND TIME OF THIS REPORT | 4 CASE # | | 4 BK |
|---|---|---|---|
| 1 0 0 6 0 5  14:00 ☑AM ☐PM ☐UNK | 5 3 0 4 1 1 1 0 9 | | |
| 6 TYPE REPORT ☒ CONTINUATION ☐ FOLLOW-UP | | | |

**Initial Investigation Steps:**

Contacted Darden and obtained informaiton.   Darden told me that she did not want anyone to go to jail over this but did want to be paid for all the timber removed.  She told me that Cherokee timber had paid her $1000.00 for four loads of wood. She told me that she was 120% sure that there was more wood taken from her property than was paid for and that she knew where it went.  According to Clark and Hudson, approximately two-three acres were cut and the area appeared to contain no more than the four loads of wood.  I tried to explain this to Darden; however, she was adamant that Clark was siding with Slusher.  I instructed Darden not to cash the check from Slusher until I had a chance to talk with him.  Darden told me that she knew that the wood had been delivered to several mills around Centerville.  She told me that she knew Kynard was in business with a man called Jimmy Ingram and that I should look into their relationship.  She felt that once I did this I would find her wood.

I contacted Cherokee timber and talked with Slusher.  He told me the following:

He had signed a contract with the Pogues to cut timber.  The area to be cut was flagged by Pogues consultant prior to logging.  He took Kynard to the site and showed him where to cut.  He went to Tennessee on vacation, and was unaware of any problems until he returned from vacation.  He called Kynard and instructed him to meet him on the site and remove his equipment as he had been instructed by the Pogue's.  I told Slusher that by law, cutting timber in the wrong area, even by mistake and without the owner's consent left him liable to the landowner for double the fair market value of the timber. He indicated to me that he had paid the Pogues for the tickets and he thought the incident had been settled, but was willing to talk to me and do what was necessary to settle the problem with the landowners.  I told him I would be in touch with him at a later time.  He agreed to meet with me at his office in Wetumpka.

I talked with Paul Pogue concerning the investigation.  He told me that he and his wife disagreed on how to resolve the incident.   He was not really interested in the wood or the money, but rather interested in prosecuting the perpetrators for stealing his timber.  He told me that Kynard was working with a Jimmy Ingram and that they had been stealing timber from citizens in Dallas and Perry coutny for years.  He told me to check with local mills and I would find this out.

I contacted numerous mills and timber dealers around Dallas and Perry Counties.  So far, no wood has been delivered or checks been paid to Jimmy Ingram in over two years.  Mark Kynard told me that he has on occasion, delivered some wood through Saco Wood; however, not on the dates that he was delivering timber from the Pogue tract.  In checking records with Saco, I was able to validate his information.  In a telephone interview, Kynard told me that he only hauled four loads of wood from the tract and he took these loads to IP through Cherokee timber's dealership.  To date no other load tickets have surfaced that can be connected to the Pogue's tract.  None of the mills that I contacted had any records of dealing with Jimmy Ingram in over two years.  At this time Jimmy Ingram is not in the logging business according to local area foresters.  Kynard, however, is using Ingram's old equipment.

Mills and Dealers contacted: Cherokee Timber, Elam Timber, Cahaba Timber, H&H Lumber, IPC, Belcher Lumber, Freeman-Patrick, Seaman's Timber, Scott Taylor Timber, Saco Wood, Thomas Forestry, Blue Ox Timber, Baseline Forestry, Buchanan Timber.

Meeting set with Slusher for 10-10-05 at his office.  I will review records of deliveries and payments to Mark Kriyard and match these with records from IPC and Saco Wood.  If all records match up, I will have no evidence to substantiate the theft allegations.  However, the liability of Cherokee Timber for the unauthorized cutting still has to be settled.  Based on Alabama law, I will arrive at a dollar figure owed to the Pogues and present it to Slusher at our meeting.

