IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PAUL POGUE,                          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        CIVIL ACTION NO. 2:06CV148-MHT
                                     )
TONY CHANDLER, et al.,               )
                                     )
            Defendants.              )

**AMENDED RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff Paul Pogue, proceeding *pro se*, brings this action against defendants Tony

Chandler and Danny Clark – employees of the Alabama Forestry Commission – in their

individual and official capacities. (Complaint, ¶¶ 4-5). Plaintiff alleges that he owns property

("Surveyors' Park") in Perry County and that, because of plaintiff's race, defendants failed

to respond to his complaints about theft of timber products from and damage to the property

inflicted by a non-party, Jimmy Ingram. Plaintiff contends that the defendants violated his

civil rights and asserts claims pursuant to 42 U.S.C. § 1983, § 1981(a) and § 1985.[1]

This action is presently before the court on the motion to dismiss or, in the alternative,

for summary judgment filed by defendants Chandler and Clark (Doc. # 24). By order

entered October 2, 2006 (Doc. # 26), the court advised plaintiff of the requirements for

---

[1]  Plaintiff has designated two counts in his complaint as "Count One," both asserting a
"[v]iolation of 42 U.S.C. § 1981(a) under 42 U.S.C. § 1983." (Complaint, pp. 9-10). A third count
– asserting a claim of "[v]iolation of 42 U.S.C. § 1985 and the Alabama Constitution – is designated
as "Count Two." Plaintiff has not alleged which provision of the Alabama Constitution he contends
has been violated and the court is unable to determine the basis for this claim. Accordingly, the
court treats "Count Two" of the complaint as a conspiracy claim pursuant to 42 U.S.C. § 1985 only.

responding to the motion and allowed him until October 18, 2006 to respond. Plaintiff has not filed a response to the motion. Upon consideration of the motion, the court concludes that it is due to be granted.

## Rule 12(b)(1) Standard

Defendants challenge the court's jurisdiction over this matter, arguing that plaintiff lacks standing to bring his claims before this court.

> Attacks on subject matter jurisdiction come in two forms: (1) facial attacks, and (2) factual attacks. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)(citing Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980).
>
> Facial attacks on a complaint "require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [plaintiff's] complaint are taken as true for the purposes of the motion." Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990). Factual attacks challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." Lawrence, 919 F.2d at 1529.

Scarfo v. Ginsberg, 175 F.3d 957 (11th Cir. 1999). If a defendant makes a factual attack on the court's jurisdiction, submitting evidentiary materials, the plaintiff is "also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981). In the present motion, defendants assert a factual attack on plaintiff's standing to maintain this lawsuit and have submitted evidentiary materials in support of their motion.

2

## The Summary Judgment Standard

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993). For issues on which the non-movant bears the burden of proof at trial, "the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ] – that is, point[ ] out to the district court – that there is an absence of evidence to support the non-moving party's case." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)(quoting U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991)(en banc)).

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

3

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

**Rule 56(f) Motion**

On November 3, 2006 – more than two weeks after the deadline for plaintiff's response to the motion for summary judgment – plaintiff filed a pleading styled "Plaintiffs'

4

Timely Objection and FRCP 56(f) Motion." (Doc. # 37).[2]  In his Rule 56(f) motion, plaintiff

argues:

> The plaintiffs are in need of court intervention to enjoy equal benefit and usage
> of the discovery process.  Discovery is vital in this case and desired by the
> plaintiffs.  The plaintiff are humbling [sic] complaining about the need to
> conduct discovery and the plaintiffs long ago raised objection to the way
> scheduling order originated[3] and the plaintiffs have shown good faith by
> enduring the discovery efforts of the defendants.  Plaintiffs will need the court
> to instruct the defendants to make themselves available for discovery and
> allow their depositions to be taken so that the plaintiffs may intelligently
> oppose the FRCP 56 efforts of the defendants.

(Doc. # 37, ¶ 3).

Plaintiff is not entitled to Rule 56(f) relief for a number of reasons.  First, the motion

is untimely.  Plaintiff's response to the present motion was due on October 18, 2006.