## ALABAMA UNIFORM INCIDENT/OFFENSE REPORT SUPPLEMENT REPORT

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| 1 ORI # | 2 AGENCY NAME | 3 DATE AND TIME OF THIS REPORT | 4 CASE # | 5 SFX |
|---|---|---|---|---|
| 0 0 3 1 1 0 0 0 | ALABAMA FORESTRY COMMISSION | 1 0 1 9 2 0 0 5 09:30 ☐AM ☐PM | 5 3 0 4 1 1 1 0 9 | |

**EVENT**

| 6 VICTIM'S NAME (ORIGINAL REPORT) | 7 ORIGINAL OFFENSE DATE | 8 TYPE REPORT |
|---|---|---|
| Pogue; Raul and Valissa | 0 6 2 9 0 5 | ☐ CONTINUATION ☒ FOLLOW-UP |

| 9 ORIGINAL INCIDENT/OFFENSE | 10 UCR CODE | 11 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Unauthorized Cutting and Removal of Timber | | 1975 AL 9-13-60 |

| 12 NEW INCIDENT/OFFENSE | 13 UCR CODE | 14 STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| | | |

| 15 HAS AN ARREST BEEN MADE? | 16 DATE OF ARREST M D Y | 17 HAS WARRANT BEEN OBTAINED? | 18 DATE OF WARRANT M D Y | 19 PRIOR YEAR PREMISE | WEAPON |
|---|---|---|---|---|---|
| ☐ 1 YES ☒ 2 NO | | ☐ YES ☐ NO ☐ WARRANT # | | | |

| 20 ☒ DEFENDANT ☐ SUSPECT | NAME: Slusher, Todd, Cherokee Timber | 20 ☒ DEFENDANT ☐ SUSPECT | NAME: Kynard, Mark- Logger |
|---|---|---|---|

| 101 RACE ☒W ☐B ☐I | 102 SEX ☒M ☐F | 103 DOB 0 1 2 9 6 1 | 104 AGE 44 | 118 RACE ☒W ☐B ☐I | 119 SEX ☒M ☐F | 120 DOB 1 1 2 6 7 | 121 AGE 37 |
|---|---|---|---|---|---|---|---|

**NARRATIVE**

Met with Slusher at his office on 10-19-05. Officer Denny Clark was also present.

I asked Slusher to produce his payment summary sheets for Mark Kynard for the months of June and July 2005. He told me that he would have his bookkeeper compile the data and fax it to me within a week.

I showed Slusher a summary table that I had made showing the amount of money that I felt he owed the Pogues. I explained that this was based on the highest price between his contract price and Timber Mart Average Stumpage Prices across the Southeastern States. I told him that Mrs. Pogue's concern was that they did not agree to any prices on the 10 acres in question and felt that he owed them what he had been paid for the wood. He told me that he had spoken with their attorney in the past and that he would be willing to reply to a letter from him concerning any requests for more money. I told him that as soon as I had checked his records, I would contact the Pogue's and present the case to them. At that time, they could then decide as to what direction they wanted to go with this case, but he was still liable under the law, to pay them double market value for the four loads.

Slusher told me that he had never intended to cut the wrong area on their property, and was under the impression that he had shown Kynard the right place to cut before he left on vacation. He did not deny that the wrong area had been cut, but told us that the mistake was purely unintentional and that he was willing to settle the matter with the Pogue's if possible. He told me that to his knowledge, he had paid for every ticket that had been hauled by Kynard but until now had not been presented with any figures concerning double market value of the wood.

In this situation, it is apparent that the Pogue's did not want to cut the 10 acre tract in question. Accidential or not, Kynard did cut wood from this area and haul it to the mill under Cherokee Timbers' contract with International Paper Company. Cherokee Timber was paid

| 22 LOCAL USE | | |
|---|---|---|
| 23 STATE USE | | |

**DOLLAR VALUE**

| 24 MOTOR VEHICLE | 25 CURRENCY, NOTES | 26 JEWELRY | 27 CLOTHING/ FURS | 28 FIREARMS | 29 OFFICE EQUIPMENT |
|---|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C | S R D C |