Plaintiff did not seek to extend this deadline before it expired and has not shown any cause

for his failure to do so.  Additionally, the motion is substantively insufficient.  In moving for

a continuance or stay pursuant to Rule 56(f), "'[t]he nonmovant may not simply rely on

vague assertions that additional discovery will produce needed, but unspecified, facts,' but

must show the court how the stay will operate to permit him to rebut, through discovery, the

movant's contentions."  Barfield v. Brierton, 883 F.2d 923, 931 (11th Cir. 1989)(quoting

---

[2]  In the "objection" portion of the pleading, plaintiff argues that defendants' motion for summary judgment is untimely, and objects to the court's October 3, 2006 order establishing a briefing schedule on the motion.  (Doc. # 37, ¶ 1).  The defendants' motion was, in fact, filed on the dispositive motion deadline and is timely.  By order entered November 16, 2006 (Doc. # 39), the District Judge overruled plaintiff's objection.

[3]  At the scheduling conference held in this matter on June 28, 2006, plaintiff objected to the entry of a Rule 16 scheduling order because the District Judge had not yet ruled on plaintiff's objection to the recommendation of the Magistrate Judge.

5

SEC v. Spence & Green Chemical Co., 612 F.2d 896, 901 (5th Cir. 1980)).

While plaintiff contends that discovery is "vital," he does not describe the nature of the evidence he expects to elicit in discovery or explain how that evidence will permit him to rebut defendant's contentions in the motion for summary judgment. Finally, the court's Rule 16 scheduling order provides that "[a]ll discovery shall be completed on or before October 30, 2006." (Doc. # 22, ¶ 3). Plaintiff filed no motion to compel in this case until the last day of the discovery period. (See Doc. # 33). The court denied the motion primarily because plaintiff had not previously sought discovery from the defendants pursuant to the Federal Rules of Civil Procedure and, thus, there was nothing to compel. (See Doc. # 35). Defense counsel represents that plaintiff "made no effort whatsoever to conduct any form of discovery" between the time the scheduling order was entered and the close of the discovery period, and plaintiff has not demonstrated otherwise. (Doc. # 38, ¶ 6).[4] Plaintiff has not demonstrated good cause for modification of the Rule 16 order and may not now engage in discovery. Thus, plaintiff's Rule 56(f) motion is due to be denied.[5]

## Standing

Defendants argue that plaintiff's claims are due to be dismissed for lack of standing. "In essence the question of standing is whether the litigant is entitled to have the court decide

---

[4] Plaintiff's verbal request that defense counsel have defendants present on the day of plaintiff's deposition so that plaintiff could depose them was not a sufficient notice under Fed. R. Civ. P. 30(b) and did not give rise to any obligation for defendants to appear for deposition. (See Conway aff. (Exhibit D to Motion for Summary Judgment), ¶¶ 3-4; Pogue depo., pp. 89, 122).

[5] The court likewise concludes that plaintiff is not entitled to an extension of the discovery period for purposes of responding to defendants' motion to dismiss on jurisdictional grounds.

6

the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975).

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. <u>Baker v. Carr</u>, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ." <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). <u>See</u> <u>Data Processing Service v. Camp</u>, 397 U.S. 150, 151-154, 90 S.Ct., 827, 829-830, 25 L.Ed.2d 184 (1970).

<u>Id</u>. at 498-99 (footnotes omitted).

To demonstrate the constitutional minimum requirement of standing, the plaintiff must establish that: (1) he has "suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical"'"; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)(citations omitted).

7

In addition to the constitutional requirements for standing, the Supreme Court has recognized prudential limitations on the exercise of federal jurisdiction.  To overcome prudential limitations on standing, a plaintiff must assert a harm that is not based on a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens," and must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of third parties."  Warth, *supra*, 422 U.S. at 499. Additionally, the statutory or constitutional provision on which the plaintiff's claim rests must be properly "understood as granting persons in the plaintiff's position a right to judicial relief." Id. at 500.