| 30 ELECTRONICS | 31 HOUSEHOLD | 32 CONSUMABLE | 33 LIVESTOCK | 34 MISCELLANEOUS |
|---|---|---|---|---|
| S R D C | S R D C | S R D C | S R D C | S R D C |

| MOTOR VEHICLE RECOVERY ONLY REQUIRED FOR 24/XX UCR CODE | 35 STOLEN IN YOUR JURISDICTION? ☐NO ☐YES WHERE? | 94 RECOVERED IN YOUR JURISDICTION? ☐NO ☐YES |
|---|---|---|

| MULTIPLE CASES CLOSED | 37 CASE # | 38 SFX | 39 CASE # | 40 SFX | 41 CASE # | 42 SFX | ADDITIONAL CASES CLOSED NARRATIVE ☐Y ☐N |
|---|---|---|---|---|---|---|---|

**ADMIN**

| 44 CASE STATUS ☒ 1 - PENDING ☐ 2 - INACTIVE ☐ 3 - CLOSED ENTERED ☐Y ACIC/NCIC ☐N DATE | 45 CASE DISPOSITION ☐ 1 - CLEARED BY ARREST (JUV) ☐ 2 - CLEARED BY ARREST (ADULT) ☐ 3 - UNFOUNDED ☐ 5 - ADMINISTRATIVELY CLEARED | ☐ 4 - EXCEPTIONAL CLEARANCE ☐ A - SUSPECT/OFFENDER DEAD ☐ B - OTHER PROSECUTION ☐ C - EXTRADITION DENIED ☐ D - LACK OF PROSECUTION ☐ E - JUVENILE, NO REFERRAL ☐ F - DEATH OF VICTIM | 46 REPORTING OFFICER Tony Chandler  ID # 411 |
|---|---|---|---|
| | | | 47 ASSISTING OFFICER  ID # |
| | | | 48 SUPERVISOR APPROVAL  ID # | 49 WATCH CMDR  ID # |

DEFENDANT'S EXHIBIT

8

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

| ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED | 5 DATE AND TIME OF THIS REPORT | | ☐ AM ☐ PM ☐ MIL | 4 CASE # | | 5 BTX |
|---|---|---|---|---|---|---|
| | M D Y | : | | | | |
| | 6 TYPE REPORT ☐ | CONTINUATION | ☒ FOLLOW-UP | | | |

a contract delivery price for the wood from this tract. It is the opinion of the AFC that no one, either the logger or the timber buyer should profit from the sale of this wood. In this case, fair market value of the wood should be double what the timber buyer received from IP when the unauthorized wood went across the mill scales. This information would be available via subpoena, from the accounting records at IP and or Cherokee Timber.

At this time, no evidence has surfaced to indicate that Mark Kynard hauled the wood from the Pogue's property to any mills other than IPC. These four loads of wood were delivered through Cherokee's dealership authorization (5G077) and payment for these four loads of wood was submitted to Cherokee Timber by IPC.

Although Kynard was using logging equipment he had borrowed from Jimmy Ingram, no evidence has been found to indicate that Kynard has a current business relationship with this individual.
Kynard, who occassionally operates as a tree climber, cuts down yard trees and picks up small tracts of wood and sells it through Saco Wood or Cheorkee Timber. During the dates he was hauling from the Pogue tract, (6/28-7/1/05) no loads of wood were delivered through Saco. All loads were delivered through Cherokee Timber.

SYNOPSIS OF FINDINGS:
At this time, based on the details of the logging contract that was signed between Cherokee Timber and the Pogues, I feel that the matter between these parties constitutes a civil case. The contract provided to me indicates no specific area to be logged. The contract states in the initial paragraph, that all merchantable timber in Section 8, Township 18N, Range 10E containing 40 acres more or less is to be cut. In item 4, on the page of additions to the original contract, it specifies that trees marked in blue paint shall not be cut. Other than this, the contract does not specify where logging will take place. It is my understanding that the areas to be cut were flagged and shown to Slusher prior to logging. I have not seen any maps or other written documents that would indicate exactly where logging was to take place. To my knowledge, this matter was agreed upon by Slusher and Pogue prior to the start of logging. Whether or not a full understanding was reached between them at that time is not known to me.