In his complaint, plaintiff alleges that he is the "owner of a development known to be a Park and located within the State of Alabama." (Complaint, ¶ 3a).  He further alleges that his park – Surveyors' Park – sustained "ground/soil damage and obliteration of unmanufactured forest products" and that he complained of these matters to the Alabama Forestry Commission. (Id., ¶¶ 9, 10).  Plaintiff asserts that a blue van occupied by seven white citizens "invaded" Surveyors' Park and left "[o]il and other environmental hazardous debris" on the ground of Surveyors' Park.  (Id.., ¶ 16).  Plaintiff contends that defendants Clark and Chandler, employees of the Alabama Forestry Commission, did not respond appropriately to his complaints regarding the condition of Surveyors' Park because of plaintiff's race.  (Id., ¶¶ 4, 5, 20-34).

Defendants point to plaintiff's deposition testimony, in which plaintiff testifies that

he asked the Forestry Commission to "look into matters that [Pogue] had regarding forestry products, missing forestry products." (Pogue depo., p. 17). He denied knowing where the "missing forest products" were located before they became missing or knowing who those products belonged to before they became missing. (Id., pp. 18-19). Plaintiff later testified, in contrast, that he owned the "unmanufactured forest products" at issue because he "assumed it, acknowledged it as [his], claimed it as [his]." (Pogue depo., pp. 29-30). Plaintiff testified as follows:

> Q. Where were the unmanufactured forest products located?
>
> A. That will be left up to an investigator to determine.
>
> Q. Were they located on property owned by Paul Pogue?
>
> A. "They" when you speak of, what are you talking about? I'm talking about ground/soil damage and obliteration of unmanufactured forest products.
>
> Q. Correct. And I'm asking about the forest products that this paragraph [paragraph 9 of the complaint][6] refers to. And what I'm asking is, where were they located?
>
> A. Like I don't understand your question. If you could rephrase your question, I could try to answer it, sir.
>
> Q. Okay. I'll try it another way. What are the unmanufactured forest

---

[6] In paragraph 9 of the complaint, plaintiff alleges: "Within two years of the filing of this Complaint, Plaintiff's Surveyors' Park sustained and experienced 'insurgency' and 'terrorist' style ground/soil damage and obliteration of unmanufactured forest products within the State of Alabama."

products that this paragraph is talking about?

A.  It's talking about that which is incorporated as, as I've said earlier, the enforcement authority at Alabama Forestry Commission.  So it's containing all earth science and all natural resources that can be contained within reason and what you would be referring to as earth science, earth natural resources.  That's dirt – that's dirt, bark, branches, leaves, whatever.

Q.  Okay.  And were the particular forest products that you're speaking of in this paragraph, were they located on property that you owned?

A.  I specifically state here that I experienced the insurgency and a terrorist-style ground/soil damage and obliteration of unmanufactured forest products within the State of Alabama, yes.

Q.  And was it on property that you owned?

A.  It's on property that I have authority over.  You need to understand, and I want to make this clear, when you start talking about ownership, it doesn't necessarily mean real property.  Ownership could mean personal property.  So Forestry products in this particular case and this particular matter would be talking about, as I've said, ground/soil damage and obliteration of unmanufactured forest products.  So, therefore, we're talking about personal property that I have.

Q, Who owned the real property where these unmanufactured forest products were located?

A.  I would not know that.  I can't answer that question.  But I can specifically answer that I owned the personal property for which I'm referring to here as unmanufactured forest products.

Q.  How did you come to own that personal property?

A.  Through assumption.  I assumed it.

10

Q.  How did you assume it?

A.  Assumed it, acknowledged it as mine, claimed it as mine.

Q.  What did you do in order to claim it as yours?

A.  I accepted it as mine, that which I've identified in paragraph 9.

Q.  Did you purchase it from somebody?

A.  I assumed it, sir.

Q.  I'm sorry, Mr. Pogue, but I don't understand what you mean by "assumed."

A.  Well, you have to rephrase your question.

Q.  Okay.  Did somebody give it to you as a gift?

A.  No one gave me a gift.

Q.  Did anybody give you a piece of paper that says you now own this personal property?

A.  No one gave me that, no paper.

Q.  What did you do in order to assume this personal property?

A.  I assumed it and claimed it as mine.

Q.  Did you tell anybody that this is now mine?

11

A.  Yes.

Q.  Who did you say that to?

A.  I told the public.

Q.  How did you tell the public?

A.  I announced it to the public.

Q.  When did you announce it to the public?

A.  Within the two years of the filing of this Complaint.

Q.  Was it on a particular day?

A.  Yes, it was on a day.

Q.  Do you know what day it was?

A.  No, I do not.  Can't recall.

Q.  Where were you located when you made that announcement?

A.  Before the public, sir.

Q.  Who was present?

A.  I do not recall, but there were several people present.

Q.  Can you tell me any of the people who were present?

A.  No, I cannot.

(Pogue depo., pp. 26-32).   Plaintiff further testified:

Q.  Did anybody cut timber belonging to Paul Pogue when they were not supposed to?

A.  I've got to get that answer from Tony Chandler and Danny Clark.

Q.  As we sit here today, do you claim that somebody came in and cut timber belonging to you when they had no permission to do so?

A.  I asked for an investigation and that investigation has not produced information for which I could rely on, sir.

Q.  Do you believe that you had timber, that you owned timber, that somebody else came in and cut when they were not supposed to?

A.  I can't answer that question.  I would object to it because it's asking me to describe or answer something that is broad and I cannot answer that question intelligently.

Q.  As of 2005, did Paul Pogue own any timber in Perry County, Alabama?

A.  I believe I owned forestry products unmanufactured and manufactured.

Q.  Did anybody come in and take those forestry products?

A.  That is left to the investigators.  I turned it over to the investigators, sir.

Q.  So you don't know one way or the other?

13

A. That's right. I turned it over to the investigators and they have not responded in a way that – I would need to take their deposition or do interrogatories to get that answer.

(Id., pp.. 155-56).

However, plaintiff also testified that he went to the Forestry Commission because of a "[f]orestry concern," but that the "forestry concern" was *not* "missing forest products," but "was a very broad concern, very broad." (Id., pp. 20). Plaintiff testified as follows:

Q. Was one of your concerns missing forestry products when you went to the forestry commission?

A. I think I went to the forestry commission, as I said, for the forestry commission to look into matters at that time that I was concerned about . . . within the scope of the Alabama Forestry Commission's authority pursuant to the Alabama law. So that would be inclusive of everything that the Alabama Forestry Commission would have anything to do with.

Q. Would you please tell me, then, all of the concerns that you took to the Alabama Forestry Commission at that time?

A. Well, I would adopt the Alabama laws as it relates to forestry issues as my concern. So it would be too volumous (sic) to really sit here and state that. But I would accept and adopt what the Alabama code says and what the administrative procedure acts and the publications of the forestry, that's what I would be concerned with.

(Id., pp. 21-22). He testified that he asked the forestry commission to investigate "any and all matters pertaining to forestry assets, manufactured and unmanufactured forestry products" belonging to anybody. (R. 119-20).

14

Defendant Clark testifies by affidavit that he met with plaintiff on July 5, 2005 to investigate a complaint that someone had wrongfully harvested timber from property in Perry County. (Clark aff., ¶¶ 5-7). Defendant Chandler testifies that he received a faxed complaint from Valissa Darden Pogue, plaintiff's wife, on July 26, 2005 concerning timber stolen from property located at "section eight, township eighteen north, at range ten east, Perry County Alabama" and that he spoke with both Ms. Pogue and plaintiff, who had differing views regarding how the matter should be resolved. (Chandler aff., ¶¶ 6-8 and Exhibit A).[7]  On October 15, 2005, plaintiff addressed a letter to defendant Chandler concerning "Pogue Timber live and dead timber Section 8 Township 18n Range 10e, Perry County, Alabama." The letter states, "Forestry assets are missing from my property located in Perry County, Alabama.  Please release a copy of your forestry investigative report."  (Pogue depo., pp. 113-17 and Exhibit 13 to Pogue depo.)  Plaintiff testified that the letter related to "a different matter that is not involving the case that we're in court about" and that it has nothing to do with the allegations of the present lawsuit. (Pogue depo., p. 113-14).  Plaintiff testified that the present lawsuit does not relate to or concern the cutting of timber. (Id., p. 11).  Plaintiff further testified that he does not own the real property "located at section 8, township 18 north, at range 10 east, Perry County, Alabama" and does not know who does own it. (Pogue depo., p. 101).

Plaintiff bears the burden of proving his standing to litigate his claims in this court.