In talking to the logger, Mark Kynard, I asked him why the four scale tickets had no landowner listed and why the county of origin was Macon instead of Perry? Kynard told me that he had used authorization tickets from a previous job he had worked in Macon county and the county name was already filled in on these tickets. According to Kynard, he did not have any blank tickets from Cherokee, and had used these tickets to deliver the wood. It did not matter to him about the county as long as the ticket got paid to Cherokee Timber, because Cherokee was only paying him to deliver the wood to the mill. He did write in the name Pope on one ticket, but was unsure if that was correct or not. With Slusher out of town on vacation and unable to confirm this, he just turned in the tickets and left the landowner name blank. He knew the ticket would be paid to Cherokee timber and felt that it was Cherokee's responsibility to pay the landowner for the wood he was hauling. Since he was the only logger on the tract, he felt sure that Slusher would know who the tickets belonged to for that time period.
Although this is not the recommended procedure and looks suspicious to landowners, this practice by itself, does not show intent to defraud on the part of the logger. IP is only bound by law to rely on the information provided by the seller. Cherokee Timber is bound by their contract with IP to guarantee that any wood they deliver under gatewood contract agreements has a free and clear title. Cherokee Timber was paid for the four loads by IP and did have a timber contract with the landowner to cut and deliver wood to any avaliable market. Cherokee timber did pay the landowner for these four tickets that were turned in by Kynard.

Based on this information, I do not find evidence to support allegations that Cherokee Timber Company intended to steal wood from the Pogue's property. By their own admissions, Cherokee Timber's logger did cut timber from the Pogue Property in an area that was not supposed to be cut. This constitutes a civil matter between the parties as to the fair market value of the timber removed. I am attaching a copy of Alabama Law 9-13-62 that explains the liability of Cherokee Timber in this case.





DEFENDANT'S
EXHIBIT

9

URGENT FAX TO:      Mr. Chandler at 251-867-7302

July 26, 2005

TO:       Alabama Forestry Commission
          Mr. Tony Chandler
          South West Region
          State of Alabama

Request:    **Forestry Investigation and Enforcement Relief**

Dear Forestry Investigator:

This is a request for help stemming from criminal trespass, destruction of property and transporting and selling of stolen timber fiber from property located at *section eight, township eighteen north, at range ten east, Perry County Alabama.* The creek is dammed and blocked causing side wall erosion to the property.

The purchase of stolen timber fiber may be verified by local and surrounding mills inventory log sheets. Criminal activity probably got started in the month of June throughout the early weeks of July 2005.

Finally, I am asking that your division of state government review and investigate and cause justice to be done under the circumstances. I am willing to cooperate and sign the necessary papers should criminal justice authorities so require.

Sincerely, *Valessa A. R.*
V. Darden, Landowner and timber owner
Route 6, Box No. 334
Selma, Alabama 36701

Copy to U.S. Forestry Service and other state and federal agencies.

**DEFENDANT'S EXHIBIT**

10



INTERNATIONAL PAPER
RIVERDALE MILL
FIBER SCALE TICKET
06/30/2005 20:22:21

TICKET NUMBER:
PRIMARY CONTRACT:
SPECIES:
PRODUCT:
TRACT:
PRICE CODE:
TRAILER ID:         3105S-02
TRIP TICKET #:
PRODUCER:           33400 MARK KYNARD
COUNTY/STATE:       MACON, ALABAMA
SECONDARY HAULING:
DATE IN:            30/JUN/05 20:13
DATE OUT:           30/JUN/05 20:22
INBOUND WEIGHT:     74240 POUND
OUTBOUND WEIGHT:    20580 POUND
NET WEIGHT:         53660 POUND
NET TONS:           26.83 TON
SCALER:             E. HARRIS          9.33 cd
COMMENTS:

INTERNATIONAL PAPER
RIVERDALE MILL
FIBER SCALE TICKET
07/   2005

TICKET NUMBER:
PRIMARY CONTRACT:
SPECIES:            PINE (SOFTWOOD)
PRODUCT:            LONG PULPWOOD
                    NONE LISTED
TRACT:
PRICE CODE:         LH
TRAILER ID:         31055-02
TRIP TICKET #:
PRODUCER:           33400 MARK KYNARD
COUNTY/STATE:       MACON, ALABAMA
SECONDARY HAULING:
DATE IN:            01/JUL/05 18:59
DATE OUT:           01/JUL/05 19:10
INBOUND WEIGHT:     59840 POUND
OUTBOUND WEIGHT:    20760 POUND
NET WEIGHT:         39180 POUND
NET TONS:           19.59 TON
SCALER:             E. HARRIS          7.32 cd
COMMENTS:

DEFENDANT'S
EXHIBIT



INTERNATIONAL PAPER     (CNS)
MAPLESVILLE SAW MILL
FIBER SCALE TICKET
06/29/2005  15:05:53

TICKET NUMBER:
PRIMARY CONTRACT:   BUTT
VENDOR:             CHEROKEE TIMBER CO
                    INC
SPECIES:            PINE (SOFTWOOD)
PRODUCT:            TREE LENGTH MEDIUM
                    SAWLOGS
TRACT:              POPE
PRODUCER:           33400 MARK KYNARD
COUNTY/STATE:       MACON, ALABAMA
PRICE CODE:         06
TRIP TICKET #:
# OF STEMS:         34
AVG LENGTH:         25
TRAILER #:          31065-02
DATE IN:            29/JUN/05 14:58
DATE OUT:           29/JUN/05 15:05
INBOUND WEIGHT:     74260 POUNDS
DEDUCT WEIGHT:      0 POUNDS
OUTBOUND WEIGHT:    20800 POUNDS
NET WEIGHT:         53460 POUNDS
NET TONS:           26.73 TONS           9.99 cd
SCALER:             R. FIELD



INTERNATIONAL PAPER
RIVERDALE MILL
FIBER SCALE TICKET
06/29/2005 18:58:29

TICKET NUMBER:
PRIMARY CONTRACT:   BUTT
SPECIES:            PINE (SOFTWOOD)
PRODUCT:            RANDOM LENGTH
                    PULPWOOD
TRACT:              NONE LISTED
PRICE CODE:         LH
TRAILER ID:         31055-02
TRIP TICKET #:
PRODUCER:           33400 MARK KYNARD
COUNTY/STATE:       MACON, ALABAMA
SECONDARY HAULING:
DATE IN:            29/JUN/05 18:42
DATE OUT:           29/JUN/05 18:58
INBOUND WEIGHT:     62300 POUND
OUTBOUND WEIGHT:    20740 POUND
NET WEIGHT:         41560 POUND
NET TONS:           20.78 TON          7.76 cd
SCALER:             E. HARRIS




**ALABAMA FORESTRY COMMISSION**

TIMOTHY C. BOYCE
STATE FORESTER

RICHARD H. CUMBIE
ASST. STATE FORESTER



*Alabama Forestry Commission*
**2584 RIDGE ROAD**
**BREWTON, AL 36426**
**251-867-5368**

February 13, 2006

Mr. Paul Pogue
Old Mays Building
1704 Goode Street
Montgomery, AL 36104

Dear Mr. Pogue:

In our last telephone conversation, you asked me to send you a letter stating that you have never officially signed or filed a complaint in my office. I have a complaint in this office that was initially filed by your wife. I have been under the impression that this complaint concerned property belonging to both of you. I have recently been informed by you that this is a totally different matter. Apparently there was some misunderstanding between us concerning her initial complaint. Please accept my apology if this has caused you any inconvenience.