---

[7]  Valissa Pogue signed the complaint as "Landowner and timber owner." (Id.).

As noted above, this burden requires that plaintiff establish, *inter alia*, that he has suffered an injury in fact – a concrete, particularized invasion of a legally protected interest.  <u>See</u> <u>Lujan</u>, *supra*, 504 U.S. at 560-61.  The evidence of record does not support a conclusion that plaintiff has suffered an injury to any legally protected interest.  While plaintiff appears to take issue with the manner in which Clark and Chandler resolved a complaint that plaintiff made to the Alabama Forestry Commission, the evidence does not demonstrate the existence of or nature of any injury to any legally protected interest of the plaintiff.  Plaintiff apparently claims that Clark and Chandler erred in the manner in which they responded to his request that the Alabama Forestry Commission investigate his concerns relating to "the Alabama laws as it relates to forestry issues . . . what the Alabama code says and what the administrative procedure acts and the publications of the forestry," *i.e.*, "any and all matters pertaining to forestry assets, manufactured and unmanufactured forestry products" belonging to anybody.  (Pogue depo., pp. 21-22, 119-20).  Allowing plaintiff to maintain his claims to redress the manner in which Clark and Chandler perform the function of investigating "any and all matters pertaining to forestry assets" would exceed the prudential limitations on standing.  Plaintiff may not base his claims on a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens.'"  <u>Warth</u>, *supra*, 422 U.S. at 499.[8]  In short, plaintiff has not shown that he has personally been harmed by any action or

_____

[8] In their affidavits, Clark and Chandler both testify that they investigated a complaint from plaintiff (or his wife, Valissa Darden Pogue) regarding the unauthorized cutting of timber from property in Perry County.  (Clark aff., ¶¶ 5-7; Chandler aff. ¶¶ 5-19).  As noted above, plaintiff testified in his deposition that this action against Clark and Chandler does not relate to the cutting

inaction on the part of Clark or Chandler.[9]   Thus, plaintiff has not carried his burden of

establishing that he has standing to maintain this action and this action is due to be dismissed

pursuant to Rule 12(b)(1).

## Motion for Summary Judgment

In the alternative, even if plaintiff has standing to maintain this action, defendants are

entitled to summary judgment.    As defendants argue, plaintiff's § 1983, § 1981 and

§ 1985(3) claims require proof of intent to discriminate.   See Jackson v. Bellsouth

Telecommunications, 372 F.3d 1250, 1270 (11th Cir. 2004)(section 1981); Sweet v.

---

of timber. (Pogue depo., p. 11). Plaintiff further testified that his October 15, 2005 letter to Chandler concerning the investigative report on missing forestry assets related to "a different matter that is not involving the case that we're in court about" and that it has nothing to do with the allegations of this lawsuit. (Id., pp. 113-17).  Plaintiff testified that he asked Clark to investigate his allegations that white citizens in a blue van left oil, trash and debris "on the strip of land [which plaintiff does not own] where the personal property which we're referring to as Surveyors' Park" was located. (Pogue depo., pp. 28-35, 66-69, 84-86 ).  Plaintiff has testified that he "assumed" ownership of the personal property he refers to as Surveyors' Park by announcing his claim to several unidentified people within two years of filing the complaint, but this evidence is insufficient to establish that plaintiff has an ownership interest in the "ground/soil" and "unmanufactured forest products" located on real property owned by someone else.  He claims to be aggrieved by Clark's and Chandler's failure to file criminal charges relating to the "blue van" incident.  (Id., pp. 124-25).  A "private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another."  Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973)(affirming dismissal for want of standing).  Additionally, plaintiff appears to be attempting to assert either the rights of third parties or generalized grievances.

[9]  The court recognizes that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing'" and that standing does not depend on the merits of the plaintiff's contention that particular conduct is illegal. Warth v. Seldin, 422 U.S. 490, 500 (1975).  However, in this case, the evidence does not even establish the particular conduct on the part of Clark and Chandler that is alleged to violate plaintiff's legal rights.  This is so despite diligent questioning of the plaintiff by defense counsel during plaintiff's deposition.