Sincerely,

Tony Chandler
SW Regional Investigator

**DEFENDANT'S EXHIBIT**

12

1704 Goode Street
Montgomery, Alabama 36104

October 14, 2005

Mr. Tony Chandler
Alabama Forestry Commission
Forestry Investigator
SW Region
Brewton, Alabama

Re:    Request for file disclosure    [Pogue Timber live and dead timber
Section 8 Township 18n Range 10e, Perry
County, Alabama]

Dear Mr. Chandler:

Forestry assets are missing from my property located in Perry County,
Alabama.  Please release a copy of your forestry investigative report.  A copy of your
report would be very much appreciated.  Thank You.

Sincerely,

PAUL POGUE

Copy to: Alabama Department of Environmental Management

TOTAL P.01



DEFENDANT'S
EXHIBIT

13



# M E M O R A N D U M

**Date:** October 20, 2005

**To:** Mr. Paul Pogue

**From:** Tony Chandler- SW Regional Investigator

**Regarding:** Request for Investigation Report

As you requested, I am submitting a copy of my investigation into the timber complaint on your property in Perry County, Alabama. Attached to the initial Incident/Offense Report you will find an Incident/Offense Supplement Report. My investigation notes and findings are written in the narrative sections of these reports. They are somewhat in chronological order as additional information has been obtained. You should also find a copy of the following documents:

A timber cutting contract signed with Todd Slusher, of Cherokee Timber Company.

Copies of four scale tickets representing the wood hauled from you property,

Copy of Alabama Forestry Law, Section 9-13-62.

A payment chart showing the amounts owed to you for each wood ticket. This chart also shows the average stumpage prices for the Southeast and the stumpage amount that you would be owed under AL 9-13-62. This is only an estimate based on stumpage prices at the time of your logging operation.

A copy of Timber Mart South average stumpage prices for the 2nd quarter of 2005.

If I can be of further assistance, please let me know.



**From:**
*Tony Chandler*
*Southwest Regional Investigator*
*2584 Ridge Road*
*Brewton, AL 36427*
*Telephone # 251-867-5368*
*Fax # 251-867-7302*

DEFENDANT'S
EXHIBIT

14



**ALABAMA FORESTRY COMMISSION**

TIMOTHY C. BOYCE
STATE FORESTER

RICHARD H. CUMBIE
ASST. STATE FORESTER



*Alabama Forestry Commission*
2584 RIDGE ROAD
BREWTON, AL 36426
251-867-5368

February 13, 2006

Mrs. Valissa D. Pogue
Route 6 Box 334
Selma, AL 36701

Dear Mrs. Pogue:

This letter is in reply to the timber complaint on your property in Perry County. After looking into the matter, Mr. Danny Clark and I have not uncovered any evidence to indicate that timber was stolen from your property. Mr. Todd Slusher, the timber buyer, has admitted that his logger Mark Kynard, cut and hauled four loads of timber from your property. He also admitted to me that he later discovered that the timber was cut in the wrong location, and that it was purely unintentional. He has offered to respond to a request from your attorney concerning any additional money that he may owe you for this timber. Considering the circumstances in this case, I feel that this complaint is civil in nature and does not constitute a criminal offense.

With that in mind, I would like to offer you the following options in handling this situation.

**Option 1.** If you do not agree with the wood ticket volumes, you can hire a consultant forester to estimate the volume and value of timber cut on your property. This is commonly called a stump cruise. A list of these individuals should be available at the Perry County Forestry Commission Office. After the cruise is completed, approach the timber buyer with your information and request a settlement. You can also ask for reimbursement of the expense of the stump cruise. You are entitled by state law (Section 9-13-62) to double the fair market value for the timber that was removed. In this case, since the timber was removed from an

DEFENDANT'S
EXHIBIT

15

area that was not authorized for cutting, you should be entitled to double the value of the wood when it was sold at market by Cherokee Timber. These figures would be available from the records at Cherokee Timber. Again, Mr. Slusher has indicated his willingness to settle this matter with you and your attorney. I feel that he will be willing to listen to any reasonable request concerning the matter.

**Option 2.** Retain a lawyer to handle the whole process in civil court.

Either way, I hope that you will be able to settle this matter to your satisfaction.


Sincerely,

Tony Chandler
SW Regional Investigator