Secretary, Dept. of Corrections, 467 F.3d 1311, 1318-19 (11th Cir. 2006)(equal protection)

and Park v. City of Atlanta, 120 F.3d 1157, 1161 (11th Cir. 1997)(section 1985). Defendants

argue that plaintiff cannot establish this element of his claims, and the court concurs. In his

deposition, plaintiff alleged discrimination, but he has produced no evidence of specific facts

which would permit an inference of discrimination. Plaintiff testified as follows:

> Q. What is it that you wanted Mr. Clark to look into?
>
> A. Wanted Mr. Clark to apply his authority as an investigator and determine exactly what had happened to the property in terms of destruction to the land, destruction to the real property,[10] just what had happened to change the character in relationship of Surveyors' Park as I knew it to be, which it wasn't after those matters were brought to the attention of the forestry commission. So it was a continuation of my complaint.
>
> Q. What destruction of property are you speaking of?
>
> A. Well, you've got, as I said earlier, we had oil everywhere. We had chemicals everywhere. We had all types of things out there that the forestry commissions deal with.
>
> Q. Did Mr. Clark look into these things?
>
> A. He said that he would.
>
> Q. Do you know if he did or not?
>
> A. Well, from all indication, nothing was done as agreed to by myself and Mr.

---

[10] As noted above, plaintiff testified that he did not own this real property and did not know the identity of the owner. (Pogue depo., pp. 28-35).

Clark.

Q.  Do you know whether or not Mr. Clark investigated?

A.  According to Mr. Clark, he said he investigated the matter.

Q.  Do you have any reason to believe that he did not investigate the matter?

A.  I have reason to believe that he didn't do an adequate investigation or his investigation was slanted for racial reasons.

Q.  That's a very serious allegation, Mr. Pogue.  What is it that you think – what makes you believe that Mr. Clark's investigation was slanted for racial reasons?

A.  First of all, as it was understood and determined out there on the property, all of these people that were involved in what we're talking about, which makes the basis of this Complaint, were white people.  And for the destruction to take place and for the theft to take place and all other matters to take place that were wronged to myself and Surveyors' Park, they were all white people. And if you're looking at the forestry and related laws, it specifically tells you what you must do and what you must not do irrespective of race, color, creed, national origin.

Q.  Do you have any evidence that Mr. Clark discriminated against you on the basis of your race?

A.  All indications that I think a jury, if they were to hear the facts, they will conclude that definitely not only was I discriminated and denied equal benefits under the workings of the law, but also it would be clearly shown that due to the nature of the matters and those involved and equipment involved, which are owned by white people, caused Mr. Clark to do nothing, which would benefit all white people.

Q.    What evidence do you have, if any, that Mr. Clark handled his

19

investigation in particular ways because of either your race or the race of the other people involved?

A.  Well, he knew my race and he also knew the race of all those people that were involved.  Plus, if you understand the Alabama law as it relates to forestry laws, you'll understand that he has the full range of authority to get to the bottom of what was going on and to ascertain what needed to be done and what needed not to be done at his discretion, and he went above and beyond that.  And one of the first and early on matters that seems to suggest that he was somehow connected to a racial effort to not do was when he congregated with those that actually had actually done wrong and were getting away from the property.  So you got different people, different groups of people that were involved.

Q.  Okay.  And you said because you saw Mr. Clark with those other groups of people, that leads you to believe that he discriminated against you?

A.  Well, in order to provide discrimination, I would think, and I'm not a judge or justice of the supreme court.  I'm not a person who would deal with the writing of the laws and interpreting the laws.  But I would think that the way that I would want to make the allegation, say that this took place, would be to find whether or not the forestry commission has done similar matters or how have they treated – treated white people.  And I think that there will be enough information, again, once the discovery is done, to confirm this particular matter.  But I would leave it to the judge and jury.

Q.  Do you have any facts or investigations or information or evidence that the forestry commission has treated black people differently from white people?

A.  Mr. Conway is not in here, but I think I spoke with him by phone – and he's supposed to be a forestry commission attorney – and I asked that we do the deposition of Clark and Chandler all in one day so that we wouldn't have the cart before the horse today are the people that were blessed and entitled with the Alabama law of protection to investigate matters.  I was not given that authority to do so.  So I would need to question those particular people extensively to come to the conclusion.  But as it stands now, I would rely on the judge and jury to conclude that.

20

MS. BRELAND: Do you have any personal knowledge of any discrimination by Mr. Clark or Mr. Chandler against any other person than yourself?

MR. POGUE: I would have to – please do understand that I do not recognize Clark and Chandler as the forestry commission. I recognize them as agents. So I would be looking at what the forestry commission has done, what the forestry commission continues to do, a pattern and practice there.

Q. Do you have any information that Mr. Clark or Mr. Chandler have discriminated against anybody as a result of their race?

A. Yes, myself. And that's what this case is about.

Q. All right. And the reason that you believe that they discriminated against you is because you were black and because they and the other people involved are white; is that correct?

A. I'm saying that the forestry laws would dictate bearing out the truth of the race and the truth of how I was treated versus how others were treated by the forestry commission --

Q. Have --

A. – under like and similar circumstances.

Q. Have you told me all the evidence or facts that you have available to you today that suggest that Mr. Clark or Mr. Chandler discriminated against you on the basis of race?

A. Well, as I said earlier, my Complaint speaks for itself. And I'm incorporating my Complaint in my entire conversation. But as I said, Mr. Conway did not make Chandler nor Clark available to me so that I can take their depositions and get the information that I know that they would have to make my case for racial discrimination. So discovery is just beginning.

Q. Okay. But you've told me everything that you know up to today, correct, about any discrimination?

A. I've explained to you that according to the laws and according to who I am and according to who others were and under like and similar circumstances, I would think, and I strongly believe, that racial discrimination has occured. I also believe that my rights as a citizen have been violated, and any protection clause should support me in this effort.

\* \* \* \* \*

Q. Mr. Pogue, paragraph 22 of your Complaint says that, Tony Chandler and Danny Clark, quote, denied Plaintiff an opportunity to file criminal complaints, closed quote. How did they deny you an opportunity to file a criminal complaint?

A. Well, my role as a citizen would be to ask that a criminal complaint be filed. I asked that a criminal complaint be filed pertaining to the matters that I allege in this lawsuit, and nothing happened.

Q. What type of criminal complaint did you wish to raise?

A. Well, that which is cited in the Alabama related laws manual, all those that a law enforcement official and employee of the forestry commission can conceivably file.

Q. Do you think somebody broke the law with respect to personal property owned by you?

A. I can't make that determination. As I said, I'm dealing with law enforcement. I'm not the investigator.

Q. Okay. At the bottom of that page it says that these people, quote, failed to provide plaintiff with the same and similar services as was provided to white citizens. Are you saying that white citizens got better treatment than you did

from Mr. Chandler and Mr. Clark?

A.  Around the well – around the well, the conversation led me to believe that.

Q.  What was said that led you to believe that?

A.  If I had been a white person, something would have been done for me.

Q.  Who said that?

A.  The people around the water well.

Q.  Could you tell me the names?

A.  No, sir.

Q.  Is there anything else that leads you to believe that Tony Chandler and Danny Clark would have given white people better treatment than they gave to you?

A.  That's what the conversation in the community around the water well suggested to me.

Q.  Could you name me any white person who has received better treatment from the forestry commission than you?

A.  I would have to get that information from Chandler and Clark.

Q.  As we sit here today, do you know of any white people who got better treatment than you?

A.  That would be in the forestry commission's office.  I don't have that

information.

Pogue depo., pp. 85-92, 124-27.

Because plaintiff has produced no evidence permitting an inference of discriminatory treatment or discriminatory intent, defendants are entitled to summary judgment on plaintiff's claims.

Additionally, to the extent plaintiff brings claims for damages against Clark and Chandler in their official capacities as employees of the Alabama Forestry Commission, the claims are barred by the Eleventh Amendment.  Under the Eleventh Amendment, a state is generally immune from lawsuits brought in federal court by citizens of the state.  Hans v. Louisiana, 134 U.S. 1 (1890).  The state's Eleventh Amendment immunity extends to agents and instrumentalities acting as an "arm of the state."  Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003).  The State of Alabama has not waived its Eleventh Amendment immunity, nor has Congress abrogated that immunity in § 1983 or § 1985 cases.  Cross v. State of Alabama, 49 F.3d 1490, 1502 (11th Cir. 1995);  Carr v. City of Florence, 916 F.2d 1521, 1524 (11th Cir. 1990);  Free v. Granger, 887 F.2d 1552, 1557 (11th Cir. 1989);  Alabama Constitution of 1901, Article 1, § 14 ("[T]he State of Alabama shall never be made a defendant in any court of law or equity.");  Fincher v. State of Florida Dept. of Labor and Employment Security-Unemployment Appeals Commission, 798 F.2d 1371, 1372 (11th Cir. 1986)("We find no express congressional abrogation of the state's Eleventh Amendment immunity with respect to 42 U.S.C. § 1985 actions.").

Further, Clark's and Chandler's affidavits establish that they were acting within the scope of their discretionary authority in determining how to investigate and resolve plaintiff's complaints.  Since plaintiff has failed to introduce evidence permitting a conclusion that defendants violated plaintiff's statutory or constitutional rights, Clark and Chandler (in their individual capacities) are entitled to qualified immunity on plaintiff's § 1983 and § 1981 claims.  See Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1167 (11th Cir. 2005)(if, viewed in the light most favorable to the party asserting the injury, the facts do not demonstrate violation of a constitutional right, qualified immunity is established without further inquiry)(citing Saucier v. Katz, 533 U.S. 194, 201 (2001)); Cook v. Gwinnett County School Dist., 414 F.3d 1313, 1315 (11th Cir. 2005).[11]

## Motions to Strike Party-Plaintiff and Fictitious Parties

Plaintiff brings this action as "Paul Pogue" and as "Paul Pogue, in his capacity as owner of Surveyors' Park."  These are not separate legal entities.  See Pogue depo., pp. 24-25 (Pogue is doing business as Surveyors' Park; Surveyors' Park is a "division of Paul Pogue"; "Surveyors' Park is a part of me and I am the plaintiff in this lawsuit and, therefore, to that extent it is a part of the lawsuit.").  In addition to Chandler and Clark, plaintiff sues fictitious defendants A, B, and C "who are those people, partnerships, associates, corporations or agents who participated in the actions made the basis of this Complaint . . ."

---

[11]  The defense of qualified immunity is not available with regard to plaintiffs § 1985(3) claim.  Burrell v. Board of Trustees of Georgia Military College, 970 F.2d 785, 794 (11th Cir. 1992); see also Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1379-80 (11th Cir. 1997).

(Complaint, p. 1). Plaintiff has not otherwise identified these defendants (see Complaint, ¶¶ 3-6), and the deadlines for conducting discovery and for amending the complaint have now passed. See Doc. # 22; see also Lewis v. City of Montgomery, 2006 WL 1761673, * 2 (M.D. Ala. 2006)("In general, 'fictitious party pleading is not permitted in federal court.'"). Accordingly, defendants' motion to strike party-plaintiff (Doc. # 11) and defendants' motion to strike fictitious parties (Doc. # 12) are due to be granted.

## CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that:

(1) defendants' motion to strike party-plaintiff (Doc. # 11) be GRANTED;

(2) defendants' motion to strike fictitious parties (Doc. # 12) be GRANTED;

(3) plaintiff's Rule 56(f) motion (Doc. # 37) be DENIED;

(4) defendant's motion to dismiss or, in the alternative, for summary judgment (Doc. # 24) be GRANTED, and that plaintiff's claims be DISMISSED pursuant to Fed. R. Civ. P. 12(b)(1), as plaintiff has failed to establish that he has standing to maintain this action or, in the alternative, that summary judgment be entered in defendants' favor on plaintiff's claims; and

(5) that defendants' motion for requests for admission to be deemed admitted (Doc. # 25) and motion to amend/correct motion for requests for admission to be deemed admitted

(Doc. # 31) be DENIED as MOOT.

The Clerk of the Court is ORDERED to file the Recommendation of the Magistrate Judge and to serve a copy on the parties to this action. The parties are DIRECTED to file any objections to this Recommendation on or before March 9, 2007. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. Resolution Trust Co. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989).

Done, this 23rd day of February, 2007.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

27